## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSSEAN CRISPIN, | ) | CASE NO. 3:21-cv-00475 (KAD) |
| *Plaintiff,* | ) | |
| v. | ) | |
| | ) | |
| PEIRI, et al., | ) | APRIL 13, 2023 |
| *Defendants.* | ) | |

## <u>INITIAL REVIEW ORDER</u>

Kari A. Dooley, United States District Judge:

Plaintiff, Jossean Crispin ("Crispin"), a now former prisoner, filed this civil rights complaint *pro se* pursuant to 42 U.S.C. § 1983 against defendants, Dr. Peiri, APRN Sara Torres, Dr. Patel, HSARC Cinthia Nadeau, Mental Health Staff Jackson 1, Mental Health Staff Jackson 2, Mental Health Staff Callahan, Mental Health Staff Barbara K., APRN Andrea Reischerl, APRN or Dr. Jane Doe, Dr. Craig Burn, Dr. Kocienda, Warden Hannah, Commissioner Rollin Cook, RCOO Green, RCOO Richard Fiery, Deputy Warden Egan, Population Management Director Dave Maiga, District Administrator Nick Rodriguez, and Correctional Officer John Doe, each in his or her individual and official capacities. Crispin contends that the defendants were deliberately indifferent to his mental health needs by failing to treat his mental illness and failing to acknowledge and address the psychological effects of solitary confinement. He brings several claims ancillary to this claim and seeks damages as well as declaratory and injunctive relief.[1]

**Standard of Review**

Under Section 1915A of Title 28 of the United States Code, the Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails

---

[1] As Crispin is no longer in the custody of the Department of Correction ("DOC"), all claims against defendants in their official capacities and for injunctive relief are moot.

to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. *See id.* In reviewing a *pro se* complaint, the Court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[]." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants). Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

**Allegations**

On February 2, 2018, Crispin was sent to Garner Correctional Institution ("Garner") for the second time and was kept on suicide watch after he had been assaulted by a correctional officer. *Id.* ¶ 3. During this stay, he was not permitted to file any complaints. *See id.* In response to Crispin's question whether he could remain at Garner, Deputy Warden Egan stated, "they don't want me there." *Id.* Crispin attributes the response to the fact that he files many grievances. *See id.* ¶ 4. Crispin was sent to Northern Correctional Institution ("Northern"), where he suffered "acute and severe and fast mental decompensation," resulting in his transfer to Whiting Forensic Hospital. *Id.* ¶ 5. These actions are the subject of a different lawsuit. *See id.*

While housed at MacDougall-Walker Correctional Institution ("MacDougall"), Crispin became so unstable and delusional that he was forced into in-patient suicide watch and sent to Garner for the third time. *See id.* ¶ 9. When Crispin asked why he was not permitted to remain at

Garner and receive mental health treatment, Deputy Warden Egan told Crispin that he was "not wanted here." Soon thereafter, Crispin was sent back to administrative segregation. *Id.* As a result, Crispin was placed in dangerous situations and was assaulted by correctional officers. The incidents with correctional staff are the subject of different lawsuits. *Id.* ¶ 10.

Upon his return to phase one of the Administrative Segregation Program, Crispin mentally decompensated and was sent to Garner for a fourth time. *See id.* ¶ 12. This was in July 2019. Crispin was suffering from schizophrenia and the effects of solitary confinement. *See id.* ¶ 1. Dr. Patel switched his medications. *See id.* ¶ 13. Crispin told Dr. Patel and CSW Bentos that switching his medication would not help his condition because his mental breakdowns were caused by the effects of solitary confinement. They ignored him. *See id.*

Crispin's schizophrenia medication was changed. *See id.* ¶ 14. The new medication caused him to experience severe dizzy spells, which caused him to fall and bump into walls. *See id.* ¶ 15. He complained to Dr. Patel and CSW Bentos about the side effects and said the new medication was causing him to become suicidal. *See id.* ¶ 16.  Dr. Patel ignored his complaints, and soon after, had Crispin transferred to solitary confinement at Northern. *See id.* ¶ 17. Crispin alleges that he was transferred when he began to file grievances. *See id.* ¶ 2.

Within two weeks, Crispin's mental state worsened, and he became suicidal. *See id.* ¶¶ 19–20. He alleges that the picture of his son was the only thing that prevented him from committing suicide. *See id.* ¶ 21. A nurse put Crispin on suicide watch. *See id.* ¶ 22.

Crispin explained what had happened at Garner to Dr. Jane Doe. *See id.* ¶ 23. He told her about the change to his medication, the side effects, his worsening mental health and suicidal ideations, and the effects of solitary confinement. *See id.* Dr. Doe refused to document Crispin's

complaints. *See id.* ¶¶ 24–25. Dr. Doe discontinued the medication Dr. Patel had prescribed and prescribed new medication to counter the side effects of the prior medication. She also kept Crispin on medical observation. *See id* ¶ 27.

While on medical observation, Crispin was seen by Dr. Doe and RCOO Fiery and asked about the incident with Dr. Patel as well as the continuing issues with Garner. *See id.* ¶ 28. Dr. Doe and RCOO Fiery said they wanted to send Crispin back to Garner for mental stabilization. *See id.* ¶ 29. They assured him that whatever had happened at Garner before would not happen this time. *See id.* ¶ 30. Crispin expressed his skepticism and belief that all doctors throughout the Department of Correction "stick together and cover for each other." *Id.* ¶ 31. Crispin was assured that the Commissioner and Health Director of the Department of Correction would supervise his treatment at Garner. *See id.* ¶ 32. This did not occur. *See id.* ¶ 33. Upon his return to Garner, Crispin was told that he would undergo testing but that the testing could not start until he was removed from all medications. Crispin said that was not his understanding but agreed if it would help with his treatment. *See id.* ¶ 34.

The removal of his medication caused Crispin to become more mentally unstable. *See id.* ¶ 35. He considers his conditions of confinement worse than at Northern: he could see no daylight when in his cell, was refused all property, and had to "battle" to get his legal work. Dr. Peiri and APRN Torres refused to document his condition. They told him he did not have any mental illness; everything was "all in his head." *See id.* During their sessions, APRN Torres discouraged, and refused to document, Crispin's reports of mental psychosis. *See id.* ¶¶ 36–37. Instead of discussing treatment, APRN Torres asked questions about Crispin's criminal case and his civil lawsuit. *See id.* ¶ 40. When Crispin tried to discuss his treatment, APRN Torres would tell Crispin what

treatment topics he could discuss and would end the session if he deviated from her chosen topics. *See id.* ¶ 41. APRN Torres would not permit Crispin to talk about his serious mental health concerns. *See id.* ¶ 42.

During one session, Correctional Officer John Doe made a sexually suggestive comment to APRN Torres, who laughed it off. *See id.* ¶¶ 45–46. The comment made Crispin uncomfortable. He made a PREA complaint, which was ignored. *See id.* ¶ 47.

Correctional staff and inmate workers often walked unannounced into Crispin's sessions with APRN Torres. *See id.* ¶ 48. When Crispin complained that this violated his confidentiality, APRN Torres ignored him. *See id.* ¶ 49. Crispin reported his issues with APRN Torres to supervising psychologist Dr. Peiri. The doctor told Crispin to ignore it and continue with his testing. *See id.* ¶ 50.

Crispin complained that he could not see the test documents without his glasses and that trying to focus without his glasses was causing headaches. *See id.* ¶ 51. Instead of his prescription glasses, Crispin was given reading glasses (that he had mistakenly purchased in the commissary when he could not see the order form properly) and was told to work with what he had. *See id.* ¶ 52.

Crispin learned that Dr. Peiri was not calling Crispin from his cell for treatment sessions because APRN Torres was falsely documenting cell-side conversations as treatment sessions. *See id.* ¶ 53. Crispin was not provided group therapy. *See id.* ¶ 54. Dr. Peiri told Crispin that he could not attend group therapy because he was considered a security risk; Crispin was being double cuffed to ease the stress on his wrists and hands. *See id.* ¶ 55.

Dr. Peiri submitted a declaration in another of Crispin's cases stating that Crispin had no

mental illness even though Department of Correction records document a long history of severe mental illness. *See id.* ¶¶ 56–57.  In addition, Dr. Peiri was aware of his mental illness, because in 2016-17, she had treated Crispin at Garner for schizophrenia for nearly a year. *See id.* ¶ 58.

Commissioner Cook and Health Director Kocienda assigned APRN Reischerl to supervise Crispin's treatment and testing at Garner. *See id.* ¶ 62. Crispin sought to speak to APRN Reischerl about his claims of denial of treatment, mental torture, sexual harassment, and deliberate indifference. She did not speak to him for nearly a month. *See id.* ¶ 63. APRN Reischerl disregarded Crispin's complaints, all of which he has alleged here, and told him to "go with the flow." *Id.* ¶ 64. Soon after this conversation, Crispin was removed from in-patient mental health observation. *Id.* ¶ 66. Crispin learned, through discovery responses in another case, that Dr. Peiri falsely stated that Crispin refused to do the tests and was malingering. Crispin alleges that he could not take the test because he could not read it, and Dr. Peiri refused him his prescription glasses. *Id.* ¶ 67.

Crispin complained about the denial of treatment, false documentation, and manipulation to Defendants Cook, Kocienda, Burn, Green, Hannah, Torres, Egan, Barbara K., Nadeau, Jackson 1, Jackson 2, Reischerl, Jane Doe, and Fiery. After he notified the Defendants of the denial of treatment, Crispin was placed in solitary confinement in the Administrative Segregation Program at Garner. *See id.* ¶ 68. His schizophrenia medication was discontinued. When Crispin tried to address this issue with Dr. Peiri and APRN Torres, they refused to speak of it, and if Crispin persisted, terminated his session. *Id.* ¶ 70

In the following months, Crispin's condition worsened until he could not mentally function well enough to get out of bed. Crispin would sleep for 20-22 hours per day to hide from his mental

illness and visual-audio hallucinations and went nearly a month without showering *See id.* ¶ 71. Crispin submitted many letters, inmate requests, and grievances, all of which were ignored. *See id.* ¶ 72. Crispin sought mental health preventive intervention, which was denied. *Id.* ¶¶ 73–74. He cut his arms and wrist "to battle against (the Audio-Visual-Hallucination) to stay in touch with reality." *Id.* ¶ 76.

In the evening of November 3, 2019, while in solitary confinement at Garner, Crispin became depressed. He began hallucinating and was unable to cope on his own. *Id.* ¶ 78. Crispin asked a correctional officer if the mental health worker had toured the unit that evening. *See id.* ¶ 79. When the officer said no, Crispin tried to maintain control. *See id.* ¶¶ 79–80. When Mental Health Staff Callahan toured the unit, Crispin tried to stop her to seek mental health preventive intervention because he was "spiraling out of control and desperately needed help." *Id.* ¶ 81. Defendant Callahan said she had to go and left the unit without helping Crispin.  *See id.* ¶ 82. To battle the hallucinations and stay connected to reality, Crispin cut his forearm. *See id.* ¶ 83.

The following day, Crispin tried several times to speak with Mental Health Staff Barbara K. *See id.* ¶ 84. He also sought treatment from Nurse Jane Doe who falsely reported that Crispin had scratched himself and was concerned about infection. *See id.* ¶ 85. Nurse Doe did not report Crispin's complaints about the denial of mental health intervention by Defendant Callahan or his decompensation. *See id.* ¶¶ 86–87. Crispin was provided mental health treatment "late in the shift" on what he thinks was November 4, 2019. *Id.* ¶ 89. Also on November 4, 2019, Crispin submitted an inmate request to Dr. Peiri describing the incident with Defendant Callahan but received no response. *See id.* ¶ 90.

On November 5, 2019, Crispin met with CSW Barbara K. She talked about Crispin's

psychological difficulties but refused to discuss the November 3, 2019 incident. *See id.* ¶ 91. Crispin saw CSW Barbara K. again on November 6, 2019. She said she would give him a packet to help with grounding coping skills but would not discuss the November 3, 2019 incident or the discontinuance of Crispin's schizophrenia medication. *See id.* ¶ 92. And on November 7, 2019, Crispin asked Defendant Callahan why she did not stop at his cell on November 3, 2019 when he was in crisis. *See id.* ¶ 101. Defendant Callahan told Crispin that he was classified as Mental Health-Level 3, and he could submit a request if he needed mental health treatment. *See id.* ¶ 102. On November 15, 2019, Dr. Peiri came to Crispin's housing unit and signed the logbook as if she had toured the unit. She ignored Crispin's calls to speak to her. *See id.* ¶ 103.

On November 19, 2019, Crispin met with APRN Torres. He described his "mental torment" and hallucinations and stated that solitary confinement was exacerbating his condition. *See id.* ¶ 104. Crispin also stated that he needed schizophrenia medication because he keeps "going in and out of a psychotic mental decompensation that precipitate suicidal ideations and self-injurious psychotic decompensation." *Id.* APRN Torres told Crispin that his reports of severe mental health issues were normal and provided him no help. *See id.* ¶ 105. On December 8, 2019, Crispin repeated the same claims he reported to APRN Torres in an inmate request to her seeking reinstatement of schizophrenia medication. She ignored the request. *See id.* ¶ 106.

On December 11, 2019, Crispin experienced intense hallucinations, suicidal ideation, and self-injurious thoughts. He stopped Defendant Callahan but was "blown off again." *See id.* ¶ 107.

In the morning of December 18, 2019, Crispin asked two correctional officers and his unit counselor to obtain mental health assistance because his psychotic state had deteriorated, and he was experiencing torment, depression, hallucinations, and psychotic thought patterns. *See id.* ¶¶

108–10. Nothing was done. *See id.* ¶ 109. Crispin spoke to CSW Barbara K. in the afternoon of December 18, 2019 when she was touring the unit. *See id.* ¶ 111. She told Crispin that he does not "dictate when Mental Health sees you." *Id.* ¶ 112. Crispin asked CSW Barbara K. to pull him from his cell so he could speak to her regarding confidential mental health information, but she refused to do so. *See id.* ¶¶ 113–14. When Crispin tried to tell her of his mental health emergency, she walked away. *See id.* ¶ 117.

Crispin's mental state worsened, and he had suicidal ideations and engaged in self-harm. *See id.* ¶ 119. Crispin was left cut and bleeding and suffering from hallucinations during first shift. *See id.* ¶ 120. Later in the day, Crispin's hallucinations subsided, and his mental condition stabilized. Crispin stopped CSW Jackson 1 during her unit tour and told her everything that had happened on first shift. Crispin emphasized his need that he be seen privately so his medical information could not be used to make fun of him or provoke him. *See id.* ¶ 121. CSW Jackson 1 refused to provide mental health treatment. *See id.* ¶ 122. When Crispin asked why it was such an issue, CSW Jackson 1 told him that Dr. Peiri ordered all mental health staff not to remove prisoners from their cells unless it was for a scheduled session. *See id.* ¶¶ 123–24.

Crispin covered his cell window to obtain mental health treatment, but correctional staff ignored the covered window. *See id.* ¶ 126. An hour later, two lieutenants came to Crispin's cell. When Crispin described the day's events and his attempts to obtain medical and mental health treatment, the lieutenants agreed that he was not being treated properly and his medication should not have been discontinued. They called the mental health unit and ordered CSW Jackson 1 and Nurse John Doe to provide medical care for his wound and a therapeutic session for his mental health issues. *See id.* ¶ 127.

On January 18, 2020, Crispin went to the medical unit to review his medical and mental health records. *See id.* ¶ 128. He observed that none of the events of December 18, 2019 were documented in the records. *See id.* ¶ 129. Crispin submitted an inmate request to RCOO Green to address "the matter of false documentation." *Id.* ¶ 131. RCOO Green questioned the medical providers and responded that Crispin had not requested treatment on December 18, 2019. *See id.* Crispin contends that video surveillance will show that he did receive treatment. *See id.* ¶ 132.

Crispin alleges that the incidents he described above occurred repeatedly from July 2019 through April 2020, the period he was confined at Garner. *See id.* ¶¶ 133–34. When Crispin was transferred to Cheshire Correctional Institution upon completion of the Administrative Segregation Program, his schizophrenia medication was restored. *See id.* ¶¶ 135–36, 139, 141.  In 2021, he was placed on single-cell status because of his mental illness. *See id.* ¶ 142.

Garner and MacDougall are the two correctional facilities equipped to handle prisoners with severe mental health or medical illnesses, as they are the only facilities with 24-hour mental health care and in-patient facilities. Both facilities refuse to house Crispin on a permanent basis. *See id.* ¶ 138.

Crispin also alleges that on February 6, 2021, he was in phase one of the Administrative Segregation Program. He was experiencing audio-visual hallucinations. *See id.* ¶ 6. "It was recommended" to Dave Maiga that Crispin should be sent to Garner for mental health treatment. Maiga and the administration ignored the recommendation. *Id.* ¶ 7. As a result, Crispin experienced what he describes as "almost two years of psychological and physical torture."[2] *Id.* ¶ 8.

---

[2] Crispin filed this action on April 5, 2021, only two months after this incident. Thus, Crispin is either mistaken about the date he was in phase one or the length of time he allegedly suffered after the decision not to transfer him to Garner.

**Discussion**

Crispin asserts ten claims: (1) Dr. Peiri failed to properly treat Crispin, falsified his mental health records, and failed to properly supervise his treatment by mental health staff; (2) APRN Torres denied Crispin mental health treatment, violated his right to medical confidentiality under HIPAA, and subjected Crispin to sexual harassment by engaging in sexual misconduct in his presence; (3) Dr. Patel prescribed a medication that caused physical and psychological injury; (4) HSARC Nadeau refused to file Crispin's grievances; (5) CSW Jackson 1 refused to provide mental health treatment on November 4, 2019 and tampered with his mental health records; (6) Mental Health Staff Callahan refused to provide mental health treatment on November 3, 2019 and tampered with Crispin's mental health records; (7) Mental Health Staff Barbara K. refused to provide treatment and tampered with Crispin's mental health records; (8) APRN Reischerl failed to act in response to Crispin's reports of misconduct by APRN Torres and Dr. Peiri; (9) APRN or Dr. Jane Doe refused to provide Crispin adequate medical and mental health treatment at Northern and failed to include all his statements in her report; and (10) Dr. Burn, Dr. Kocienda, Commissioner Cook, RCOO Green, Warden Hannah, and RCOO Fiery failed to act in response to Crispin's reports of misconduct by subordinates.

### Deliberate Indifference to Medical and Mental Health Needs

Crispin alleges that defendants Peiri, Torres, Patel, Jackson 1, Callahan, Barbara K., Reischerl, and APRN or Dr. Doe failed to provide proper mental health treatment.

The Eighth Amendment prohibits deliberate indifference by a medical provider or a prison official to an inmate's serious medical and mental health needs. *See Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir.2013) (citing *Estelle v. Gamble*, 429 U.S. 97, 104

(1976) and *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir. 1989)). Deliberate indifference may

be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials

or] guards in intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104.

To state a claim for deliberate indifference to a serious medical or mental health need, two

elements must be met. First, the inmate must assert facts to demonstrate that his or her medical or

mental health need or condition is "a serious one." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.

2003) (citations omitted). In determining whether a condition is serious, the Court considers

whether "a reasonable doctor or patient would find [it] important and worthy of comment,"

whether the condition "significantly affects an individual's daily activities," and whether it causes

"chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal

quotation marks and citations omitted).

To satisfy the second element, the inmate must allege that the prison official was aware

that his or her actions or inactions would cause a substantial risk of serious harm to him. *See*

*Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Mere negligent conduct does not constitute

deliberate indifference. *See id.* at 280 (reckless indifference "entails more than mere negligence;

the risk of harm must be substantial and the official's actions more than merely negligent.").

Crispin alleges that his mental health need is serious and, combined with the psychological

effects of solitary confinement, has caused him to experience hallucinations and suicidal ideations

and to engage in self-harm. "In the context of mental health needs, propensities to attempt suicide,

harm oneself, and/or exhibit severe depression or anxiety attacks have been viewed as 'sufficiently

serious.'" *Young v. Choinski*, 15 F. Supp. 3d 194, 199 (D. Conn. 2014) (citing cases). Thus, for

purposes of initial review, the Court assumes that Crispin has a serious mental health need.

Crispin alleges that these Defendants refused to provide him appropriate mental health treatment, failed to record his mental health concerns in their reports and, at times, refused to even discuss his mental health concerns. At this time, the record is not sufficiently developed to enable the Court to determine whether Crispin's claims are a true denial of treatment or merely treatment that is different or not as immediate as he would have wanted. The Court will permit the deliberate indifference to mental health needs claims to proceed against Defendants Peiri, Torres, Patel, Jackson 1, Callahan, Barbara K., Reischerl, and APRN or Dr. Doe for further development of the record.

Crispin alleges that in February 2021, Director Maiga ignored a recommendation that he be sent to Garner for mental health treatment. "[A] deliberate indifference claim may lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *Dowdy v. Hercules*, No. 07-CV-2488 (ENV) (LB), 2010 WL 169624, at *8 (E.D.N.Y. Jan. 15, 2010) (quoting *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (quotation marks omitted)). Crispin does not indicate who made the recommendation but, construing the facts in Crispin's favor, it appears that the recommendation was made by a mental health provider. Thus, the Court will permit the deliberate indifference claim to proceed against Director Maiga for further development of the record.

### Failure to Accurately Report All Interactions

Crispin contends that Defendants Dr. Peiri, CSW Jackson 1, Mental Health Staff Callahan, CSW Barbara K., and APRN or Dr. Jane Doe falsified or failed to include all his statements/complaints in their medical and mental health reports. The Court has considered these allegations as part of Crispin's claim for deliberate indifference to mental health needs. To the

extent Crispin asserts an independent claim based only in the inclusion of false or incomplete information in his medical records, the claim is not cognizable.

Inmates have no constitutional right to accurate prison records. *See Meizies v. McDonald*, No. 3:21-cv-1041 (KAD), 2021 WL 3914137, at *4 (D. Conn. Sept. 1, 2021). Thus, false entries in an inmate's medical records do not rise to the level of a constitutional violation. *Williams v. Bentivegna*, No. 14-CV-6105-CJS, 2015 WL 162994, at *7 (W.D.N.Y. Jan. 13, 2015); *see also Chance,*143 F.3d at 703 (noting that claim that doctor wrote false information in medical record might constitute malpractice but does not rise to level of constitutional violation); *Young v. Annucci*, No. 9:16-CV-0566 (DNH/ATB), 2016 WL 11708239, at *6 n.12 (N.D.N.Y. July 29, 2016) ("Because plaintiff does not enjoy a protected constitutional right to be free from false and inaccurate information in his prison records, his claim that Nurse Fairchild's medical report was half misleading is not cognizable in this Section 1983 action.") (quotations omitted). Any independent claim for falsifying mental health records is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

**Supervisory Liability**

Crispin alleges that Dr. Burn, Dr. Kocienda, Commissioner Cook, RCOO Green, Warden Hannah, and RCOO Fiery failed to act in response to his complaints of misconduct by their subordinates. As Crispin references subordinates of all these Defendants, the Court considers whether Crispin has stated a plausible claim for supervisory liability against any of these individuals.

Supervisors cannot be held liable merely because they hold supervisory positions. The Second Circuit has held that "there is no special rule for supervisory liability. Instead, a plaintiff

14

must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

Knowledge that unconstitutional acts were occurring is insufficient to state a claim for supervisory liability. "A supervisor's 'mere knowledge…' is not sufficient because that knowledge does not amount[] to the supervisor's violating the Constitution." *Id*. at 616–17 (quoting *Iqbal*, 556 U.S. at 677)*; see also Lopez v. Chappius*, No. 6:17-CV-96395 EAW, 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) (receipt of communication insufficient to show personal involvement; "Even before *Tangreti*, it was well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find the defendant was personally involved in the deprivation alleged.") (quotations omitted).

Thus, Crispin must allege facts showing that each supervisor was aware that his or her actions would cause a substantial risk of harm and then disregarded that risk. Absent such allegations, the failure to supervise subordinates does not state a cognizable claim for supervisory liability. *See Robinson v. Graham*, No. 9:20-CV-1610 (MAD/ML), 2021 WL 2358415, at *3 (N.D.N.Y. June 9, 2021) (dismissing claim against supervisor for failure to train and manage staff).

Crispin alleges only that he sent requests to Defendants Cook, Hannah, Burn, Kocienda, and Fiery. He does not allege facts showing that these Defendants received or read the requests. As merely sending a letter is insufficient to state a claim for supervisory liability, the claims against Defendants Cook, Hannah, Burn, Kocienda, and Fiery are dismissed pursuant to 28 U.S.C. § 1915A(b)(1). As Crispin alleges individual actions by RCOO Green, the Court separately considers the claim against her.

Crispin alleges that RCOO Green investigated his complaints but did not review surveillance footage and chose to believe the medical providers rather than Crispin. Inmates have no constitutional right to have their claims of improper conduct by correctional staff investigated. *See Davis v. Rinaldi*, No. 3:19-cv-504 (CSH), 2019 WL 7879729, at *7 (D. Conn. Oct. 31, 2019) ("Plaintiff does not have a protected liberty interest in having correctional officials investigate his complaints, through the grievance process or otherwise."); *see also Davila v. Messier*, No. 3:13-cv-81 (SRU), 2014 WL 4638854, at *8 (D. Conn. Sept. 17, 2014) ("[The inmate] does not have a procedural due process interest in having his claim investigated in a manner he deems appropriate."); *see also Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) ("prisoners do not have a due process right to a thorough investigation of grievances"). As Crispin has no right to a thorough investigation of the complaint, RCOO Green's actions have not violated Crispin's constitutional rights. The claim against RCOO Green is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Crispin names Deputy Warden Egan and District Administrator Rodriguez as defendants but does not include them in any of his claims. Both are supervisory officials. The only allegation against Deputy Warden Egan is that he told Crispin that "they" did not want him to remain permanently at Garner. Crispin's allegation implies that Deputy Warden Egan was not one of the persons who did not want him to remain at Garner. In addition, Crispin alleges no facts indicating that Deputy Warden Egan has decision-making authority regarding which inmates require permanent confinement and treatment at Garner. Thus, Crispin has not alleged a plausible claim against Deputy Warden Egan. Crispin does not mention District Administrator Rodriguez in his statement of facts. Thus, as he has not identified any constitutional right that Defendant Rodriguez

violated, Crispin fails to state a plausible claim against him. All claims against Defendants Egan

and Rodriguez are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### Failure to File Grievances

Crispin alleges that Defendant Nadeau failed to file his grievances. However, inmates have

no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to

have a grievance properly processed. *See Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018)

(claim relating to grievance procedures "confused a state-created procedural entitlement with a

constitutional right"; "neither state policies nor 'state statutes…create federally protected due

process entitlements to specific state-mandated procedures'") (quoting *Holcomb v. Lykens*, 337

F.3d 217, 224 (2d Cir. 2003)). Thus, the fact that Defendant Nadeau may not have filed his

grievances does not state a constitutional claim. The claim against Defendant Nadeau is dismissed

pursuant to 28 U.S.C. § 1915A(b)(1).

If the Defendants assert failure to exhaust administrative remedies as an affirmative

defense in their answer, Crispin may assert this failure to file in connection with an argument that

administrative remedies were not available to him.

### HIPAA

Crispin contends that APRN Torres violated his right to medical privacy under the Health

Insurance Portability and Accountability Act of 1996 ("HIPAA"). HIPPA, 42 U.S.C. § 1320d, *et

seq.*, does not create a private right of action and cannot support a claim under Section 1983. *See

Rogers v. Rensselaer Cty. Sheriff's Dep't,* No. 1:14-CV-1162 (MAD/TWD), 2015 WL 4404788,

at *7 (W.D.N.Y. July 17, 2015) ("It is well established that, because there is no private right of

action under HIPAA, a violation of the Act cannot serve as the basis of a § 1983 claim.") (citing

cases). Thus, Crispin has not shown that APRN Torres violated his constitutionally or federally protected rights by not ensuring his confidentiality. Any claim for violating HIPAA is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

**Sexual Harassment**

Crispin also alleges that APRN Torres and Officer Doe subjected him to sexual harassment when they engaged in banter with a sexual undertone. He states that he filed a PREA complaint because the conversation made him uncomfortable.

The Prison Rape Elimination Act ("PREA"), 34 U.S.C. § 30301, *et seq.,* was enacted to address the issue of rape in prisons.[3] PREA does not provide any specific rights to prisoners. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 279–80 (2002) (absent an unambiguous intent to confer individual rights, such as a private right of action, the court will not imply the existence of such a right in a federal funding provision) (quotations omitted). Thus, district courts have held that there is no private right of action for prisoners to sue prison officials for failure to comply with the PREA. *See Abrams v. Erfe*, No. 2:17-cv-1579 (CSH), 2018 WL 691714, at *16 (D. Conn. Feb. 2, 2018) (finding that PREA does not create private right of action for prisoners) (citing cases). Accordingly, Crispin cannot assert a sexual harassment based on a violation of PREA.

A prisoner may, however, bring a sexual harassment claim under the Eighth Amendment. *See Boddie v. Schnieder*, 105 F.3d 857, 859, 860–61 (2d Cir. 1997) (holding that sexual abuse of an inmate by a correctional officer may reach constitutional dimension as a violation of the Eighth Amendment prohibition against cruel and unusual punishment). More recently, the Second Circuit has held that even one incident of sexual abuse that is "sufficiently severe or serious" can constitute

---

[3] It was intended to compile data and statistics concerning incidents of prison rape and to develop and implement national standards to detect, prevent, and punish prison rape. *See* 34 U.S.C. §§ 30302-03 & §§ 30306-07.

an Eighth Amendment violation. *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015). Even an incident of verbal sexual harassment can be actionable if it caused the inmate to suffer an appreciable injury. *See Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015) (remanding case to district court to re-evaluate claims of verbal sexual harassment to determine whether inmate suffered an "appreciable injury" where the inmate alleged he suffered "psychological pain" and attempted to commit suicide as a result of the harassment).

Here, the alleged sexual comment was made in Crispin's presence but was not directed at him. He alleges only that he felt uncomfortable. As Crispin does not allege that he suffered any appreciable injury, his sexual harassment claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1). *See Negron v. Matthews*, No. 3:17cv1042 (SRU), 2019 WL 1298558, at *5–6 (D. Conn. Mar. 21, 2019) (dismissing Eighth Amendment claim where inmate alleged a single incident of verbal sexual harassment with no physical touching and no emotional or psychological harm or pain as a result of the incident) (citing cases); *see also Trowell v. Theodarakis*, No. 3:18cv446 (MPS), 2018 WL 3233140, at *3 (D. Conn. July 2, 2018) (allegation that correctional officer called plaintiff "derogatory names based on [plaintiff's] sexual orientation" did not state Eighth Amendment claim for sexual abuse).

**ADA**

Crispin generally references the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* alleging that the Defendants have "refused to comply with" and "intentionally violated" the ADA. He states that he has named all Defendants in their official capacities so he can recover damages under the ADA.

To state a prima facie case for discrimination under the ADA, Crispin must allege: (1) that

19

he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability. *See Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *see also Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (discussing elements of ADA in prison context).

Crispin has alleged facts supporting an inference that he is a qualified individual with a disability and that he was excluded from confinement and treatment at Garner, a facility equipped to provide the mental health treatment he needs. Or, alternatively, that he was discriminated against by the Defendants. However, he has not alleged facts showing that any Defendant denied him mental health treatment or otherwise discriminated against him *because of* his mental illness. He alleges that he has been confined in isolation because of his classification to administrative segregation and that he was transferred from Garner on at least one occasion because he filed many grievances and complaints. Thus, the facts alleged do not suggest that he was singled out for discriminatory treatment because of his mental illness, as opposed to other behaviors. Thus, Crispin fails to allege a plausible ADA claim. *See Gonzalez v. Maurer*, No. 3:17cv-01494 (JAM), 2017 WL 4531685, at *3 (D. Conn. Oct. 10, 2017) (dismissing ADA claim for denial of eye care because "complaint is that [plaintiff] has not received treatment for his vision, not that any vision disability prompted any of the defendants to discriminate against or disadvantage him"). Any ADA claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

**Orders**

Crispin's claims for supervisory liability, failure to file grievances, HIPAA violations, sexual harassment, violation of the ADA, and any independent claim for failing to maintain

accurate mental health records are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). The Clerk of Court is directed to terminate Defendants Nadeau, Burn, Kocienda, Hannah, Cook, Green, Fiery, Egan, Rodriguez and CO Doe.

Crispin lists CSW Jackson 1 and CSW Jackson 2 as defendants but references only Jackson 1 in his allegations. Thus, any claim against CSW Jackson 2 is dismissed pursuant to 28 U.S.C. § 1915A(b)(1). The Clerk of Court is directed to terminate Defendant CSW Jackson 2.

The case will proceed on Crispin's Eighth Amendment claim for denial of mental health treatment only against Defendants Peiri, Torres, Patel, Jackson 1, Callahan, Barbara K., Reischerl, APRN or Dr. Doe, and Maiga in their individual capacities only.

The Court enters the following additional orders:

(1)     **The Clerk shall** contact the Department of Correction Office of Legal Affairs to ascertain a current service address for Defendants Peiri, Torres, Patel, Callahan, Barbara K., Reischerl, and Maiga, mail a waiver of service of process request packet containing the Complaint and this Order to each Defendant at that address on or before **May 4, 2023**, and report to the Court on the status of the waiver request on the thirty-fifth (35) day after mailing.  If any Defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on the Defendant in his or her individual capacity and the Defendant shall be required to pay the cost of such service.

(2)     **The Clerk shall** send Plaintiff a copy of this Order.

(3)     **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4)     The Defendants shall file their response to the Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver form is sent. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above. They also may include all additional defenses permitted by the Federal Rules.

(5)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed by **November 14, 2023**. Discovery requests need not be filed with the court.

(6)     All motions for summary judgment shall be filed by **December 13, 2023**.

(7)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8)     If the Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The Plaintiff must give notice of a new address even if he is incarcerated. The Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address. The Plaintiff should also notify the Defendants or the attorney for the Defendants of his new address. **FAILURE TO NOTIFY THE COURT OF A CHANGE OF ADDRESS MAY RESULT IN THE DISMISSAL OF THE CASE.**

(9)     **The Clerk shall** immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented parties and shall send a copy to the Plaintiff.

(10)     Crispin states that he was treated by two mental health workers named Jackson and an APRN or Dr. Doe. The Court cannot effectuate service of the Complaint on Defendants Jackson and Doe without their full names and current work addresses. Crispin is directed to obtain this information through discovery and file a notice containing the information. Once Crispin files the notice containing service information, the Court will order service on Defendants Jackson and Doe.

**SO ORDERED** this 13th day of April 2023 at Bridgeport, Connecticut.

*Kari A. Dooley*_____
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE