# United States District Court
## District of Connecticut

SCANNED at CCI and Emailed
4/11/24 date — by MB initials — 94 No. — 94 pages

Crispin : Case: 3:21-CV-0475
v.
Peiri, et al : Date: 2/26/2024

## ("Amended Civil Right's Complaint")
## "Filed In Propia Persona"
## (Introduction)

This is a civil right's action filed by the Plaintiff: Jossean Crispin, a state prisoner for relief under 42 U.S.C. §1983, for allegation of denial of treatment, violation of the American with Disabilities Act, violation of Civil Right Act; Section 504 of the Rehabilitation Act; Protection and Advocacy for Individual's with mental illness Act; Federal Patient bill of right's (42 CFR 482.13); Hospital Bill of right's (C.G.S. 46a-58) Discrimination & Retaliation for Practicing civil right's Action against a Qualified Disabled Individual; Spoliation of Evidence Likely to be used in Civil Litigation's by failing to Document Incident's & Properly maintaining mental Health Record's Deliberately; failure to Act by supervisor's; failure to Protect by supervisor's; Systemic Retaliation & Discrimination against a Qualified Disabled Individual; Bias and Discrimination against the mentally Ill; violation of the 1st Amendment; violation of the 14th Amendment; violation of the 8th Amendment; Perjury; Spoliation of Evidence.

# Statement of facts

1) On (July, 2019) The Plaintiff was sent to (Garner, Corr, Inst) do to the ("effect's of Solitary Confinement") The Plaintiff is a ("Qualified Disabled Individual") who has Struggled (Since Child-Hood up to present day with mental Illnesses)

2) Because the Combination of ("Psychological effect's of Isolated Confinement mixed with the Plaintiff's mental Illness of Schizophrenia) Caused severe adverse Psychological effect's exacerbating the Plaintiff's Pre-existing mental Illnesses

3) It was Recommended by the mental Health (Doctor's : John Doe) and (A.P.R.N. : Andrea Reischerl) on the Initial evaluation of the Plaintiff's mental State, Prior to Placement in (Administrative Segregation) to (Defendant : Nick Rodriguez) and (Defendant : Dave miaga) that the Plaintiff mental Health was not well and that the Plaintiff should be sent to (Garner, Corr, Inst) for Psychological treatment and Stablization

4) As (Defendant : Nick Rodriguez) and (Defendant : Dave miaga) ("Discriminatively and Biasly") Disregarded with the ("mental State of the Plaintiff") by The (Doctor John Doe) and (Defendant : Andrea Reischerl)

nerefore openly aware of the Decompensated
.e of mental Health the Plaintiff was in and
·iscriminatively" and "Baisly" and "Prejudicely"
(Defendant: Nick Rodriguez) and (Defendant: Dave miacg)
Acted Discriminatively and Deliberately to Injury the
Plaintiff and punish.

6) Because of this Discriminatively and Baisly
Act the Plaintiff Was subjected to close to
#2-Years of (Psychological torture) and (Physical torture).

7) During which the Plaintiff suffered and struggled
with Inadequate treatment and eventually was transferred,
o(Walker/mcdougle, Corr, Inst,)

8) Where the Plaintiff became so unstable with
(Audio-visual Hallucination's) that he was hospitalized
(In-patient on a Suicide Watch) within (Walker/
mcdoughe, Corr, Inst,)

9) And then sent to (Garner, Corr, Inst) for the 3rd
ime, when I met with (Doctor: Patel) I expressed
that Isolated Confinement is causing severe adverse
Psychological effect's exacerbating the Plaintiff's
Pre-existing mental Illnesses and could not cope
With (22) to (23) Hour lockDown as is routine in
Isolated Confinement Programs in Connecticut.

10) (Doctor: Patel) Biasly and Discriminatively Disregarded the Psychological Injuries and Physical Injury Isolation Confinement was causing the Plaintiff a Qualified Disabled Individual

11) I expressed to (Defendant: Patel) that this is the 3rd time I have been to (Garner, Corr, Inst) for mental Rehabilitation and Instead Denied adequate mental Health treatment and false Documentation Placed in my mental Health Records to aviod Civil Right's Action's and to Create a false Defense against and any Civil action's file as a result spoliction Decumented Evidence was knownly Commit

12) I then Notified (Defendant: egon) of these exact action's by (Defendant: Patel) as stated above and (Defendant: egon) Stated to the Plaintiff "because I am not wanted here" (Garner, Corr, Inst) as Justification to Discriminatively deny care.

13) I was then Discriminatively, Biasly and Prejudicely Denied Adequate mental Health treatment and sent back to (Walker/Mcdougle, Corr, Inst) under false Documentation, and to the same

14) I was then assaulted by an Inmate in Administrative Segregation Phase #2 Who was exploiting me During this mental Decompensated State.

After being returned to ("Phase one of Administrative-segregation") I mentally Decompesated fast to the point as sent again for the (4th, time) to (Garner, Corr, Inst,) the only facility that main stream's in mental Health treatment in Connecticut.

16) I again was (Doctor: Patel's) patient and (Maria Bentos) while at (Garner, Corr, Inst,) on this (4th, time), During this (4th, time) my medication's were switched, the Plaintiff expressed to (Doctor: Petal) and (maria-Bentos) while they were on their tour of (I.P.M./In-patient - mental Health/medical) unit at (G. C. I.) that switching my medication wasn't going to help because it is the effect's of Isolated confinement that are causing these severe mental Breakdown's and that the torment suffered can only be stopped by removing the Plaintiff out of solitary Confinement with a Doctor's order because solitary Confinement only exacerbates my underlying mental Illnesses and ~~Conteract~~ (Counter-Act) any medication treatment not permitting medication treatment to adequately work, Instead I was Ignored by (Doctor: Patel) and (maria Bentos Csw.), these same fact's I expressed to all named Defendant's: Peiri, Torres, Patel, Jackson 1, Callahan, Barbara K., Reischerl, A.P.R.N./Dr. Jane Doe, at many occasion's.

17) Soon after my schizophrenia medication were switched to another Different schizophrenia medication known as sequiqull/seriqull)

(8) This new Schizophrenia medication Caused me severe side effects as Dizzy spells that caused me to fall an Injury myself against walls and floors Causing Me to Hit my Head hard enough to Leave me seeing the cell spinning out of Control.

19) I told and expressed this to (Doctor: Patel) and (maria Bentos) of this severe side effects causing me Injury and how this new medication have effected my mind Causing me to become suicidal.

20) (Doctor: Patel) and (maria Bentos) Ignored my verbal Complaints and soon after cleared me falsely as stable to be transferred back to (Northern, Corr, Inst to Solitary - Confinement).

21) I was in (Northern, Corr, Inst, Solitary Confinement) Less then (48-Hour's) when I became mentally tormented by the effects of Solitary Confinement, which were Hightened and exacerbated and made worse by (Doctor: Patel) and (maria Bentos) action's of Deliberate Indifference to rectify the medication that was causing severe side effects which Instead worsened my mental Health even after I told (Doctor: Patel) and (maria Bentos-csw) of these facts before my Transfer, of which my mental Health treatment team was aware and given Prior notice timely but refused to act.

22) soon after within two-weeks of Psychological torment and nothing being done to help by mental Health staffing at (Northern, Corr, Inst,).

22) I became so hopeless under the mental torture of solitary Confinement and Continuos Constitutional violation's to the point, I became so suicidal truely believing the only way out of the Psychological tormented Hell was Suicide

23) The only thing that Gave me pause was the Picture of my son.

24) This small pause as short as it was gave me time to get help and was Immediately Placed on a Suicide watch by (2nd Shift Nurse) because no mental Health Staffing was readily available.

25) When the Plaintiff spoke to (mental Health Doctor or APRN : Jane Doe) and Described what lead to the suicide watch, I told (APRN or Doctor : Jane Doe) what happen at (Garner, Corr, Inst) with (Doctor : Patel and CSW: maria Bentos) and treatment team and their (Deliberate Indifference) to the side effects of the medication Change and how it "worsened" my (mental Health) and ("Causing Dizzy spell's, that Caused me to fall and Injury myself repeatedly and caused suicidal Ideation") and I expressed and told this to (Doctor or APRN: Jane Doe) that all these side effects coupled with the effects of solitary Confinement were torture to me.

26) (Doctor or APRN: Jane Doe) Intentionally refused to Documents these specific report's clearly understanding the Gravity of the matter's I reported and how it would effect her co-worker's at (G.C.I.) and her employer The Department of Correction and Chose to Cover up the report's I made as all D.O.C. employee's are trained to do off the record, show a clear Systemic Level of violation of the (A.D.A.) and the Rehabilitation Act.

27) Though (Doctor or APRN: Jane Doe) Refused to report the facts of the Cause and effect's that Lead to the suicide watch.

28) (Doctor or APRN: Jane Doe) action's Confirm the report's as a matter of fact

29) Because (Doctor or APRN: Jane Doe) removed me off the medication (Doctor: Patel) Prescribed Immediately and Prescribed to me as she explained new medication to Counter the side effect's and Kept the Plaintiff on a mental Health-Suicide watch.

30) During this (mental Health suicide watch) I was seen repeatedly by (Doctor or APRN: Jane Doe) and (R.O.C.C.C: Dr Richard fiery) and Questioned me repeatedly about (Doctor: Patel's) misconduct and Deliberate Indifference to my Health and safety and my continued Issue's with the (mental Health staff's) at (G.C.I.) and their (Prison Administration) Deliberate Action's to violate the Plaintiff's (American-with Disablities Act) and (Rehabilitation Act) as a Qualified Disabled Individual needing more adequate treatment than was being Provided

31) I was then told by (R.O.C.C.C.: Dr Richard Fiery) and (Doctor or APRN: Jane Doe) that they want to send me back to (G.C.I.) for mental Stablization.

32) I expressed and told (R.O.C.C.C: Dr Richard fiery) and (Doctor or APRN: Jane Doe) that I'll be treated adequately by any Doctor or mental Health Staffing, because ("All Doctor's and any and All D.O.C. employee's, employeed by D.O.C. are trained off the record to cover for each other and their employer D.O.C.) this type of conduct is not Isolated to Just one facility but is a uniform partice accross all (D.O.C.) facilities

33) I was verbally assured by (R.O.C.C.C. Dr Richard fiery) and (Doctor or APRN: Jane Doe) that whatever happened at (Garner, Corr, Inst/G.C.I.) will not happen again.

34) I was assured repeatedly that not Just (R.O.C.C.C.: Richard fiery), but that also (the Prison Commissioner : Angel Quiros) and the (Health Director's : (Doctor: Kocienda) and (Dr: Craig Burns) from the main office of D.O.C. at Wethersfield, CT. will have their eye's on Supervising the treatment I recieve this time at (G.C.I.)

34) This never happened Instead upon transfer to (G.C.I.) the mental torture only Intensified and Initiated by the named Defendant's

35) The moment I was transferred to (G.C.I.), I was told, I would be doing testing, but can not start until they slowly remove me off my medication.

36) I expressed and told them, that that's not what I was originally told by (R.O.C.C.C Dr: Richard fiery) and (Doctor or APRN: Jane Doe) and would only serve to make me mentally unstable

37) I expressed to (Dr: Pieri) and (APRN: Sara Torre) that if that is what work's I'll try it, but if I communicate any Issues of mental Decompensation, that my schizophrenia medication should be restored

38) During this time I was Given a (Questionaire to complete) and subjected to multiple other testing, I could not Complete without my Prescribation Glasses as my eye sight is damaged I am close to Blind without my Glasses, Instead I was Deliberately refused my Glasses repeatedly and Given Reading Glasses I mistakenly ordered when trying buy Shorts.

39) During this time spent on a (suicide watch) at the (G. C. I.) (In-patient hospital) I was subjected to denial of treatment, and Group therapy and Instead was mentally tormented and exploited for any Little attempt to seek mental Health treatment by (Doctor: Pieri) and (APRN: sara Torre) whenever I attempted to seek medication treatment and or help when suffering mental pschosis or reporting Instances of mental pschosis and these Instences were refused to be documented Deliberately to Leave no Documented evidence behind and Cover up any and all Civil right's violation presented through their misconduct, Knowingly and willing Committing spoliation of Evidence.

40) During session (APRN: sara Torre) would refused to allow me to discuss any matter's Concerning my mental Illnesses and Would Discourage me from ("Reporting mental Pschosis") and (Brow Beat) into submission, telling me it's all in my Head and Don't have any mental Illnesses.

41) As my mental state worsen do to the enviroment that was worse then (Northern, Corr, Inst) as I had no way of seeing Day light when in my cell, and was refused the Comfort of my Property as well as Commensary or other simple Previliages those on Administrative segregation exacerbating my mental Health at a faster rate than Isolated Confinement as the condition's were even worse than Isolated confinement and can be Labeled as Complete Isolation.

42) During session's ("A.P.R.N.: Sara Torre) would, whenever I ~~Reported~~ mental Illnesses and Incident's occuring from my mental Illnesses and (APRN: Sara Torre) and (Doctor: Pieri) Would (Quickly Reject), (Down Play) or (Find excuses to Contridict) for a factual example at one time (A.P.R.N.: Sara Torre) said to me how can I be able to file lawsuit's but be mentally Ill.

43) I responded to (A.P.R.N.: Sara Torre) and stated that not only is her word's showing ("Clear Bais and Discrimination against me for being mentally Ill")

44) The fact that (A.P.R.N.: Sara Torre) Infer with her statement that I have to be ("stupid in order for me to be mentally Illnesse's") is "extremely bais and Discriminative", toward's a Qualified disabled Individual as me.

45) After this Interaction every session with (APRN: Sara Torre) was like a verbal attack on my mental Illnesses Leaveing me hopeless at recieving any form of treatment by and her Co-worker's

46) Because any further attempt by me to recieve mental Health treatment was met with the termination of the session and Instead (A.P.R.N.: Sara Torre) would ask Irrelevant Question's not treatment related, and would Question me about my Criminal Charges and Civil suit known as (Crispin v. Reischerl, et, al)

47) I reported all these on going Issues, I was having with (A.P.R.N.: Sara Torre) to her supervisor (Psychologist: Peiri) Who in return told me to just Ignore it and keep doing my testing.

I expressed to (Doctor: Peiri) how am I going to inue doing testing if I'm not even given my Glasses see the testing Document's to be able to answer them and any attempt's to focusing only Gave me extremely painful Headache.

49) And expressed that I need my Prescription Glasses to see and Instead was Given reading Glasses that I accidently purchased on Commonsary when I bubbled in the wrong number's, and was refused my Prescription Glasses and told by (Doctor: Peiri) to work with what I got.

50) I soon found out after that (Doctor: Peiri) was not pulling me out for (Therapy Session) because ("She was falsely - Documenting) cell-side Conversation's as (Therapy session's) of which I was never notified of and which cell-side Conversation's are not Classified as by Definition Therapy session's at all.

51) Which in and of itself is denial of treatment and the Department of Correction's recieves federal founding's to Provide treatment under the (American with Disablities Act) and under (the Rehabilitation Act) to Qualified disabled Individual's like me.

52) I was also Denied (Group therapy session's) by (mental Health Recreational staff: Gorge) and (Doctor: Peiri) and Was told by both Individual's that because I was being Double cuffed in order to ease the (Pain of the Hand cuff's on my wrist and hand's) after being assaulted by ("Correctional-officer: Graig Roach) see ("Crispin v. Roach et al) in appeal's Court and that because of this, I was a security risk even though I —

was Injuried after being Stabbed multiple time's by (C/o Roach) from my hand and up and Down my arm and had my thumb closed in a Steal Foodslot, even though other prisoner's were also Cuffed behind their back's enjoyed the benefit's of Group therapy

53) During this time as well (Doctor: Peiri) ("committed perjury in her Declaration under oath to the court") lying and Creating a false narrative for the creation of a false Defense for her ("Co-worker") in retaliation in order to have my (motion at that time for Appointment of Counsel) in the Civil action known as (Crispin v. Reischerl, et al)

54) When in fact the Department of Correction's mental Health Staffing are openly aware of the Plaintiff's long standing History of severe mental Illnesses on Record.

55) And in (2016 to 2017) ("Doctor: Peiri) herself treated the Plaintiff for nearly a year During his Incarceration for Schizophrenia while housed at (Garner, Corr, Inst.) therefore clearly lying on record Committing Perjury to Protect her (Co-worker) and Deny me any relief by the appointment of Counsel which would have changed the caurse of the Litigation in (Crispin v. Reischerl, et al)

56) Then to ("Create a false Defense) for her ("Co-worker's") and ("the Department of Correction's) by creating a false narrative by removing the Plaintiff's diagnosis of schizophrenia and Subjecting the Plaintiff to torture knowly and purposely resulting in the Denial of proper adequate treatment and the filing of this civil right's Action.

57) These action's Caused the Plaintiff severe mental Torment, and mental Decompensation resulting in self-Harm because of (Doctor: Peiri) and (A.P.R.N.: Sara Torre) to subject the Plaintiff Intentionally to this torture as a subsequent Act by them to Protect their (Co-workers) and (the Department of Correction's) During the cause of the Civil action that was known as (Crispin v. Reischer, etal)

58) Then the (Commissioner of Corrections) and the (Health-Director: Kocienda) assigned (A.P.R.N. Reischerl) who was a Named Defendant in (Crispin v. Reischerl et al) to (Supervise) the "treatment" and "testing" being done by (Doctor: Peiri) and (A.P.R.N. Sara Torre) while at (Garner, Corr, Inst,).

59) After almost a month of Constant violation's of the (American with Disabilities Act) and the (Rehabilitation-Act) and multiple Civil right's violation's by the named Defendant's I demanded to Speak with (A.P.R.N. Reischerl) During the cause of almost a month.

60) When I finally was able to speak to (A.P.R.N. Reischerl) who was Charged with supervising (A.P.R.N. Sara Torre) and and (Doctor: Peiri) testing and treatment of the Plaintiff, I reported everything outlined in this claim Concerning (A.P.R.N. Sara Torre) and (Doctor: Peiri)

61) (A.P.R.N. Reischerl) Quickly Disreguarded my Complaint's and told me to Ignore what's going on and How I'm being tortured & Denied treatment and ("Go with the Flow").

(62) I became extremely hopeless and Depressed and mentally tormented by both my mental Illnesses and the Deeply Ingrained Practice of Discrimination against the mentally Ill by the Department of Correction's and those Charged with Providing this treatment, and how Deeply the Systemic Retaliation is Ingrained against those who bring suit against the Department of Correction's and those employeed by the Department of Correction's When Proper Care is Deliberately Denied.

(63) These Act's Can be taken right out of the pages of (the willie lyche Letter the making of a Slave) as these (Civil right's violation) and (A.D.A. violation's) are done with the Sole purpose to enflict the most severe Physical and mental torture on an Individual.

(64) Soon after this multi-Level Systemic Attack I was removed from the (In-patient mental Health observation) and placed back In the (Solitary Confinement Program) known as (Administrative Segregation).

(64) During my time on (Administrative segregation) I attempted verbally address the severly serious matter of mental Decompensation and the removal of my schizophrenia medication without any reason's Given to me by (A.P.R.N. Sara Torre) and (Doctor: Peiri) to (A.P.R.N. Sara-Torre) and (Doctor: Peiri) Who would During their tour's of (Fox-unit at Garner, Corr, Inst,) and During session's would warn me of the topic and if I continued would terminate session's and During tour's of the unit would walk away from me and Ignore the Topic.

(65) After Notifying all named Defendant's both verbally and writtenly of everything outlined in this claim all named Defendant Deliberately refused to act and Deliberately Ignored the matter

(66) This Continued for month's upon month's while I mentally Decompensated, to the extent I could not mentally function to even get myself moving out of my Bed and would sleep (20 to 22) Hour's a day to Hide from my mental Illnesses from ("visual and audio - hallucination) and for month's without Showering because of my mental State.

(67) I wrote Letter's upon Letter's to the (Prison Commissioner Angel Quiros) who would Ignore my complaint's and tell me in writting to address The matter with mental Health Staffing who would Just Simply continue to do nothing

(68) I wrote Letter upon Letter's the (Health Director: Kocienda) and (Doctor: Craig Burns) who would then refer me back to (Doctor: Peiri) and (A.P.R.N. Sara Torre) who were the cause the Denial of treatment and torment

(69) I filed Inmate Request form's upon Inmate request form's to mental Health requesting treatment to only have them not responded to or given excuses for denial of treatment but the matter never addressed

(70) Which resulted in me filing multiple Grievance upon multiple Grievances because they were refused responses where I would then mail a copy to the (Health Director: Kocienda) and (Dr: Craig Burns) requesting they order the (H.S.A.R.C.: Cinthia - Nadeau) to answer them to no avail.

71) As the Plaintiff mentally Decompensated further without medication treatment and do to the effects of solitary confinement, the Plaintiff used the only coping skill he could think of while in a state of psychotic mental Decompensation in order to mentally Ground myself with reality and ("ONLY AFTER ATTEMPTing FIRST TO RECIEVE MENTAl HEAITH - PREVENTIVE INTERVENTION").

72) When Preventive Intervention is Denied as it was Constantly Done by Mental Health Staffing Intentionally.

73) When Denied mental Health Intervention this resulted in severe mental torment and torture Leaving the Plaintiff ("Psychologically tormented") with the ("Demon's") of (Audio-visual Hallucination) fighting a mental battle to stay In touch with reality.

74) This resulted with "me cutting my arm's and wrist's" while in this "Psychotic decompensated state of mind in order to battle against (The Audio-Visual Hallucination) to stay in touch with reality.

75) Because the Physical pain Gives the Plaintiff something real to focus on in order to mentally Come back to reality from the (Audio-Visual Hallucination).

The Plaintiff was Psychologically and Intentionally pushed to these extreme to Intentionally torment the Plaintiff by All The named Defendant's Knowingly and Deliberately.

76) On (11/3/2019) around the time of (9:17-Pm) while housed in (Solitary Confinement Program Administrative Segregation) at (Garner, Corr, Inst.) Fox-Unit the Plaintiff on this day and time became Depressed over the mental torture he was being subjected too and during this time started having (Audio-Visual Hallucination) and was having severe Difficulty Coping alone.

77) I asked the Correctional Officer's working on (11/3/2019) if mental Health Staffing have toured the prison block yet and was told no.

78) I then did my best to mentally hold it together as long as possible.

79) around (9:17-Pm) on (11/3/2019) (mental Health Staff: Miss-Callahan) was conducting her tour of (Fox-Unit) at (Garner, Corr, Inst) I tried to stop her Attempting to seek (mental Health Preventive-Intervention) because I was mentally spiralling out of Control and Desperately needed help before getting any worse.

80) Instead of stopping and helping me and Providing (mental Health Preventive Intervention) (mental Health Staff Miss Callahan) told me no not now I have to go and she took off and Left.

81) I mentally worsened becoming severely mentally tormented trying to battle against (Audio-Visual-Hallucination) in a Desperate Attempt to stay connected to reality in this Psychotic mentally —

Decompensated State the Plaintiff cut his forearm.

82) On (11/4/2019) I atempted multiple times to speak with the (Unit mental Health Staff Barbra K.) in order to address the Incident of Severe mental Decompensation and Denial of treatment that occurred the night before on (11/3/2019) by (mental Health Staff miss. Callahan) on (2nd shift.)

83) I also tried to recieve medical treatment by the Unit Nurse (Nurse: Jane Doe) who I later found out that she falsely Documented my Attempts to recieve medical treatment to hide and cover up the Incident of Denial of (mental Health Intervention-Preventive treatment) by (mental Health Staff: Callahan) and then (mental Health staff Barbrak.) by falsely Documenting (That I scratched myself and was picking at my scabs and was Concerned about Infection.

84) When in fact the Plaintiff clearly stated how he was (denied mental Health Preventive Intervention Treatment) by (mental Health staff Callahan) and how and why the Plaintiff mentally Decompensated.

85) Instead (Nurse: Jane Doe) Conspired to Cover up the Incident by Spoiling Documented evidence that would Directly point to guilt by her Co-Workers and friend by falsely Documenting the Incident Intentionally and Deliberately Committing spoliation of Evidence.

86) The Department of Correction's as an agentcy trains all their personnel in (Damage Control) this training is done off the Records and off the Book's and Includes training in false Documentation, and manipulating of Camera angles, and use of Key wording to hide and or Cover-up Incident's and misconduct's, assault on prisoner's, medical abuse, mental Health abuse, in order to (Protect The Department of Correction's and any and all it's agent's) from accountability in civil action's and in criminal Act's.

87) On (11/4/2019), I wrote the (Supervising Psychologist Doctor: Peiri") by way of (Inmate Request form) notifying her of the Incident on (11/3/2019) with (mental Health Staff: Callahan) When I was Denied Preventive Intervention treatment of which (The Department of Correction recieves Federal fonding under American with Disabilities Act's) to Provide this treatment and many more and ("by Denying such treatment's the Department of Correction as a whole to Include the named Defendant's are In Direct violation of the American with Disabilities Act's") and the fact (Defendant: Peiri) refused to respond to my Inmate request was Deliberate Indifference to the (A.D.A.)

89) on (11/5/2019) the Plaintiff met with (C.S.W.barbrak.)

90) During this session on (11/5/2019) with the (C.S.W.-Barbra,K.) talked on and on about how hard it has been for me "The Plaintiff" (Psychologically-Throughout), (A.S./Administrative Segregation) and how ("she C.S.W.-Brabrak") has seen how difficult it has become to even shower and stay awake through Daily functions.

100) But whenever I tried to Discuss and report The Incident that occurred on (11/3/2019) on 2nd shift (C.S.W. Brabra,K.) would over talk me and Change the Topic (and the falsely Documented this meeting session Ommitting any mention of the actual Incident on (11/3/2019) So there would be no Evidence on record.

101) On (11/6/2019) (C.S.W. Barbra,K.) Saw me again in the morning and again would not allow me to talk about the Incident that Occurred on (11/3/2019) on 2nd shift and would not allow me to talk about my mental Psychosis because of the removal of my Schizophrenia medication

102) On (11/7/2019) around (8:30-pm) I stopped (mental Health Staff miss:callahan) and I asked her Why She didn't Stop on her tour of the Box-unit on (11/3/2019) When I was in Crisis.

103) (Defendant: Callahan) Stated that I'm a (mental Health Level-3) and if I need mental Health I can write a Inmate Request form to them, as a Justification for her Action of Denial of Care on (11/3/2019)

104) On (11/15/2019) (Doctor: Peiri) Came on to (fox-unit) and ("signed th log-in Book") as if she toured the unit when she did not and refused to acknowledge my Attempt's to speak to her, her action of false documentation Spolied evidence that would have been used in these Litigation the stationary Camera's were saved and preserved as Proof.

105) On (11/19/2019) I met in a Session with (A.P.R.N.- Sara Torre) I expressed to her the mental torment I've been going through with (Audio-Visual Hallucinations) and (How severe solitary Confinement is exacerbating my mental Health and request to be Placed back on my (medication to treat my Schizophrenia) because these factor's eure Precipitating suicidal Ideation's and self Injurious Psychotic Decompensation.

106) In response to the Plaintiff on (11/19/2019) (A.P.R.N.- Sara Torre) said to me that these Report's ceuel of Severe mental Decompensation are normal and did nothing to address these Serious Report's and Pleas for help.

107) On (12/8/2019) I wrote an (Inmate Request form) to be Placed back on on my (Schizophrenia medication) and outlined the same exact (severe mental Psychosis) I expressed to (A.P.R.N.-Sara Torre), She Ignored it and never responded.

108) On (12/11/2019) around the time of (3:41-Pm) The (Intensity of The Audio-Visual Hallucination) was Building as well as the (Psychotic Thought's of suicidal Ideation's and self Injurious thought's), I again Stopped (mental Health Staff Miss: Callahan) During this (mental Decompensation) who worked this day and was Blow off again and Denied treatment.

109) On (12/18/2019) I stopped (Lieutenant: White) and asked for mental Health Preventive Intervention treatment because for about a week I've been mentally Decompensating do (the effects of Isolated Confinement) and lack of Adequate treatment that have become ("mental torture and torment") from (The "Psychological torture All the named Defendants have subjected me too") Coupled with (Audio-visual-Hallucination's) During the Time between (10:50-Am and 11:15-Am) that I Stopped (L.J. White) notifying her of this extremely serious matter which video's were Preserved as Critical Direct Evidence to prove this Claim.

110) On (12/18/2019) I spoke to (unit Counselor: Ibisevic) and begged him to notify mental Health Staffing that I need mental Health Preventive Intervention of which he did not notify Them at all.

111) On (12/18/2019) time between (11:15-Am & 11:30-Am) I spoke to (Correctional Officer: Bakewell) and expressed that I needed to speak with mental Health Staffing because I was becoming extremely over-whelmed with (Audio-Visual Hallucination and Psychotic-thought Patterns) and needed mental Health Preventive Intervention treatment to help Ground me to reality and ("Nothing was Done") to help.

112) On (12/18/2019) around the time between (1:15-Pm and 2:30-Pm) (C.S.W. Barbra K.) acknowledged the need for Intervention.

113) At this date and time (C.S.W. Barbra K.) approached my (Cell-113) in (fox-unit) and She Stated to me ("You don't Dictate When mental Health Staffing see's You")

114) I expressed to (C.S.W. Barbra K.), I'm not looking to argue and requested if she Could Please Pull me out as what I needed to express was Confidential and did not want to have other (Prisoner's and Correctional officer's) hearing so as not to give them Information they can use to Provoke me or make fun of me and exacerbate me mentally.

115) I Interrupted and express that what I need to Say is verry serious & Confidential.

116) ("C.S.W. Barbra K.") Said not to Interrupt her so I let her talk.

117) As soon as I tried to express the need and reason for "Preventive Intervention treatment" (C.S.W. Barbra k.) Interrupted me and Cut me off Preventing me from Letting her know my ("mental-Health emergency")

118) When I expressed to her that I Let her talk Can you Hear me out, She Immediately walked away Completely Disreguarding my mental Health emergency.

119) These action's and behavior by (C.S.W. Barbra K.) Left me mentally tormented and Hopeless to get any emergency mental Health Preventive Intervention treatment.

120) This resulted in extreme mental Decompensation and Suicidal Ideation and Developed into (Self-Harm) because of Denial of treatment exacerbated and Lead to (Uncontralable Audio-Visual Hallucination)

121) As I was struggling all through (1st Shift) on (12/18/2019) to the point prior to this I held the foodslot open in desperation asking for help, while Deliberately Ignored by (C.S.W. Brabra k.)

122) later that same day on (12/18/2019) on (2nd Shift) when I stablized, I saw (C.S.W. Jackson #1) doing her unit Tour and stopped her and addressed everything that happened on (12/18/2019) on (1st Shift) and asked if she could Pull me out so I can recieve medical treatment and mental Health treatment.

123) (C.S.W. Jackson) Continuely refused to Pull me out and Provide mental Health treatment and medical treatment.

124) I finally asked Why is it such a Big Problem and Issue to recieve mental Health treatment here at (Garner, Corr, Inst) in the (Administrative Segregation-Program), for (Phase-Two and Phase-Three)

125) (C.S.W. Jackson) stated to me that the ("supervising Psychologist Doctor? Peiri") verbally order ("ALL-mental Health staffing") that work and tour (Fox-unit) not to Provide any Prisoner on Administrative - Segregation any treatment and any mental Health staffing and medical staffing who Broke this order would be written up.

126) After stating this to me (C.S.W. Jackson) walked away Leaving me. standing at my window ("with no medical treatment or mental Health treatment.")

127) After going almost all Day being refused medical and mental Health treatment, in Desperation without any other option, I covered my window, while all the unit Correctional Officer's toured and refused to Act.

128) About an Hour went by When (Lieutenant: Fortin) and (Lieutenant: Finkle) came and asked me what the Issue was, and I Described in Details all of the Day's event's resulting in the Covered window

129) (Lieutenant: Fortin) and (Lieutenant: Finkle) Both knowing my mental Health history expressed that What was being done was not right, and I shouldn't have been removed off my (Schizophrenia Medications) based off their experiences and Dealings with me in the past and their knowledge of my mental Health History.

130) They Both Stated they were going to call (C.S.W. Jackson) and (Nurse: Kenny) to return to fox unit and Provide medical and mental Health treatment.

131) On (1/18/2020) I went to the medical Unit off fox unit For a ("chart review of my medical and mental Health Record's.

132) During this Chart Review, I Discovered that nothing of the event's that Occurred on (12/18/2019) throughout (1st Shift) and (2nd Shift) was Documented Deliberately Committing Spoliation of Evidence to Cover-up any wrong doing in anticipation of this Civil rights action

133) I wrote an (Inmate Request form) to (R.C.O.O. Green) asking to address this problem, Instead he Ignored my statement and proceeded to create a false narrative with his response to Cover-up the spoliation of Evidence.

134) when my video Preservation of (12/18/2019) will Contradict all named Defendant's



135) My Whole time spent on (Administrative-Segregation) Was a Living hell of torment and Torture

136) Upon completion of (Administrative Segregation) I Was transferred to (Cheshire, Corr, Inst,) Where Immediately I was placed back on my (schizophrenia-medication) as the "Nurses" and "medical Staffing" and "mental Health Staffing"

137) And medication Intake were adjusted to (12:00-Pm Noon time) and (Night time) under the Reasonable Accommodation's Act, in order to Preserve the Plaintiff's mental Health

138) And later the next year on (2021) I was placed on a (Single-cell) status due to the acknowledgement of my (Severe mental Illnesses) and the (Risk that my mental Health Presented to the Normal General-Population and the risk the General Population Presented to me and my Severe mental Illnesses)

139) These action only Confirm's the Constitutional violation's Committed by the Defendant's, When another facility acknowledge's, these severe mental Illnesses and take affirmative action based on the Plaintiff's mental Health History and medical History

<u>Note:</u> This Amended Civil Rights Action, moves the Court to reconsider Violation's of the (A.D.A.) and (R.A.) and multiple other clear violation's

Based on the Present Exhibit's as Evidence submitted Supporting (A.D.A.) and (R.A.) violation's the Court Should Reconsider The (American With Disabilities Act) violation's and ~~Reasonable Accommodation~~ (Reasonable Accommodation's Act) violation's and The (Rehabilitation Act) violation's

sign: Jossean Crispin

Print: Jossean Crispin

Date: 4/15/2024

# Exhibit #1

This Exhibit Consist of #38 Page's on (A.D.A.) violation's and solitary confinement abuse

...ndants for declaratory and injunctive relief. DRCT seeks to stop the prolonged isolation and in-cell shackling of prisoners with mental illness at Northern, and to stop DOC's failure to make reasonable modifications to its policies, practices, and procedures.

## JURISDICTION

8.    Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the United States Constitution, 42 U.S.C. § 1983, the ADA, 42 U.S.C. § 12131, *et seq.*, and Section 504, 29 U.S.C. § 794(a).

## VENUE

9.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and because a substantial part of the events and omissions giving rise to DRCT's claims occurred in this district.

## PARTIES

**A.    Disability Rights Connecticut, Inc.**

10.    DRCT is a private, nonprofit corporation and is the authorized protection and advocacy system for the State of Connecticut under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and its implementing regulations. DRCT's office is located at 846 Wethersfield Avenue, Hartford, Connecticut 06114. DRCT is the successor entity to the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities ("OPA"). Conn. Gen. Stat. § 46a-10a *et seq.*

11.    The PAIMI Act provides for establishing and funding protection and advocacy systems, including DRCT, to investigate the abuse and neglect of individuals with mental illness and to advocate for and ensure that their rights are protected, including their rights under the Constitution and federal and state statutes. 42 U.S.C. §§ 10801(b)(1), 10801(b)(2)(A).

4

12.    DRCT is responsible for providing protection and advocacy services to individuals with mental illness and disabilities pursuant to the PAIMI Act.

13.    DRCT has statutory authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State of Connecticut.  42 U.S.C. § 10805.

14.    DRCT is pursuing this action to advocate for and protect the rights and interests of "individuals with mental illness," as defined in 42 U.S.C. § 10802, who are in DOC's custody and are currently incarcerated at Northern in Administrative Segregation, Security Risk Group, or Special Needs Management ("Special Management Programs") at Northern, or are at risk of transfer to Northern ("DRCT's Constituents").  DRCT's Constituents are the direct beneficiaries of DRCT's activities, including the declaratory and injunctive relief sought in this litigation.

15.    DRCT's Constituents have "significant mental illnesses or emotional impairments," as determined by a mental health professional qualified under the laws and regulations of the State of Connecticut.  *See* 42 U.S.C. § 10802.  The mental illness of DRCT's Constituents substantially limits their ability to perform major life activities, such as self-care, working, and interaction with others.  DRCT's Constituents are therefore individuals with mental illness for purposes of the PAIMI Act, 42 U.S.C. § 10802.  DRCT's Constituents are also individuals with disabilities for purposes of the ADA, 42 U.S.C. § 12131(2), and Section 504, 29 U.S.C. § 794.  "Mental illness" is used throughout this Complaint pursuant to its definition under the PAIMI Act.  This definition encompasses individuals with mental illness who have serious mental illness or who are at substantial risk of developing serious mental illness.

16.    DRCT's Constituents have each suffered injuries, are continuing to suffer injuries, and/or are at risk of suffering injuries that make them eligible to bring suit against Defendants in

their own right. DRCT's Constituents all reside in "facilities" rendering care and treatment for individuals with mental illness, as that term is defined in 42 U.S.C. § 10802 and 42 C.F.R. § 51.2.

17. Consistent with the PAIMI Act, DRCT's governing structure allows its constituents to express their collective views and protect their collective interests, and to participate in, significantly influence, and help guide DRCT's priorities and activities.

18. DRCT has established a PAIMI Advisory Council ("Council") that advises DRCT on policies and priorities to be carried out in protecting and advocating for the rights of individuals with mental illness. The Council complies with all requirements of 42 U.S.C. § 10805(a)(6). The Chair of the Council sits on the Board of Directors of DRCT.

19. The Council holds bi-monthly meetings to discuss, evaluate, and advise on DRCT's policies, priorities, procedures, and activities. The Chair of the Council presents the substance of the Council's findings and conclusions to the Board of Directors at the monthly Board meetings. The Council considers, nominates, and appoints its own members, including its Chairperson. DRCT's Executive Director does not control or take part in the election of new members to the Council. Council members may be removed only upon recommendation by the Council to the Executive Director.

20. DRCT has established a grievance procedure whereby persons served under PAIMI or their representatives or family members may file a grievance when there is disagreement about a DRCT action or decision. The grievance procedure is designed "to assure that individuals with mental illness have full access to the services of the system." 42 U.S.C. § 10805(a)(9). The Council is the final decision-maker with respect to grievances filed by persons served under PAIMI or their representatives or family members.

21. The Council, in conjunction with the Executive Director and Board of Directors, establishes DRCT's PAIMI priorities for each fiscal year at an annual meeting.

22. The Council has voted to include a priority concerning DOC's in-cell shackling of prisoners with mental illness. The Council has supported and approved DRCT's efforts to address the prolonged isolation and in-cell shackling of prisoners with mental illness. The Council has also approved the commencement of this lawsuit to remedy that mistreatment of DRCT's Constituents. The interests that DRCT seeks to vindicate by this lawsuit — protecting the rights of institutionalized individuals with mental illness — are germane to DRCT's central purpose and federal mandate.

23. As demonstrated above, DRCT's Constituents have the power to participate in and exert significant influence over DRCT's policies, priorities, and activities. DRCT provides the means by which these Constituents express their collective views and protect their collective interests. DRCT is therefore the functional equivalent of a traditional membership organization, and DRCT's Constituents possess sufficient indicia of membership in DRCT so as to support DRCT's associational standing to sue on their behalf.

24. DOC's continuing violations of the Eighth Amendment, ADA, and Section 504 have also directly and proximately caused injury, including economic injury and impairment, to DRCT itself. DRCT has been forced to divert substantial resources over the past several years to investigating DOC's mistreatment of DRCT's Constituents, including DOC's actions that form the basis for the claims asserted in this litigation. For example, and without limitation, DRCT has worked pursuant to the Council's priorities concerning prolonged isolation and restraint, including in-cell shackling, of DRCT's Constituents. DRCT employees have spent a significant amount of time processing and reviewing DRCT's Constituents' complaints about DOC's

mistreatment of them, including the conditions that form the basis for the claims asserted in this litigation. Given DOC's failure to remedy the situation, DRCT has also been forced to divert substantial resources to preparing to enforce the rights of DRCT's Constituents through this litigation.

### B.    Connecticut Department of Correction

25.    Defendant DOC is a public entity duly organized and existing under the laws of the State of Connecticut, and a government entity. DOC employs more than 5,000 persons and is responsible for, and retains authority over, the operation of Northern and other Connecticut state prisons, including the housing and treatment of DRCT's Constituents. DOC is charged with rendering care or treatment to DRCT's Constituents at Northern and other Connecticut state prisons. DOC receives state and federal funds for the operation of Northern and other state prisons and has received such funds throughout the time period during which the acts described herein have continued.

### C.    Angel Quiros    *Rollin Cook*

26.    Defendant Angel Quiros is the Acting Commissioner of DOC. Defendant Quiros, as Acting Commissioner, is the legal custodian of all prisoners confined in DOC facilities, is responsible for the safe, secure, and humane housing of those prisoners, and has authority over the assignment of prisoners to DOC's administrative statuses. Defendant Quiros served as Warden of Northern from 2009 to 2011. Defendant Quiros has acted within the scope of his employment and under color of state law at all times relevant hereto and in connection with all policies, procedures, practices, and conduct described herein. Defendant Quiros is sued in his official capacity.

8

**D.   Roger Bowles**   *Maldano*

27.    Defendant Roger Bowles is the Warden of Northern. Defendant Bowles, as Warden, is the legal custodian of all prisoners confined at Northern and is responsible for the safe, secure, and humane housing of those prisoners. Defendant Bowles has acted within the scope of his employment and under color of state law at all times relevant hereto and in connection with all policies, procedures, practices, and conduct described herein. Defendant Bowles is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.   DOC's Design of the Northern Supermax Prison

28.    DOC opened Northern in March 1995 as Connecticut's first and only super-maximum security prison. DOC justified the enormous costs of constructing and maintaining Northern as necessary to securely house the "worst of the worst," in the words of former DOC Commissioner Leo Arnone.

29.    Northern was purposely designed to isolate prisoners and its conditions are singularly oppressive. According to John Kessler, the architect of Northern, "[w]hen we were designing it, there was a desire that [prisoners'] first experience would make an impression — the limited environment, the lack of stimulus. . . . There is nothing soft. It's hard, and they wanted that." *The Worst of the Worst: Portrait of a Supermax* (2012) (interview with James Kessler). Former State Senator Joseph Crisco observed during a floor debate in 2012 that "Northern Prison, death row . . . is hell on earth. How one retains his sanity in an environment like that is incomprehensible." This Court recently determined that a special circumstances

prisoner's conditions of confinement at Northern constituted cruel and unusual punishment under the Eighth Amendment. *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 23 (D. Conn. 2019).[1]

30.     As shown below (Figure 1), Northern's six housing units radiate outwards from a long, sloped, windowless corridor, meant to give the impression of walking underground. Light and sound reverberate off the concrete walls and mirrored windows, which are purposefully arranged at irregular angles and create a disorienting, kaleidoscopic effect.



Figure 1
Aerial View of Northern

31.     Compounding this disorienting effect, there is a small room (the "bubble") at the center of each unit from which Northern staff control all movement and communication. The bubble is covered with mirrored glass so that staff can see out but prisoners cannot see in. Staff

---

[1] "Special Circumstances" is a status for prisoners sentenced to death before Connecticut abolished the death penalty. DRCT does not, by this lawsuit, seek to address the conditions of confinement for Special Circumstances Status prisoners. Those conditions of confinement are already at issue in *Reynolds v. Arnone*, No. 3:13-cv-1465 (SRU) (D. Conn.).



Figure 2
Sink and Toilet



Figure 3
Bed and Desk



Figure 4
"Window" Slot



Figure 5
Sink and Door

36.      A prisoner's access to fresh air and direct sunlight comes from a trip to what is

called the "recreation cage," a space slightly larger than a cell, surrounded by approximately

fourteen-foot concrete walls and topped by a steel cage.  The only view is of the sky.  Figures 6

and 7, also taken from the documentary *The Worst of the Worst: Portrait of a Supermax* (2012), show the "recreation cage."



Figure 6
"Recreation Cage"



Figure 7
"Recreation Cage"

**B.     DOC's Long History of Mistreating Prisoners with Mental Illness**

37.     Mental illness is prevalent at Northern.  Many prisoners there have histories of mental illness, have been diagnosed with mental illness, and/or have been treated with

14

41. On September 26, 2005, the District Court approved a Settlement Agreement in the Choinski Litigation (the "Settlement Agreement") and retained jurisdiction over the matter to enforce compliance with the Settlement Agreement.

42. The Settlement Agreement provided that services for prisoners with serious mental illness would be consolidated at Garner, which would be designated as DOC's mental health institution. All prisoners who met the definition of "seriously mentally ill," as determined by an independent evaluation process, had to be promptly removed from Northern. The Settlement Agreement also called for increased staffing and changes to mental health evaluation and services. All prisoners held in the most restrictive form of confinement at Northern were to be assessed by psychiatric experts to determine whether their placement was appropriate. Individuals with mental health scores of MH4 or MH5 (i.e., a mental health disorder requiring specialized housing or ongoing intensive treatment, or crisis level mental disorder) were to be transferred to a facility with intensive psychiatric services such as Garner. The Settlement Agreement also prohibited DOC from disciplining prisoners for actions that were the result of their mental illness.

43. In 2008, the Settlement Agreement's judicial monitoring and compliance period ended. The final independent audit carried out pursuant to the Settlement Agreement found substantial noncompliance by DOC, including a failure to remove prisoners with serious mental illness from Northern and a failure of doctoral-level clinicians to see prisoners within appropriate timeframes.

44. DOC closed its independent ombudsman's office in 2009. DOC then quickly reverted to using Northern as a heavy-handed solution for even routine and nonviolent behavioral issues, including those caused by mental illness. While many prisoners had

documented histories and symptoms of mental illness at the time the Settlement Agreement ended, DOC, along with its employees, agents, and contractors, failed to ensure that these prisoners received meaningful mental health treatment. Instead, under the supervision of Defendant Quiros, then Warden of Northern, staff at Northern often punished these individuals with disciplinary sanctions and in-cell shackling.

45.     Upon information and belief, people with mental illness, including those with serious mental illness and those at substantial risk of developing serious mental illness, comprise a substantial portion of Northern's population. Although DOC has taken steps toward reducing the overall population at Northern in the past decade, those measures have not changed the daily reality for prisoners who remain trapped at Northern.

**C.     DOC's Transfer and Holding of Prisoners with Mental Illness at Northern**

46.     Prisoners with mental illness, including those with serious mental illness and those at substantial risk of developing serious mental illness, end up at Northern through a variety of paths, including being assigned to one of the Special Management Programs, *i.e.*, Administrative Segregation, Security Risk Group, or Special Needs.

47.     Administrative Segregation is supposed to be reserved for individuals "whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that . . . can no longer be safely managed in general population." (Administrative Directive 9.4.) Administrative Segregation has three phases. Phase I occurs at Northern and lasts a minimum of 120 days. Individuals in Phases II and III are currently housed at Garner, although some individuals complete the latter phases of the program at Northern as well. Phases II and III last a minimum of 90 days each.

48.     Security Risk Group is supposed to be reserved for individuals whom DOC deems to have a gang affiliation. (Administrative Directive 6.14.) Phase I occurs at Northern and lasts

17

a minimum of 120 days. But these prisoners must complete a total of five phases lasting at least two years. Later phases of the Security Risk Group program occur at other facilities.

49.     Special Needs Management is an open-ended status that DOC developed to manage individuals who "have demonstrated behavioral qualities either through the serious nature of their crime, behavior, or through reasonable belief that they pose a threat to the safety and security of staff, other inmates, themselves, or the public." (Administrative Directive 9.4.) Individuals in Special Needs Management have typically been judged by the DOC to have "failed" the Administrative Segregation or Security Risk Group statuses. Special Needs prisoners are typically sent to Northern, where they will spend a minimum of six months. Special Needs prisoners are required to be seen by a mental health professional after 30 days of initial placement and every 90 days thereafter.

50.     The Administrative Segregation, Security Risk Group, and Special Needs Management prisoner stay at Northern is often far more than the minimum required. Prisoners are commonly held back for disciplinary infractions or if Northern staff decide that they have not completed the required programming. For example, even Administrative Segregation prisoners who progress out of Northern to Phase II at another facility can find themselves quickly sent back to Phase I at Northern to begin all over again.

51.     Prisoners with mental illness have even more difficulty managing the stress of prison life and are likely to be placed into, and held back in, Administrative Segregation. DOC maintains oppressive conditions of confinement at Northern. Consequently, once isolated, prisoners with mental illness are often unable to maintain stable behavior and find themselves held back in the program for disciplinary violations of all kinds. The result is that prisoners with mental illness can languish at Northern for months, years, or even indefinitely.

18

52. Even after prisoners complete Administrative Segregation, Security Risk Group, or Special Needs Management, they can be placed on "Special Monitoring" status indefinitely. DOC subjects prisoners on this status to heightened supervision and monitoring per Administrative Directive 9.4. They can be returned to Northern for any action deemed a "threat to safety and security," a broad term that can include self-harm behaviors, without a hearing.

**D. DOC's Prolonged Isolation of Prisoners with Mental Illness**

53. Prisoners with mental illness at Northern, including those with serious mental illness and those at substantial risk of developing serious mental illness, are subjected to prolonged isolation and sensory deprivation. Administrative Segregation Phase I and Security Risk Group Phase I, which constitute the majority of Northern's population, impose the most restrictive conditions on prisoners, including prisoners with mental illness.

54. Most prisoners at Northern are locked in their cells by themselves. Regular conversation with anyone outside of the cell is impossible: individuals must shout through metal doors, air vents, and sink drains to communicate.

55. Most prisoners are locked in their cells at least 22 hours per day on weekdays and 24 hours per day on weekends.

56. All physical movement is highly restricted. Prisoners remain locked in their cells except for a shower three times per week (or four times per week during the COVID-19 pandemic) and one hour of "recreation" five times per week, when prisoners are sent to the outdoor cage. Security Risk Group prisoners allowed to "recreate" with other prisoners spend this time shackled with their hands behind their back.

57. Typically, each time a prisoner leaves their small cell, they must submit to a humiliating and invasive "strip search" ritual, whereby they must strip naked, squat, and cough

to expose the testicles and anus. DOC staff visually inspect the naked prisoner's hair, ears, nose, mouth, underarms, soles of feet, and cavities between the toes, rectum, and genitalia.

58.     Most prisoners, including all prisoners in Phase I of the Administrative Segregation and Security Risk Group programs, are shackled every time they leave their cell and must crouch to be handcuffed through the trap prior to exiting.

59.     DOC policy mandates strip searches when individuals go to or from the "recreation" cage, but prisoners are often subjected to full strip searches when they leave their cell for other purposes, including for mental health treatment or legal visits. Many prisoners choose to avoid the humiliation, and often harassment, by simply remaining in their cells, where their only contact with others is conversations through sink drains and air vents.[2]

60.     Contact with the outside world is highly restricted. On paper, DOC's administrative directives permit weekly calls and visits, with the permitted number of calls and visits varying by status. In practice, however, visits and even phone calls are rare. DOC routinely revokes visitation and call privileges as punishment for disciplinary violations; many people at Northern have accrued disciplinary violations and lost visiting and phone privileges for years or even decades. Prisoners may receive visits from immediate family only, leaving many people cut off from loved ones — aunts, girlfriends, cousins, mentors, friends — who might otherwise provide critically needed social support. Even when social visits do occur, they are noncontact and occur via phone through a thick, Plexiglass barrier. Most prisoners must be shackled in full restraints (wrists, ankles, and tether chain) during visits.

---

[2] Prisoners at Northern on Special Needs status are granted a few additional hours of recreation per week. But these few chances for additional time out of cell are not granted to most of the individuals incarcerated at Northern, and when accessible, they are wholly insufficient to mitigate the overarching environment of deprivation and restriction.

61.     These extreme conditions fuel, and are fueled by, Northern's longstanding culture of violence and brutality.  While many DOC staff perform their jobs with the utmost professionalism, others engage in harassment, intimidation, or outright violence against prisoners.  DOC staff have tampered with prisoners' food, threatened retaliation if prisoners file a grievance or lawsuit, and spread misinformation about prisoners, including false allegations of child rape and molestation that provoke violence against them.  Verbal harassment by staff is commonplace, either in person or via intercom.  Some have even goaded prisoners with mental illness who were having suicidal thoughts, ignoring their pleas for treatment and encouraging them to hurt themselves.

62.     DOC staff also routinely and deliberately antagonize prisoners, inciting them to act out in order to justify the use of force.  As part of their punishment, prisoners are denied access to blankets and adequate clothing for days and sometimes weeks.

63.     This punishing and prolonged isolation and mistreatment is particularly taxing and is discriminatory toward prisoners with mental illness.  The prolonged isolation of these prisoners exacerbates mental illness and can lead to cognitive deterioration and heightened stress-related symptoms.  Prolonged isolation can also exacerbate, and in some cases cause, physical or psychiatric disabilities, such as gastrointestinal disorders, insomnia, eyesight deterioration, heart palpitations, migraines, and profound fatigue.  Even those who endure the effects of isolation better than others are subjected to intolerable conditions, as they are forced to endure the hallucinations and screaming of other prisoners suffering the debilitating effects of isolation.  In addition, together with the social and sensory deprivation, the cold temperatures interfere with sleep, likely contributing to feelings of anxiety and depression.

dysfunction, hypersensitivity to stimuli, and hallucinations," "loss of emotional control," and "increased suicidality and instances of self-harm." Craig Haney, *Restricting the Use of Solitary Confinement*, 2018 Ann. Rev. Criminology 285, 291 (2018); *see also* Jesenia Pizarro & Vanja M. K. Stenius, *Supermax Prisons: Their Rise, Current Practices, and Effect on Inmates*, 84 Prison J. 248, 256 (2004) (noting "declines in mental functioning," "difficulties in thinking, concentration and memory problems, and problems with impulse control" in incarcerated people subject to prolonged isolation). One leading survey of the literature on the psychological effects of prolonged isolation concluded that prisoners subjected to prolonged isolation may develop "a confusional psychosis with intense agitation, fearfulness, and disorganization" and that "the harm caused by such confinement may result in prolonged or permanent psychiatric disability." Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325, 354 (2006).

68. Many courts have recognized the psychological harm inflicted by prolonged isolation. In fact, this Court recently acknowledged the "growing consensus among the scientific community that solitary confinement inflicts severe harm on prisoners." *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 12 (D. Conn. 2019). *See also Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."); *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting) (noting the petitioner "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting) ("[I]t is well documented that . . . prolonged solitary confinement produces numerous deleterious harms."); *Porter v. Clarke*, 923 F.3d 348, 357 (4th

Cir. 2019) (finding that, based on the scientific literature, solitary confinement poses a "substantial risk of serious psychological and emotional harm"); *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566-67 (3d Cir. 2017) (noting scientific consensus that solitary confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subject to it at risk of long-term . . . damage").

69. Prolonged isolation is also known to cause negative long-term physiological effects. These effects may include "pains in the abdomen and muscle pains in the neck and back," "dizziness and loss of appetite," "lethargy and chronic tiredness," and "a constellation of symptoms — headaches, trembling, sweaty palms, and heart palpitations — that is commonly associated with hypertension." Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 488-92 (2006); *see also* Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 133 (2003); Brie A. Williams et al., *The Cardiovascular Health Burdens of Solitary Confinement*, 34 J. Gen. Internal Med. 1977, 1977 (2019). The physiological harm caused by prolonged isolation is closely linked to the psychological harms of this isolation; worsened physical symptoms may aggravate psychological symptoms, and vice versa. Justin D. Strong et al., *The Body in Isolation: The Physical Health Impacts of Incarceration in Solitary Confinement*, PLoS ONE (2020).

70. United States and international institutions responsible for human rights and the treatment of prisoners have recognized the devastating psychological and physiological impacts of prolonged isolation. These institutions agree that prolonged isolation of individuals with mental illness violates standards of common decency. In fact, there is broad consensus that

individuals with mental illness should not be placed in isolation unless absolutely necessary, under medical supervision, and only for brief periods of time.

(a)  The United Nations Standard Minimum Rules for the Treatment of Prisoners ("Mandela Rules") prohibit isolation of prisoners with psychiatric disabilities when those conditions would exacerbate their disabilities.  G.A. Res. 70/175 (Dec. 17, 2015).

(b)  The Inter-American Commission on Human Rights has established that isolation "should be absolutely prohibited . . . for persons with mental disabilities."  Press Release, Organization of American States, *IACHR Expresses Concern over Excessive Use of Solitary Confinement in the United States* (July 18, 2013).

(c)  American Bar Association ("ABA") standards recommend that "no prisoner diagnosed with serious mental illness should be placed in long-term segregated housing."  ABA, *ABA Standards for Criminal Justice: Treatment of Prisoners* (3d ed. 2011) ("ABA Standards").

(d)  The National Commission on Correctional Health Care states that "mentally ill individuals . . . should be excluded from solitary confinement of any duration."  Nat'l Comm. on Corr. Health Care, *Position Statement on Solitary Confinement* (Apr. 2016).

71.  Ultimately, DOC's policies and practices of prolonged isolation trap people with mental illness, including those with serious mental illness and those at substantial risk of developing serious mental illness, in a vicious cycle of deterioration and punishment.  Prolonged isolation causes prisoners' mental health to deteriorate and prompts them to act out.  Those actions, in turn, prompt DOC to respond with even harsher sanctions — including excessive use

**F. DOC's Failure to Make Reasonable Modifications to Policies, Practices, and Procedures to Avoid Discriminating Against Prisoners with Mental Illness**

90. DOC fails to make reasonable modifications to policies, practices, and procedures that are necessary to accommodate prisoners with mental illness and that would allow those prisoners meaningful access to services, programs, and activities afforded to other prisoners. DOC has failed to reasonably modify its programs, services, and activities to provide DRCT's Constituents with needed mental health services in DOC's other facilities and instead transfers them to Northern where they are subjected to prolonged isolation and in-cell shackling.

91. DOC fails to reasonably modify its policies, practices, and procedures when assigning prisoners with mental illness to Administrative Segregation and housing them at Northern; subjecting prisoners with mental illness to in-cell shackling and Behavioral Observation Status ("BOS") at Northern; and disciplining prisoners with mental illness and holding them back from progression through Administrative Segregation at Northern. DOC's failure to furnish reasonable modifications to prisoners with mental illness punishes prisoners with mental illness for disability related conduct, exacerbates existing mental illness, and, sometimes, causes development of additional mental illness and/or exacerbation of symptoms of existing mental illness.

92. For example, DOC has a policy, practice, and procedure or excluding certain psychiatric diagnoses as being "untreatable." DOC draws a false distinction between different types of mental disorders. DOC differentiates between mental disorders such as schizophrenia and bipolar disorder, formerly characterized as "Axis I" disorders in the APA's Diagnostic and Statistical Manual of Mental Illness ("DSM-IV"), and Borderline Personality Disorder ("BPD") and Antisocial Personality Disorder ("ASPD"), formerly characterized as "Axis II" disorders in

31

the DSM-IV. The DSM-V eliminated the Axis I and Axis II labels, but DOC's false distinction between these disorders continues.

93.     Borderline Personality Disorder ("BPD") is a serious and treatable mental illness. Symptoms of BPD include recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior; affective instability due to a marked reactivity of mood; chronic feelings of emptiness; and stress-related paranoid ideation or severe dissociative symptoms. A BPD diagnosis may be "defined, in part, by recurrent suicidal and self-injurious behaviors." Up to seventy percent of people living with BPD attempt suicide during their lifetime; up to ten percent of people diagnosed with BPD die of suicide. Michelle M. Wedig et al., *Predictors of Suicide Attempts in Patients with Borderline Personality Disorder over 16 Years of Prospective Follow-up*, 42 Psychol. Med. 2395 (2012).

94.     Antisocial Personality Disorder ("ASPD") is also a serious and treatable mental illness. Symptoms of ASPD include failure to conform to social norms with respect to lawful behaviors, impulsivity, and failure to plan ahead. Prisoners with ASPD are more likely to attempt suicide than those without. "Individuals with ASPD diagnoses may be at increased risk for multiple suicide attempts over the course of their lifetime." Emily B. Ansell et al., *Personality Disorder Risk Factors for Suicide Attempts over 10 Years of Follow-up*, 6 Personality Disorders 161 (2016).

95.     As a result of DOC's policies, practices, and procedures that erroneously deem BPD, ASPD, and other mental health conditions as being "untreatable" mental illnesses, DOC refuses to provide reasonable modifications for individuals diagnosed with such mental health disabilities. DOC does not make reasonable modifications to prevent prisoners with BPD and ASPD, or numerous other mental illnesses, from being sent to Northern. To the contrary, DOC

letter was received by DOC on November 24, 2020. In the letter, DRCT requested that DOC confirm it will implement the following changes:

(a)     immediately and permanently cease the use of in-cell restraints on individuals with mental illness, including those at substantial risk of developing serious mental illness, at Northern;

(b)     immediately and permanently cease subjecting individuals with mental illness, including those at substantial risk of developing serious mental illness, at Northern to prolonged isolation; and

(c)     immediately cease subjecting any persons at Northern to prolonged isolation or in-cell restraints until such time that DOC demonstrates that it has implemented an independent and effective mechanism to screen out all persons with mental illness, including those at substantial risk of developing serious mental illness.

155.    On January 22, 2021, DOC responded that the letter had been received but was delayed in reaching the Commissioner's Office, and that the allegations were being reviewed. DRCT responded to DOC's letter but DOC has not yet provided any substantive response.

156.    The conditions described herein are likely to persist unless enjoined by this Court. DRCT has no alternative adequate remedy at law.

## CAUSES OF ACTION

### First Cause of Action
(42 U.S.C. § 1983: Eighth and Fourteenth Amendments;
prolonged isolation of individuals with serious mental illness)

157.    DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 156 above as if fully set forth herein.

158.    This claim is brought against Defendants Quiros and Bowles in their official capacity.  Defendants Quiros and Bowles acted under color of state law at all times relevant hereto and in connection with all events described herein.

159.    Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice, have violated and continue to violate the rights of DRCT's Constituents by depriving them of their right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment to the United States Constitution.

160.    Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice of prolonged isolation of DRCT's Constituents, have subjected DRCT's Constituents to dangerous and degrading mistreatment, caused them serious pain and injury, placed them at substantial risk of serious physical and psychological injury, acted contrary to standards of decency, and denied them the minimal civilized measure of life's necessities. Defendants Quiros and Bowles, and their agents, officials, employees and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice of prolonged isolation of DRCT's Constituents, continue to subject DRCT's Constituents to dangerous and degrading mistreatment, cause them serious pain and injury, place them at substantial risk of serious physical and psychological injury, act contrary to standards of decency, and deny them the minimal civilized measure of life's necessities.

161.    Defendants Quiros and Bowles, and their agents, officials, employees and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom,

46

and practice of subjecting DRCT's Constituents to prolonged isolation at Northern (1) have unnecessarily and wantonly inflicted, and continue to unnecessarily and wantonly inflict, pain upon them; (2) have acted and continue to act with deliberate indifference to their health, safety, and serious medical needs; and (3) knew and continue to know the risk to the health, safety, and serious medical needs of DRCT's Constituents but have disregarded that risk and failed to take any reasonable measures to abate that risk.

162.     Defendants Quiros and Bowles and their agents, officials, employees and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice have subjected and continue to subject DRCT's Constituents to prolonged isolation at Northern for punitive or retaliatory purposes, and not in a good faith effort to ensure safety or security or, at times, maintained them in prolonged isolation for longer than safety and security required.

163.     Defendants Quiros and Bowles authorized, condoned, and failed to exercise their supervisory authority to prevent the illegal prolonged isolation of DRCT's Constituents by their agents, officials, employees, and others acting in concert with them under color of state law, and are continuing to authorize, condone, and fail to exercise their supervisory authority to stop that illegal practice.

164.     Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law to subject prisoners with mental illness to prolonged isolation, have inflicted, and continue to inflict, cruel and unusual punishment on DRCT's Constituents in violation of the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

165. Defendants Quiros and Bowles, and their agents, officials, employees, and all persons acting in concert with them under color of state law, are the proximate cause of the ongoing deprivation of constitutional rights of DRCT's Constituents.

166. As a result of the actions of Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, DRCT's Constituents have suffered and continue to suffer irreparable harm.

167. Unless enjoined, Defendants Quiros and Bowles, and their agents, officials, employees and others acting in concert with them under color of state law, will continue the prolonged isolation of DRCT's Constituents in violation of the Eighth and Fourteenth Amendments, and continue to inflict injuries for which such prisoners have no adequate remedy at law.

168. DRCT is entitled to an injunction against the prolonged isolation of DRCT's Constituents by Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law.

### Second Cause of Action
(42 U.S.C. § 1983: Eighth and Fourteenth Amendments;
in-cell shackling of individuals with mental illness)

169. DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 168 above as if fully set forth herein.

170. This claim is brought against Defendants Quiros and Bowles in their official capacity. Defendants Quiros and Bowles acted under color of state law at all times relevant hereto and in connection with all events described herein.

171. Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice, violated and continue to violate the rights of DRCT's Constituents by depriving

them of their right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment to the United States Constitution.

172. Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice of in-cell shackling of DRCT's Constituents, have subjected DRCT's Constituents to dangerous and degrading mistreatment, caused them serious pain and injury, placed them at substantial risk of serious injury, acted contrary to standards of decency, and denied them the minimal civilized measure of life's necessities. Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law by and pursuant to DOC's policy, custom, and practice of in-cell shackling of DRCT's Constituents, continue to subject DRCT's Constituents to dangerous and degrading mistreatment, cause them serious pain and injury, place them at substantial risk of serious physical and psychological injury, deny them the minimal civilized measure of life's necessities, and act contrary to standards of decency.

173. Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice of subjecting DRCT's Constituents to in-cell shackling (1) have unnecessarily and wantonly inflicted, and continue to unnecessarily and wantonly inflict, pain upon them; (2) have acted and continue to act with deliberate indifference to their health, safety, and serious medical needs; and (3) knew and continue to know the risk to the health, safety, and serious medical needs of DRCT's Constituents but have disregarded that risk and failed to take any reasonable measures to abate that risk.

174. Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice, subjected and continue to subject DRCT's Constituents to in-cell shackling maliciously and sadistically, and for punitive or retaliatory purposes. In many instances, they used in-cell shackling to punish DRCT's Constituents for behavior that predictably arises from their own actions — that is, from placing people with mental illness in prolonged isolation at Northern.

175. Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, did not and do not instigate or continue to subject DRCT's Constituents to in-cell shackling in a good faith effort to maintain or restore discipline, to ensure the safety or security of others, or to ensure their own safety or security.

176. Defendants Quiros and Bowles authorized, condoned, and failed to exercise their supervisory authority to prevent, the illegal in-cell shackling of DRCT's Constituents by their agents, officials, employees, and others acting in concert with them under color of state law, and continue to authorize, condone, and fail to exercise their supervisory authority to stop that illegal practice.

177. Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law by the in-cell shackling of prisoners with mental illness, have inflicted, and continue to inflict, cruel and unusual punishment on DRCT's Constituents in violation of the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

178.   Defendants Quiros and Bowles, and their agents, officials, employees, and all persons acting in concert with them under color of state law are the proximate cause of the ongoing deprivation of constitutional rights of DRCT's Constituents.

179.   As a result of the actions of Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, DRCT's Constituents at Northern have suffered and continue to suffer irreparable harm.

180.   Unless enjoined, Defendants Quiros and Bowles, and their agents, officials, employees and others acting in concert with them under color of state law, will continue the in-cell shackling of DRCT's Constituents in violation of the Eighth and Fourteenth Amendments, and to inflict injuries for which such prisoners have no adequate remedy at law.

181.   DRCT is entitled to an injunction against the in-cell shackling of DRCT's Constituents by Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law.

### Third Cause of Action
(Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; failure to implement reasonable modifications for persons with mental illness)

182.   DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 181 above as if fully set forth herein.

183.   This claim is asserted against DOC.

184.   DOC, by the policies and practices described herein, has violated and continues to violate the rights of DRCT's Constituents secured by the ADA. DOC has violated, and continues to violate, the rights of DRCT's Constituents by failing to make reasonable modifications to policies, practices, and procedures needed in order for these prisoners to enjoy meaningful access to services, programs, and activities.

185. The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

186. The ADA has been implemented regulations promulgated by the United States Department of Justice, 28 C.F.R. § 35.101 *et seq.*, providing, *inter alia*, that public entities: (a) shall not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service," 28 C.F.R. § 35.130(b)(1)(i); and (b) "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the [DOC] can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7).

187. DRCT's Constituents are qualified individuals with disabilities within the meaning of the ADA, 42 U.S.C. §§ 12102, 12131, and 28 C.F.R. § 35.104. DRCT's Constituents have mental impairments or illnesses that substantially limit their ability to perform major life activities, such as caring for themselves, working, concentrating, thinking, and communicating with others. Many of DRCT's Constituents also have records of mental impairment or illness, and are regarded as having such mental impairment, or illness.

188. DOC is a public entity within the meaning of and subject to Title II of the ADA. *See* 42 U.S.C. § 12131(1). DOC is responsible for the operation and management of correctional facilities, including Northern, and subject to the ADA Regulations at 28 C.F.R. § 35.152 *et seq.* DOC is legally responsible for ADA violations committed by DOC staff and contractors who

provide programs, services, or activities, including, but not limited to, mental health services, to DOC prisoners including DRCT's Constituents. *See* 28 C.F.R. § 35.130(b)(1).

189. DOC services, programs, and activities are covered by the ADA. The services, programs, and activities that DOC provides to individuals in its custody include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the prison by mail and telephone, exercising, entertainment, safety and security, the prison's administrative, disciplinary, and classification proceedings, medical and mental health services, the library, educational, vocational, substance abuse, and anger management classes, and discharge services.

190. DOC is, and at all times relevant hereto was, aware of the mental illness of DRCT's Constituents and has failed to implement reasonable modifications to policies, practices, or procedures needed in order for these prisoners to enjoy meaningful access to services, programs, and activities and to avoid discrimination on the basis of disability. DOC has violated, and continues to violate, the rights of DRCT's Constituents by failing to provide reasonable modifications to policies, practices, or procedures in order to proscribe discrimination against prisoners with mental illness.

191. For example, DOC fails to reasonably assess and account for mental illness or otherwise provide reasonable modifications to policies, practices, and procedures in connection with assigning DRCT's Constituents to Administrative Segregation and housing them at Northern where they are subject to prolonged isolation.

192. DOC fails to reasonably assess and account for mental illness or otherwise provide reasonable modifications to policies, practices, and procedures in connection with subjecting DRCT's Constituents to in-cell shackling and BOS at Northern.

193. DOC fails to reasonably assess and account for mental illness or otherwise provide reasonable modifications to policies, practices, or procedures in connection with issuing disciplinary tickets to DRCT's Constituents at Northern, holding them from progression through Administrative Segregation, or otherwise maintaining them at Northern where they are subject to prolonged, or even indefinite, isolation and in-cell shackling.

194. DOC, by subjecting prisoners with mental illness to prolonged isolation at Northern and by the use of frequent in-cell shackling and BOS, excludes these prisoners from participation in, denies them the benefits of, and discriminates against them with respect to equal access to, and the provision of, services, programs, and activities that are accessible to other prisoners. DOC's exclusion, denial, and discrimination are solely by reason of these prisoners' mental illness.

195. In sum, DOC has failed to make reasonable modifications to policies, practices, or procedures to ensure that prisoners with mental illness are able to enjoy meaningful access to services, programs, and activities.

196. DOC, by virtue of the above-described discrimination and mistreatment of prisoners with mental illness, has violated the ADA, including its supporting regulations.

197. DOC's failure to meet its obligations to prisoners with mental illness constitutes an ongoing and continuous violation of the ADA and its supporting regulations and continues to inflict irreparable harm on these prisoners. Unless enjoined, DOC will continue to violate the ADA and to inflict injuries for which prisoners with mental illness have no adequate remedy at law.

198. The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1).

199.    DRCT is entitled to injunctive relief to prevent DOC's continued violation of the ADA, as well as reasonable attorneys' fees and costs incurred in connection with bringing this action.

**Fourth Cause of Action**
(Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a);
failure to provide reasonable accommodation for persons with mental illness)

200.    DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 199 above as if fully set forth herein.

201.    This claim is asserted against DOC.

202.    DOC, by the policies and practices described herein, has violated and continues to violate the rights of DRCT's Constituents secured by the Section 504 and its implementing regulations.  DOC has violated, and continues to violate, the rights of DRCT's Constituents by denying them reasonable modification in policies, practices, and procedures needed in order for them to enjoy meaningful access to services, programs, and activities.

203.    Section 504 provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

204.    Section 504 has been implemented by DOJ-issued regulations, providing, *inter alia*, that recipients of federally funded programs and activities shall not "utilize criteria or methods of administration . . . that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap," 45 C.F.R. § 84.4(b)(4).

205.    DRCT's Constituents are qualified individuals with disabilities within the meaning of Section 504, 29 U.S.C. § 705(20), 42 U.S.C. § 12102.  DRCT's Constituents have

significant mental impairments, or illnesses, that substantially limit their ability to perform major life activities, such as caring for themselves, working, concentrating, thinking, and communicating with others. Many of DRCT's Constituents also have records of such their mental impairment or illness, and are regarded as having such mental impairment, or illness.

206. DOC receives federal grants, contracts, and other financial assistance thereby subjecting itself to the requirements of Section 504. 29 U.S.C. § 794(a). DOC is legally responsible for Section 504 violations committed by DOC staff and contractors who provide programs, services, or activities, including but not limited to mental health services, to DOC prisoners including DRCT's Constituents.

207. DOC programs and activities are covered by Section 504, 29 U.S.C. § 794(b)(1). These programs and activities that DOC provides to prisoners in its custody include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the prison by mail and telephone, exercising, entertainment, safety and security, the prison's administrative, disciplinary, and classification proceedings, medical and mental health services, the library, educational, vocational, substance abuse, and anger management classes, and discharge services.

208. DOC is, and was at all times relevant hereto, aware of the mental illness of prisoners with mental illness and has failed to implement reasonable modification to policies, practices, or procedures needed in order for these prisoners to enjoy meaningful access to services, programs, and activities and to avoid discrimination on the basis of disability. DOC has violated, and continues to violate, the rights of people with mental illness by failing to make reasonable accommodations to policies, practices, or procedures in order to proscribe discrimination against prisoners with mental illness.

209. For example, DOC fails to reasonably assess and account for mental illness or otherwise make reasonable modification to policies, practices, and procedures in connection with assigning DRCT's Constituents to Administrative Segregation and housing them at Northern where they are subject to prolonged isolation.

210. DOC fails to reasonably assess and account for mental illness or otherwise make reasonable modification to policies, practices, and procedures in connection with subjecting DRCTs Constituents to in-cell shackling and BOS at Northern.

211. DOC fails to reasonably assess and account for mental illness or otherwise make reasonable modification to policies, practices, or procedures in connection with issuing disciplinary tickets to DRCT's Constituents, holding them from progression through Administrative Segregation, or otherwise maintaining them at Northern where they are subject to prolonged, or even indefinite, isolation and in-cell shackling.

212. DOC, by subjecting prisoners with mental illness to prolonged isolation at Northern, and by the use of frequent in-cell shackling and BOS, excludes these prisoners from participation in, denies them the benefits of, and discriminates against them with respect to services, programs, and activities that are accessible to other prisoners. DOC's exclusion, denial, and discrimination are solely by reason of these prisoners' mental illness.

213. In sum, DOC has not made any reasonable modification to policies, practices, or procedures to ensure that prisoners with mental illness are able to enjoy meaningful access to services, programs, and activities.

214. DOC, by virtue of the above-described discrimination and mistreatment of prisoners with mental illness, has violated Section 504, including its supporting regulations.

215. DOC's failure to meet its obligations to prisoners with mental illness constitutes an ongoing and continuous violation of Section 504 and its supporting regulations and continues to inflict irreparable harm on these prisoners. Unless enjoined, DOC will continue to violate Section 504 and to inflict injuries for which prisoners with mental illness have no adequate remedy at law.

216. Section 504 authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 29 U.S.C. § 794a(a)(2).

217. DRCT is entitled to injunctive relief to prevent DOC's continued violation of Section 504, as well as reasonable attorneys' fees and costs incurred in connection with bringing this action.

## REQUEST FOR RELIEF

WHEREFORE, in order to stop the ongoing psychological and physical tormenting of its constituents, DRCT respectfully requests that the Court:

(a) Issue a judgment declaring that the prolonged isolation of DRCT's Constituents constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

(b) Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from subjecting DRCT's Constituents to prolonged isolation at Northern either by maintaining any of DRCT's Constituents at Northern or transferring any of DRCT's Constituents to Northern;

(c) Issue a judgment declaring that the in-cell shackling of DRCT's Constituents constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

(d) Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from subjecting DRCT's Constituents to in-cell shackling at Northern;

(e) Declare that Defendants' conduct described herein, including, without limitation, Defendants' failure to provide reasonable modifications that would allow DRCT's Constituents access to services, programs, and activities afforded to other prisoners, violates the ADA and Section 504;

(f) Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from the continued violation of the ADA and Section 504 and further require that Defendants make reasonable modifications that would allow DRCT's Constituents meaningful access to services, programs, and activities afforded other prisoners, as required under the ADA and Section 504;

(g) Grant Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, 28 C.F.R. § 35.175, 29 U.S.C. § 794a(b), and other applicable law; and

(h) Grant such other relief as the Court considers just and proper.

Respectfully submitted,


/s/ Dan Barrett
Dan Barrett (ct29816)
Elana Bildner (ct30379)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 065105
Phone: (860) 471-8471
Email: e-filings@acluct.org


Hope Metcalf (ct424312)
Ify Chikezie (Law Student Intern)
Kamilyn Choi (Law Student Intern)
Luke Connell (Law Student Intern)
Zoe Rubin (Law Student Intern)
Lowenstein International Human Rights
Clinic
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Phone: (203) 432-9404
Email: hope.metcalf@ylsclinics.org

Kyle Mooney (*pro hac vice* forthcoming)
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Phone: (212) 468-8000
Fax: (212) 468-7900
Email: kmooney@mofo.com

Kasey Considine (ct30756)
Disability Rights Connecticut (DRCT)
846 Wethersfield Avenue
Hartford, CT 06114
Phone: (860) 297-4300
Fax: (860) 296-0055
Email: kasey.considine@disrightsct.org

*Counsel for Plaintiff Disability Rights
Connecticut, Inc.*

Finally, the laws of some states may provide different or greater legal rights than the federal laws discussed in this information sheet. Disabled prisoners should investigate this possibility before bringing suit.

DRCT 846 Wethersfield Avenue, Hartford, Conn. 06114
# 860-297-4300 - Kasey Considine

## Disability Rights of Connecticut, Inc.

DRCT is a private, nonprofit corporation and is the authorized protection and advocacy system for the State of Connecticut under the "PAIMI Act" (Protection and Advocacy for Individuals with Mental Illness"), 42 U.S.C. § 10801 et seq., and its implementing regulations. The PAIMI Act provides for establishing and funding protection and advocacy systems, including DRCT, to investigate the abuse and neglect of individuals with mental illness and to advocate for and ensure that their rights are protected, including their rights under the constitution and federal and state statutes 42 U.S.C. § 10801 (b)(1) 10801 (b)(2)(A).

68

# Exhibit #<u>2</u>

Consistant of #2-Pages
of A.D.A.



# National Network
Information, Guidance and Training on the
Americans with Disabilities Act

Call us toll-free
1-800-949-4232 V/TTY
Find your regional center at
www.adata.org

For the most current and accessible version, please visit
https://adainfo.us/adacorrect

# Detention & Correctional Facilities

The Department of Justice (DOJ) regulates Title II of the Americans with Disabilities Act (ADA), which covers state and local governments. These public entities are responsible for the operation or management of juvenile and adult jails, detention and correctional facilities, and community correctional facilities, whether they are operated directly by the state or local government, or through contracts, licenses, or other arrangements with other entities. (§35.151(k) and §35.152)

## Overarching Obligation

The regulations require public entities to ensure that qualified inmates or detainees with disabilities are not discriminated against, denied benefits to which they are entitled, or excluded from programs, services, or activities for which they are eligible.

## Integrated Setting

Inmates or detainees with disabilities must be housed in the most integrated setting appropriate to their needs. Accessible cells or housing units need to be available in all security classifications and/or program levels of a facility.

Qualified inmates or detainees with disabilities should have access to available programs and activities, whether they are mandatory or voluntary. Such activities may include educational, vocational, work release, or religious programs, as well as opportunities for visitation.

Unless it is appropriate to make an exception, public entities must not place inmates with disabilities in:

- Inappropriate security classifications because no accessible cells or beds are available;
- Medical areas unless they are actually receiving medical care or treatment;
- Facilities that do not offer the same programs as facilities where they otherwise would be housed; or
- Distant facilities where they would otherwise not be housed and that would deprive them of visitation with family members.

## Minimum Requirements from the 2010 Standards (§35.151(k))

New construction of jails, prisons, and other detention and correctional facilities must comply with the 2010 ADA Standards for Accessible Design. At least 3% of cells must be accessible for individuals with mobility disabilities, including those who use wheelchairs. Accessible cells must be provided in each classification level.

At least 2% of the general holding and housing cells must be equipped with communication features designed to accommodate individuals who are deaf or hard of hearing. These features include

 **Detention & Correctional Facilities**

telephones with volume control where telephones are provided in cells, and visible alarm signals where audible emergency alarm systems are provided for occupants of cells and occupants are allowed to evacuate independently. (Sections 232 and 807, ADA Standards)

Alterations to jails, prisons, and other detention and correctional facilities must also comply with the 2010 ADA Standards until new construction levels of access are achieved within the facility.

When alterations are made to specific cells, required features for mobility access may be provided in substitute cells (cells other than those where alterations are originally planned), as long as the substitute cell:

- Is located within the same prison site,

- Is integrated with other cells to the maximum extent feasible, and

- Has equal physical access to areas used by inmates or detainees for visitation, dining, recreation, educational programs, medical services, work programs, religious services, and other offered programs.

If it is technically infeasible to locate a substitute cell within the same prison site, the substitute cell may be provided at another prison within the same system.

Medical and long-term care facilities in detention and correctional facilities, whether they are licensed or not, are also subject to the 2010 ADA Standards for accessibility.

Content was developed by the Mid-Atlantic ADA Center, and is based on professional consensus of ADA experts and the ADA National Network.

**Mid-Atlantic**  **Center**

http://www.adainfo.org

The contents of this factsheet were developed under grants from the National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR grant numbers 90DP0089 and 90DP0086). NIDILRR is a Center within the Administration for Community Living (ACL), Department of Health and Human Services (HHS). The contents of this factsheet do not necessarily represent the policy of NIDILRR, ACL, HHS, and you should not assume endorsement by the Federal Government.

© Copyright 2019 ADA National Network. All Rights Reserved.
May be reproduced and distributed freely with attribution to ADA National Network (www.adata.org).

# Exhibit #3

Consist of #1-Page
(A.D.A.) Lawsuit

Exhibit #3
Jossean Crispin

# $1,050,000 Settlement Reached in Disabled Illinois Prisoner's ADA Lawsuit

### by David M. Reutter

AFTER A VERDICT WAS RETURNED BY A federal jury in favor of a disabled Illinois prisoner against the state Department of Corrections (DOC), the parties reached a settlement agreement for $1,050,000 — inclusive of attorney's fees and costs — and attorneys for Plaintiff signed off on a satisfaction of the judgment on July 7, 2022.

The award was made to William Richard, who remained for almost a year at an intake prison where he was subjected to restricted conditions and deprived of services, programs, and activities due to his disability. In its verdict returned on August 25, 2021, the federal court for the Northern District of Illinois found the prisoner was deprived of his rights under federal disabilities legislation, as well as the Eighth Amendment.

When Richard entered Illinois's Northern Reception and Classification Center (NRCC) in June 2015, he was 61 years old and suffered from asthma, emphysema, diabetes, chronic obstructive pulmonary disease, and heart disease. He used an oxygen tank, continuous positive airway pressure (CPAP) machine, and a cane or walker.

Prisoners entering DOC are received at NRCC and typically stay for one to two weeks before being transferred to a "parent" prison to serve their sentence. While held at NRCC, prisoners are significantly more restricted than in general population settings at parent prisons.

As observed by the Court, when ruling on the complaint Richard later filed, conditions at NRCC in many ways resemble those in disciplinary segregation. For instance, NRCC "has no day room, gym, library, educational or vocational programs, or out-of-cell religious services." Prisoners "eat meals in their cells, which lack natural light and electrical outlets, where they remain 22-24 hours a day."

Just eight days after his arrival at NRCC, Richard was approved for transfer to Western Correctional Center. But when the transfer bus arrived and a guard saw Richard's oxygen tank, he was not allowed to board. Instead he was told to await another transfer. A month later, NRCC Superintendent Tracy Engleson contacted the DOC Transfer Coordinator's Office to arrange car transport for Richard.

NRCC Assistant Warden Ricardo Tejeda began in October 2015 to receive weekly reports that Richard had been at the prison over 90 days due to "ADA transport." Richard talked to Tejeda about his situation on October 5, 2015. He was told the matter would be looked into.

In December 2015, Richard filed a grievance stating he had been at NRCC for six months. When he did not receive a response, he filed another grievance in February 2016. A third grievance was filed on April 7, 2016. A transfer approval to Dixon Correctional Center was finally issued on April 8, 2016. Richard, however, was still not transferred to that prison — by car — until June 1, 2016.

With the assistance of Chicago attorney Amanda C. Antholt and co-counsel Samantha Reed of Equip for Equality in Chicago, Richard then filed his complaint with the Court, accusing DOC of violating the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq., as well as the Eighth Amendment's guarantee of freedom from cruel and unusual punishment.

Defendants immediately moved for summary judgment. But the Court denied their motion on July 16, 2021, noting they did not dispute that Richard was a qualified person with a disability nor that for 11 months he was subjected to conditions at NRCC that included deprivation of services, programs, and activities enjoyed by other prisoners who did not have a disability. While Richard did not advance the theory, the Court also said he could have claimed the transport from NRCC to a parent prison was also a service to which he was denied equal access. See: Richard v. Pfister, 2021 U.S. Dist. LEXIS 133313 (N.D. Ill.).

The case proceeded to a two-day jury trial that concluded on August 3, 2021. The Court then entered judgment on August 24, 2021, reflecting the jury verdict awarding Richard $750,000 in compensatory damages and $75,000 in punitive damages.

Defendants moved for judgment notwithstanding the verdict and remittitur of the damage award on September 21, 2021, but the Court denied that motion on January 6, 2022. Defendants then filed an appeal to the U.S. Court of Appeals for the Seventh Circuit on February 8, 2022. See: Richard v. Pfister, USCA (7th Cir.), Case No. 22-1197.

Before that could be heard, on March 9, 2022, the parties notified the district court that they had reached a full settlement of the case. Under their agreement, $750,000 was designated for Richard and $300,000 for his attorneys' costs and fees. See: Richard v. Pfister, USDC (N.D. Ill.), Case No. 1:17-cv-04677.

# Idaho Joins Missouri in Banning Incarceration for Inability To Pay Court Fines, Fees

### by Jayson Hawkins

IT IS NO SECRET THAT IN MOST PRISONS, poverty is the characteristic most often shared by prisoners. Some countries are trying to reduce crime by reducing poverty. But in many American states a different tactic is used: They criminalize being poor.

Take what happened to Roxanna Beck. She owed $643 to the magistrate court in Elmore County, Idaho, stemming from a misdemeanor involving no jail time. When she could not pay, the court had her arrested. Fortunately, on June 24, 2021, the Idaho Supreme Court ruled this practice "constitutionally infirm," just as a Missouri court did in 2019.

In that earlier case, state judges were locking people up for not paying "bills" for their room and board during their primary

sufficiency of the district court's plans, but they were affirmed by the Ninth Circuit in a 1989 ruling, which also reversed the order to provide rehabilitative programming because there is no "constitutional right to rehabilitation." See: *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461 (9th Cir. 1989).

In 2005, the Court recalled, "the district court found 'conditions that [were] worse, both as to overall inmate population and plumbing problems, than when the original injunctive orders were put in place.'" See: *Balla v. Idaho Bd. of Corr.*, 2005 U.S. Dist. LEXIS 51482 (D. Idaho), clarified on denial of reconsideration at 2005 U.S. Dist. LEXIS 38804 (D. Idaho).

That led to appointment in 2011 of a special master, who investigated prison officials' compliance and found they were deliberately indifferent to the medical and mental healthcare needs of prisoners. After mediation, the parties agreed in 2012 to a settlement outlining procedures to modify the compliance plans to allow ISCI to seek certification by the National Commission on Correctional Health Care (NCCHC). If that certification were granted, the parties would voluntarily terminate the court

orders. [See *PLN*, Feb. 2013, p. 40.]

After adopting a modified compliance plan in 2014, the district court entered sanctions for Defendants in 2015 because they falsified and manipulated medical records, misleading the special master. It extended the monitoring period and struck the automatic termination of some terms after NCCHC certification. [See: *PLN*, Nov. 2016, p.44.]

Then in September 2017, the district court found Defendants in contempt for past failure to follow the 2014 order. [See: *PLN*, June 2018, p.51.]

Defendants moved to terminate all prospective relief pursuant to 18 U.S.C. § 3626(b). The Class countered that the failure to treat prisoners with Hepatitis C was a current and ongoing violation. But the district court wasn't interested in hearing an issue never raised before in the litigation. Moreover, it said that Hepatitis C was being addressed in a separate class action. See: *Turkey v. Atencio*, USDC (D. Idaho), Case No. 1:18-cv-00001.

After an 11-day evidentiary hearing, the district court found no ongoing constitutional violations and granted Defendants' motion to terminate. The Class appealed.

Taking up the case again, the Ninth Circuit addressed the Hepatitis C claim first, finding it was not at issue in this long-running class action. Rather, it said, the Class was concerned with the general provision of medical care, and there were no previous findings specifically related to Hepatitis C. The Court also agreed there was no evidence that conditions at ISCI's Medical Annex rose to the level of an Eighth Amendment violation. In fact, the record supported the district court's finding that Defendants complied with staffing requirements for medium-custody units. Moreover, the parties agreed that Defendants complied with required population caps. The Class' attempt to challenge 2005 orders terminating earlier population caps was also dismissed as untimely.

Thus the Court found that "Defendants met their burden of showing there was no ongoing constitutional violation," and the district court's order was affirmed. Plaintiffs were represented by attorneys from the Stoel Rives firm in Boise, which has provided Plaintiffs' counsel in this case since recruited by the district court before its 2005 decision in the case. See: *Balla v. Idaho*, 29 F.4th 1019 (9th Cir. 2022). ■

**CADMUS PUBLISHING** — **Need something new to read? Check out these great new titles written by the incarcerated!**

### Silence in the Face of Injustice
by Gary W. Hardy, PhD
Exposes how lawmakers use fear to abolish reason, abort justice, and unnecessarily and unjustly prosecute criminal wars costing taxpayers billions each year in mass imprisonment. Non-Fiction
$16.99
238 pgs



### Yard Life: Exposé, Real Life Inside of Prison
by Sodo Austin
A raw, authentic inside look into the unbalanced maze of prison & yard life. Wake your game up and enlighten yourself about the life.
Non-fiction; Riots; Lock-Down
$25.99
532 pgs



### Marketing Your Book
by Frank Raemond
The only book specifically about marketing your book *from prison* A must-read for anyone who wants their book to succeed - written by an industry professional who also understands prison restrictions!
Marketing; Writing; Non-Fiction
$15.99
110 pgs



### This Shit Crazy
by Tre Prince
A look into society from the viewpoint of a divine spirit incarcerated physically but not mentally. It is a memoir of humor, truth, and personal events that gives color to life, tragedy and politics that shape America. Memoir; Cultural; Legal
$7.99
76 pgs



### Abort
by Randy Hudson
A team of assassin couples put together to rid the country of bad actors who thrive outside of the law. At present 4 couples work together or independant as the situation requires. Fiction; Crime; Suspense
$18.99
360 pgs



### Living In Reality
by David W. Jones
What the Government does NOT want you to know about Texas Prisons and Mass Incarceration. One man's story about survival and rehabilitation, what really goes on behind the bars. Prison life; Memoir; Crime
$22.99
384 pgs



### Habeas Citebook
by Jackie Keeter & Kevin Sinquefield
This book is a law library at your fingertips, and an essential source for anyone with a claim based upon prosecutorial misconduct. This book contains too much to mention here! Buy today! Law Book; Nonfiction; Educational
$16.99
222 pgs



### Asija Erotica Vol I
by Rasheed H. Williams
Take a trip with these wild stories of erotic tales from these hot steamy pages of Asija Erotica from Rahlo Productions at IG: Rahlo_Pro
Fiction; Erotica
$11.99
176 pgs



### Fangs
by Frank Barvitch
Not all vampires are rich and beautiful. Lawrence is barely getting by until he turns two household pets into his vampire companions. A comedic modern vampire tale unlike any other! Comedy; Fiction; Modern Vampire
$15.99
288 pgs



*All titles available through Amazon and all major online retailers, or order direct from Cadmus! To order direct, just tell us the title(s) you want, include the cost of the book(s) and add $7 (for S&H, no matter how many):* **Cadmus Publishing, PO Box 2146, Port Angeles, WA 98362**

# Exhibit #4

Consist of #1-Page
Concerning Health Records

Jossean Crispin    Exhibit #4

# ACLU Accepts $37,500 Settlement Over Redacted Records From New Mexico Prison Healthcare Provider

*by Benjamin Tschirhart*

**W**EXFORD HEALTH SOURCES HAD BEEN sued over 50 times in just four years when the state of New Mexico terminated the firm's contract to provide healthcare to state prisons. That was in 2007. So the state chapter of the American Civil Liberties Union (ACLU) was understandably alarmed when, in 2019, the New Mexico Corrections Department (NMCD) announced that Wexford had "submitted the winning bid" for the agency's new healthcare contract.

ACLU made a request for all records pertaining to the decision, including Wexford's bid. NMCD denied the request, claiming the records were property of a private company and thus not subject to the state's Inspection of Public Records Act. A NMCD spokeswoman stated in an email that the documents were "protected from public inspection by the Procurement Code."

In response to a court ruling, Wexford released a limited number of documents which were heavily redacted, obscuring more than they showed. In a lawsuit then filed for the ACLU in the First Judicial District Court, attorneys Laura Schauer Ives and Adam C. Flores of Kennedy Kennedy & Ives, PC, in Santa Fe accused the state of "blithely ced[ing] its mandatory duties under the Inspection of Public Records Act to a private corporation." This allowed a "massive state expenditure" to remain essentially secret. The suit named Andrew Kuhlmann and Brian Fitzgerald, the former and present NMCD custodians of public records. It requested the release of the public records, as well as attorney fees, damages, and costs.

In its brief, ACLU cited the Procurement Code — the same one defendants claimed allowed the documents to remain secret. The Code's rules instruct that "the price of product afforded or the cost of services proposed may not be designated as confidential information." Thus, the lawsuit alleged, "neither Wexford nor NMCD complied with the Procurement Code's confidentiality procedures."

First filed in March 2020, the case was in litigation for two years before a $37,500 settlement was signed on July 28, 2022, including costs and attorney fees. "We certainly should not have had to go to court to get documents [regarding] private corporations our state is giving money to," noted ACLU staff attorney Lalita Moskowitz, who said it "flies in the face of everything the Inspection of Public Records Act is supposed to do."

NMCD had awarded Wexford a $246 million contract to provide medical care to prisoners and then allowed the company to decide which of its documents were public and which were not — including the bid itself. Wexford gave no reply to media questions. See: *Am. Civil Liberties Union of N. Mex. v. Fitzgerald*, 1st Jud. Dist. Ct. (Santa Fe Cty.), Case No. 101-CV-2020-00724. 🖐

Additional source: *Santa Fe New Mexican*

# Massive Price Tags and Meager Results: The Legacy of Federal Monitors in New York City

*by Benjamin Tschirhart*

**F**ROM PAYOFFS TO TEACHERS OVER BIASED tests to oversight for excessive force in New York City jails, there's money in being a federal monitor for New York City agencies. But are the results worth the incredible outlay by taxpayers?

The history of these monitors and "special masters" appointed by federal courts to oversee New York City's agencies goes back to the 1970s and a lawsuit against the city's Department of Correction (DOC). Brought by a group of pretrial detainees subjected to brutal and inhumane conditions in jail, the suit's 1982 settlement created the Office of Compliance Consultants (OCC), which is still a big line item on the City's budget to this day. The expenses don't stop there; in the 30-plus years since that first appointment, the Big Apple has been forced to feed growing slices of its budget to ever more numerous and costly monitors appointed by federal courts to oversee consent decrees with city agencies.

According to a tally published by the *New York Post* in February 2022, the price tag stands at $111 million and counting. That includes all payments to monitors for DOC, the Board of Education, the Office of Children and Family Services, the Department of Transportation and the Housing Authority, as well as a "diversity monitor" for hiring and recruitment practices in the city Fire Department.

But for all the millions spent to date, it's difficult to identify results that are worth the cost. Forty years after OCC was created to reform city jails, the situation is still horrific and growing steadily worse; according to the Legal Aid Society, "conditions in the jails are deteriorating at an exponential rate." *PLN* has reported extensively on the mess that is the city's Rikers Island jail complex. [See, for example: *PLN*, Feb. 2022, p.1; May 2022, p.54; and Oct. 2022, p.24.] As city councilman Keith Powers (D) noted, DOC "has failed to provide even basic services" even after 40 years of oversight.

The most ironic comments on the situation come from Steven Bastian, a former warden at Rikers Island and a 31-year veteran of DOC. He accuses the monitors of tactics that have long been attributed to law enforcement and correctional officers themselves; he complains that these officials justify their own existence by expanding the definitions of "excessive force" and by reporting more violations than actually take place. "You can't win!" Bastian laments.

In another spectacularly tone-deaf statement, the Correctional Officers Benevolent Association — which represents DOC guards — claims that both the agency and its monitors are incompetent: "if the current monitoring team hasn't been able to compel any significant progress ... in five years, then perhaps it is time for a new monitor."

It does not seem to occur to the critics that by their reasoning, an argument might be made for replacing DOC itself. Legal Aid Society spokesperson Redmond Haskins answers these complaints with the sort of response long favored by law enforcement officers themselves: "The quickest way to end a monitorship is to stop violating the law." 🖐

Source: *New York Post*

After Reese was removed from his cell, he was taken to the medical unit and a nurse wiped chemical residue from his eyes. But no decontamination was provided for other areas of his skin. His requests to shower were also denied. In fact, Burns told Reese that rinsing with water would exacerbate his pain and discomfort. "Reese was ultimately denied any opportunity to shower for three days following the Incident," his complaint recalled.

Reese further alleged that Defendants had a practice of deploying chemical agents in excessive "super-soaker" doses during cell extractions, which had persisted "for at least 18 months" prior to the incident in his cell.

Represented by attorneys James G. Monteleone and Patrick Marass of Bernstein Shur in Portland, along with Zachary L. Heiden and Emma E. Bond of the American Civil Liberties Union of Maine, Reese filed suit in federal court for the District of Maine in 2018. Proceeding under 42 U.S.C. § 1983, he accused DOC and its officials of violating his Eighth Amendment guarantee of freedom from cruel and unusual punishment.

The parties engaged in some back-and-forth over redactions of DOC testimony and discovery materials. Plaintiff argued that the public had an interest in how its agents acted, and the Court largely agreed. However, it conceded that releasing too much information about internal decision-making "might allow a prisoner to accurately predict how prison staff will act, thereby putting the prison staff in danger," so it partially granted the motion to redact on November 15, 2020. See: *Reese v. Liberty*, 2020 U.S. Dist. LEXIS 213103 (D. Me.).

The parties then proceeded to reach their settlement agreement on September 10, 2021. Under its terms, the payment Reese accepted also included his legal costs and fees. See: *Reese v. Liberty*, USDC (D. Me.), Case No. 1:18-cv-00421.

Reese, now 40, is serving a 29-year sentence for aggravated assault of his girlfriend in 2008, shortly after the couple relocated from Texas to a hotel in Old Orchard Beach. Described by his defense attorney at sentencing as a model student and athlete, he blamed what he did "on a series of foolish decisions that I regret deeply." ◼

Additional source: *Portland Press-Herald*

## Stop Prison Profiteering: Seeking Debit Card Plaintiffs

The Human Rights Defense Center is currently suing NUMI in U.S. District Court in Portland, Oregon over its release debit card practices in that state. We are interested in litigating other cases against NUMI and other debit card companies, including JPay, Keefe, EZ Card, Futura Card Services, Access Corrections, Release Pay and TouchPay, that exploit prisoners and arrestees in this manner. If you have been charged fees to access your own funds on a debit card after being released from prison or jail within the last 18 months, we want to hear from you.

Please contact Kathy Moses at kmoses@humanrightsdefensecenter.org Call (561) 360-2523 Write to: HRDC, SPP Debit Cards, PO Box 1151, Lake Worth Beach, FL 33460

# WRONGFULLY CONVICTED?
# UNFAIR SENTENCE?
# BAD LAWYER?
# NEED A DO-OVER?

# WE CAN HELP.

We are the best source for direct appeals, petitions for review, timely petitions for post-conviction relief, successive petitions for post-conviction relief, and habeas corpus petitions in Arizona.
**NO PRO BONO CASES • ARIZONA CASES ONLY**

 **GRAND CANYON** LAW GROUP | 1930 E BROWN RD, STE 102 MESA, AZ 85203 | 621 N 5TH AVE PHOENIX, AZ 85003 | T 480.400.5555 grandcanyon.law

# Exhibit #5

Consist of #1-Page of
Torture in solitary Confinement
In C.T. Department of Corrections

Exhibit #5

# United Nations Official Says Connecticut's Use of Solitary May Amount to Torture

*by David M. Reutter*

A UNITED NATIONS HUMAN RIGHTS expert has denounced the use of prolonged solitary confinement, which could inflict psychological torture on prisoners. His critique, given at a press conference on February 28, 2020, was aimed at conditions in Connecticut but has implications for the entirety of America's prison system.

"The [Connecticut] DOC appears to routinely resort to repressive measures, such as prolonged or indefinite isolation, excessive use of in cell restraints, and needlessly intrusive strip searches," said Nils Melzer, the UN Special Rapporteur on Torture. "There seems to be a state-sanctioned policy aimed at purposefully inflicting pain or suffering, physical or mental, which may well amount to torture."

"These practices trigger and exacerbate psychological suffering, in particular in inmates who may have experienced previous trauma or have mental health conditions or psychosocial disabilities," Melzer added. "The severe and often irreparable psychological and physical consequences of solitary confinement and social exclusion are well documented and can range from progressively severe forms of anxiety, stress, and depression to cognitive impairment and suicidal tendencies."

Those comments were in response to a May 2019 letter from the Allard K. Lowenstein International Human Rights Clinic at Yale University, which alleged Connecticut "systematically engages in psychological

and physical torture of persons incarcerated at Northern Correctional Institution."

While state and federal laws allow solitary confinement, international law, known as the 2015 updated Mandela Rules, hold that prolonged or indefinite solitary confinement cannot be a "lawful sanction."

U.N. rules define solitary confinement as "the confinement of prisoners for 22 hours or more a day without meaningful human contact." Such confinement can only be imposed in exceptional circumstances, and "prolonged" use of solitary confinement of more than 15 consecutive days is regarded as a form of torture. ▪

See: *ctmirror.org, news.un.org*

# Exhibit #6

Consist of #1-Page
in support of (A.D.A) and
(R.A.) Violation's

Exhibit # 6

# Third Circuit: Showers Part of Prison Operations for ADA and RA Purposes

*by David M. Reutter*

THE THIRD CIRCUIT COURT OF APPEALS held on August 8, 2019 that the provision of showers "is a part of the programs, activities, or services" referred to by the Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA). The appellate court concluded that prison officials had denied a prisoner showers due to his disability, and were deliberately indifferent for failing to provide a handicapped-accessible shower for more than three months.

The ruling came in an appeal by Pennsylvania prisoner Robert Furgess, who suffers from a neuromuscular disease that inhibits his ability to see, walk, speak and lift things.

Upon his arrival at State Correctional Institution-Albion in 2014, prison officials provided accommodations for his disability. His conditions of confinement, however, drastically changed when he was found guilty of a disciplinary infraction and placed in a Restrictive Housing Unit (RHU) on December 14, 2015. The RHU was not equipped with handicapped-accessible showers.

Furgess' repeated requests to be provided with an accessible shower went unheeded.

A March 7, 2016 grievance resulted in his move to a handicapped-accessible cell, but he still was not provided access to a shower. It was not until March 16 that Furgess was finally escorted to a shower, but it was not handicapped-accessible.

He was given a rimless plastic chair to sit on, which caused injuries when he tried to exit the shower because the hot water was exacerbating his symptoms. He slipped and fell due to a lack of safety bars and rails.

After completing the grievance process, Furgess sued under Title II of the ADA and Section 504 of the RA for the prison's failure to provide an accessible shower. The district court granted the defendants' motion to dismiss, finding that a shower was not a "'service, program, or activity' under either statute."

The Third Circuit disagreed. It found §.504 defines a "program or activity" quite broadly to include "'*all* of the operations' of a state instrumentality." While the ADA

does not define "services, programs, and activities," Congress and the courts have recognized the statute provides the same protections as Section 504. The Court of Appeals concluded that "[a] prison's provision of showers" is one "of the operations" of the facility.

The Court was then tasked with determining whether Furgess suffered discrimination due to his disability. It held that he did, rejecting the defendants' argument that "but-for his alleged misconduct, he would not be in the RHU and thus deprived of a shower."

The appellate court wrote that a "prisoner's misconduct does not strip him of his right to reasonable accommodations, and a prison's obligation to comply with the ADA and RA does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there."

The Third Circuit also found prison officials were aware of Furgess' disability and were deliberately indifferent by failing to provide him with a handicapped-accessible shower for over three months. The district court's order was reversed. See: *Furgess v. Pennsylvania Department of Corrections*, 933 F.3d 285 (3d Cir. 2019).

# Exhibit #7

Consist of #1-page
supporting (A.D.A.) and (R.A.)
Violations

# Disabled Detainee at Cook County Jail
## Wins Class Certification in Lawsuit

*by David M. Reutter*

ON APRIL 9, 2020, PRESTON BENNETT, a disabled prisoner at the Cook County Jail (CCJ) in Chicago, won class-action certification to represent all of the jail's disabled prisoners housed in its Division 10 as he proceeds with a lawsuit alleging violations of federal laws protecting the disabled.

The ruling by Judge John Robert Blakey of the U.S. District Court for the Northern District of Illinois allows Bennett to proceed with a 2018 suit filed against Cook County Sheriff Thomas Dart, alleging that CCJ's Division 10 failed to provide accessibility for disabled persons.

Bennett, an amputee, was housed with inmates in Division 10, all of whom need canes, crutches or walkers. His lawsuit alleges that Division 10 lacks grab bars and other fixtures needed for safe use of showers and bathrooms, resulting in a fall he took. The missing fixtures also constitute violations of the Americans with Disabilities Act and the Rehabilitation Act, the suit said.

Bennett initially sought to represent a class consisting of all detainees who need canes, crutches or walkers, but Judge Blakey denied that motion, ruling that the diverse types of apparatuses would prevent the formation of a class. Bennett then proposed an alternative class consisting of all detainees in Division 10, contending that the 1992 facility must comply with the Uniform Federal Accessibility Standards.

But Blakey denied that motion, too, in a September 2019 ruling that said the court "would need to rule on the merits of Plaintiff's case" in order to grant the class-action certification – effectively putting the legal cart before the horse. Bennett was granted an interlocutory appeal, and in March 2020 the Seventh Circuit Court of Appeals vacated Judge Blakey's order denying certification of a class.

Noting that Rule 23(a) and (b) of the Federal Rules of Civil Procedure list the requirements for class certification, the court said that "surety of prevailing on the merits is not one of them;" since classes can lose as well as win. The district court's order was a formula for one-way intervention rather than avoiding it; the court continued, and Bennett's proposed class would win only if the Standards apply to Division 10's facility.

"That's how class actions should proceed," the Seventh Circuit wrote. It vacated the district court's order and remanded the case to Judge Blakey, who determined the Rule 23 standards had been met and granted the class certification. See: *Bennett v. Dart*, 2020 U.S. Dist. LEXIS 62454. ◼

Other sources: *chicagolawbulletin.com*

# Exhibit #8

Consist of #1 Page
Considering solitary a 8th Amendment
violation of the U.S.C.

Exhibit #8

# Solitary Confinement for Former Death Row Prisoner Held Unconstitutional

### by David M. Reutter

A CONNECTICUT FEDERAL DISTRICT court held on August 27, 2019 that a former death row prisoner who was kept in solitary confinement had been subjected to cruel and unusual punishment. The court issued injunctive relief and set a hearing for damages.

The ruling came in a civil rights action filed by Richard Reynolds, who had spent the last 23 years in solitary. "Reynolds committed a heinous crime – he murdered a law enforcement officer," the court wrote. It noted that he was sentenced to death and awaited execution for over two decades.

When Connecticut retroactively abolished the death penalty, Reynolds was resentenced in 2017 to life without the possibility of parole. Section 18-10b of the Connecticut General Statutes decrees that prisoners such as Reynolds would be classified as a "special circumstances high security" prisoner. Such prisoners are only allowed out of their cell for 15-minute periods to eat lunch and dinner and to take a shower. They receive two hours of outdoor recreation six days a week, plus two hours of weekly indoor recreation. Contact visits are prohibited and no interaction other than with clergy, staff and other special circumstances prisoners is allowed.

The district court agreed with Reynolds that his conditions of confinement were inhumane. It found an "overwhelming body of scientific research supports the conclusion that prolonged isolation presents dangerous risks to an inmate's physical and mental health." Dr. Stuart Grassian described the conditions of Reynolds' confinement as "psychologically toxic, cruel, ineffective, and counter productive."

The court also found the defendants were aware of the mental health risks of prolonged segregation, and that it was immaterial that Reynolds had not yet displayed symptoms of a mental health problem due to his social isolation. Further, it held there was no penological purpose for his continued placement in solitary. It noted Reynolds is a "thoughtful, articulate, and disciplined" individual who is a "far cry from the death row inmate who has nothing to lose in committing assaults

and attempting escape.'"

In addition to finding an Eighth Amendment violation, the district court found Reynolds had a liberty interest in avoiding solitary confinement and his due process rights were violated because he was not given notice or a hearing. The defendants "have never made an individualized determination finding that he presents a risk that requires indefinite placement in restrictive housing," the court wrote. There was no rational basis for the differential treatment of Reynolds and two other prisoners who were removed from death row and placed in general population prior to the state's repeal of the death penalty.

Finally, the district court found § 18-10b was an unconstitutional bill of attainder (a legislative act declaring someone guilty of a crime and imposing punishment, without a trial). The court noted the legislature had named Reynolds when debating that statute, and enacted it with the intent of punishing him and other former death row prisoners. Accordingly, the court granted Reynolds summary judgment, awarded declaratory and injunctive relief, and ordered a hearing on damages. The defendants have since filed an appeal, which remains pending. See: *Reynolds v. Arnone*, U.S.D.C. (D. Conn.), Case No. 3:13-cv-01465-SRU; 2019 U.S. Dist. LEXIS 145314. ◼

Exhibit #9

Consist of #10 Page's

of Civil Right's Action
FOWLer V. Department of Correction
Case NO: 3:17-CV-00848



Fowler v. Department of Correction, Slip Copy (2017)
Case 3:17-cv-00107-JBA Document 52-2 Filed 10/02/17 Page 59 of 80
2017 WL 3401252

Exh-20
10 pages

**2017 WL 3401252**
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Jamarr FOWLER, Plaintiff,
v.
DEPARTMENT OF
CORRECTION, et al., Defendants.

No. 3:17-cv-00848 (JAM)
|
Signed 08/08/2017

**Attorneys and Law Firms**

Jamarr Fowler, Suffield, CT, pro se.

**INITIAL REVIEW ORDER
PURSUANT TO 28 U.S.C. § 1915A**

Jeffrey Alker Meyer, United States District Judge

*1 Plaintiff Jamarr Fowler is a prisoner in the custody of the Connecticut Department of Correction. He has filed a complaint *pro se* and *in forma pauperis*, against the Connecticut Department of Correction ("DOC") and 32 individual prison officials. Plaintiff, who is hearing impaired, alleges that defendants violated his rights under the Americans with Disabilities Act, Rehabilitation Act, First Amendment, Eighth Amendment, and Fourteenth Amendment. Based on my initial review pursuant to 28 U.S.C. § 1915A, I conclude that plaintiff's complaint should be served on 28 of the 33 defendants.

**BACKGROUND**

The following allegations from plaintiff's complaint are accepted as true for purposes of the Court's initial review. Plaintiff has a hearing-related disability.[1] On January 29, 2016, he was transferred to Osborn Correctional Institution ("Osborn") and was improperly placed in the "E-Block" unit as opposed to the unit for disabled inmates, as previously ordered by a physician, Dr. Brenton. When plaintiff asked the correctional staff why he was not being placed in the disability unit, he was told that he had to be placed in E-Block because of a

disciplinary report that he received at a previous facility. Plaintiff later learned that there was nothing in DOC's administrative directives that confirmed what he was told. He immediately filed written grievances to defendants Maldonado, Wright, and Long, requesting that he be transferred out of E-Block and housed in the disability unit. No one responded in writing to his complaints. *Id.* at 7–9 (¶¶ 38–39).

Although E-Block is classified as a "general population" unit, the inmates housed in E-Block are subjected to greater restrictions than those inmates in other units, including the disabled inmate unit. For example, E-Block inmates are locked in their cells for 22 hours per day, whereas inmates in the other general population units are outside their cells for the majority of the day. E-Block inmates may only use the law library twice per month for 45 minutes whereas other inmates may use it four to five times per week. E-Block inmates are also not permitted recreation time to exercise, cannot obtain hot water to make food, and are forced to wear bright yellow jumpsuits as opposed to more comfortable clothing. *Id.* at 9–10 (¶ 40).

After several weeks in E-Block, plaintiff was transferred to F-Block, another restrictive housing unit. Again, he was locked in his cell for 22 hours per day. When he was let out of his cell, he was forced to choose between taking a shower, attending religious services, or using the telephone. Such a restriction did not apply to other general population inmates. Plaintiff had very limited access to the telephone, and on the rare occasions when he was permitted to use the phone, his time was cut short. Plaintiff continued to make verbal complaints and file written grievances about his treatment. *Id.* at 11 (¶ 42–43).

*2 After several weeks in F-Block, plaintiff was transferred again—this time to C-Block, another restrictive housing unit. While housed in C-Block, plaintiff was again subjected to the same restrictive and punitive treatment as in F-Block. In addition, defendant Colon completely denied plaintiff access to the telephone during the day. When plaintiff filed complaints against Colon, Colon instructed other correctional officers to falsify disciplinary reports against plaintiff and to prevent him from using the telephone. *Id.* at 11–12 (¶¶ 43–45).

Sometime during his placement in C-Block, plaintiff and plaintiff's family members contacted defendant Martucci,

Director of External Affairs for DOC, and complained about plaintiff's treatment. Martucci informed plaintiff and his family that she was going to organize a meeting between plaintiff, Maldonado, and defendant Gallagher, the Health Services Coordinator, to "work out a plan that would be good for everybody." That meeting never occurred. Gallagher eventually met with plaintiff, but she ended up placing plaintiff on an even more restrictive housing plan. *Id.* at 12 (¶ 45).

Plaintiff then sent Martucci a letter, requesting that he be afforded reasonable accommodations and all of the same rights and privileges as other disabled inmates. Martucci responded with a letter informing plaintiff that all of his issues "have been thoroughly addressed" by Maldonado and his facility team. Plaintiff attempted to follow up with Martucci and explain that none of his issues had been addressed, but his requests were ignored. *Id.* at 13 (¶ 46).

On April 4, 2016, in retaliation for plaintiff's filing of grievances, Maldonado transferred plaintiff to Corrigan Correctional Institution ("Corrigan"), a level-four maximum security prison that is much more restrictive than Osborn. Plaintiff alleges that Maldonado transferred plaintiff to Corrigan in order to prevent him from completing the programs he needs in order to be granted parole. *Id.* at 13–14 (¶ 47). While at Corrigan, plaintiff was only permitted to use the telephone on a "handful of occasions." *Id.* at 14 (¶ 48). Defendants Santiago, Martin, Zegarzewski, and Gillette, all employees of Corrigan, told plaintiff that he would not be permitted to use the telephone during his evening recreation period, on weekends, or on holidays, and that he would only be allowed to use the phone "at [his] counselor's convenience." *Ibid.* These restrictions did not apply to hearing inmates, and they also contradict the DOC's administrative directives, which provide that hearing-impaired inmates be permitted additional time to use the telephone. *Ibid.*

Plaintiff filed numerous complaints and grievances "to the commissioner's office" and within the facility regarding his transfer to Corrigan and the denial of reasonable accommodations, alleging that defendants Marga, Vazquez, Martin, Zegarzewski, and Santiago were retaliating against him, but all his complaints went unanswered. In a further effort to punish plaintiff, Gillette placed plaintiff in the restrictive housing unit under administrative detention for making eleven phone calls to

his family on May 6, 2016. However, because only two of the eleven calls were answered and the other nine went to voicemail, plaintiff's actions did not violate any DOC policy. *Id.* at 15 (¶ 49).

Plaintiff did not receive a copy of the disciplinary report for the eleven phone calls until May 11, in violation of DOC's administrative directives, which required disciplinary reports to be served on inmates within 24 hours. A correctional officer falsified the date of service on the report, stating that it was served on May 9. Plaintiff complained to defendants Nemeth and Dousis (both disciplinary investigators) that he did not receive the report in a timely manner and that it contained false information. Nemeth and Dousis told plaintiff to direct his complaint to defendant Conger. When plaintiff complained to Conger, Conger told plaintiff that he believed Gillette and not plaintiff, and that it was not Conger's job to decide whether plaintiff was timely served with a copy of a disciplinary report. Plaintiff then complained to defendants Santiago and Martin, who responded with a statement to plaintiff that "due process was followed." *Id.* at 16 (¶ 50).

*3 On May 12, 2016, Corrigan staff held a hearing regarding plaintiff's three disciplinary reports. Defendants Nemeth and Dousis denied plaintiff's requests to produce witnesses and documentary evidence in support of his defense and refused to investigate and gather evidence in connection with the reports. Plaintiff requested a continuance of the hearing so that he could obtain replacement hearing aids. He also requested that the hearing be conducted in a quieter room. Defendant Richardson, the hearing officer, denied both requests. When plaintiff questioned Richardson about his decision, Richardson "kicked [plaintiff] out of the hearing" and disciplined him with 40 days of punitive segregation, 8 months loss of commissary, 90 days loss of phone privileges, 60 days loss of jailhouse visits, and 40 days loss of good time credit. *Id.* at 17 (¶ 51).

Plaintiff appealed Richardson's decision and disciplinary action to defendant Quiros, the district administrator. Quiros granted in part and denied in part plaintiff's appeal, ordering Santiago to release plaintiff from punitive segregation by June 1, 2016. Again acting in retaliation, Santiago did not release plaintiff until June 2. While in punitive segregation, plaintiff was subjected to poor ventilation and extremely cold temperatures,

Fowler v. Department of Correction, Slip Copy (2017)
Case 3:17-cv-00103-JBA Document 52-2 Filed 10/02/17 Page 61 of 80
2017 WL 3401252

which caused him to suffer from allergic reactions, infections, and extreme chest pain. He had to be given special medication in addition to his regular asthma medication "to keep him alive." *Id.* at 18 (¶ 52). He was denied regular access to personal hygiene products, barber services, recreation, and showers. In addition, correctional staff threw away his legal mail, and defendants Conger, Santiago, Martin, and Zegarzeski denied plaintiff access to legal books from the law library, causing plaintiff to lose two of his *pro se* post-judgment motions for release. *Id.* at 18–19 (¶ 52).

After he was released from punitive segregation, plaintiff continued to be denied access to the phone. Santiago, Martin, Gillette, and Zegarzewski often threatened to punish plaintiff if he made too many phone calls. Gillette personally read plaintiff's incoming and outgoing mail and monitored his phone conversations. At one point, Gillette told plaintiff that he had learned about plaintiff's connections to two particular women, both of whom Gillette falsely claimed had obtained no-contact orders against plaintiff. Gillette threatened to place plaintiff in restrictive housing if he contacted the women again. *Id.* at 19 (¶ 52).

After several months, plaintiff was transferred back to Osborn and placed in E-Block. Plaintiff alleges that the transfer and placement were the result of a collaborative effort by defendants Marga, Vazquez, Semple, Maldonado, Santiago, Chapdelaine, Wright, and Colon to retaliate against plaintiff for the numerous complaints and grievances he had filed throughout his incarceration. When plaintiff arrived back at Osborn, Colon "forced officers to deny [plaintiff] access to his reasonable accommodations," including his use of the TTY telephone. *Id.* at 20 (¶ 53). Colon also unlawfully went through plaintiff's medical file, obtained records regarding his medical conditions and treatment plan, and posted copies of those records in the medical unit and outside plaintiff's housing unit where other inmates and officers could read them. Plaintiff immediately complained to Gallagher and Maurer about Colon's actions. Gallagher directed Colon to take down the documents but failed to take any other remedial action. *Id.* at 21 (¶ 53).

In September 2016, Maldonado, Marga, and Vazquez transferred plaintiff back to Corrigan in an act of retaliation. When he arrived at Corrigan, plaintiff was notified that he was being immediately sent back to Osborn. Within 24 hours, he arrived back at Osborn and was placed in the B-Block unit. B-Block houses inmates who work in institutional jobs. While housed in B-Block, plaintiff was again subjected to 22-hour lockdown and denied rights and privileges afforded to other B-Block inmates. When he filed more complaints and grievances about being denied rights and privileges afforded to other B-Block inmates, defendants Maldonado, Wright, Semple, and Griffen informed him that he would have to obtain employment within the facility to receive the privileges to which he was referring. Plaintiff replied that he should be entitled to the privileges whether or not he had a job, but defendants did not respond. *Id.* at 21–22 (¶ 54).

*4 On December 12, 2016, Colon falsified a disciplinary report against plaintiff, charging him with "giving false information." *Id.* at 22 (¶ 55). On January 18, 2017, Maldonado, Griffen, and Colon placed plaintiff in restrictive housing as a result of the report. A hearing was held on January 24, 2017. Defendants Lizon and Maldonado ultimately dismissed the report because Colon was not authorized to author disciplinary reports against plaintiff due to a department policy. Despite the dismissal, plaintiff was placed on high-security status in accordance with Commissioner Semple's policy that permitted supervisors to place inmates on high-security status without a hearing. *Id.* at 23 (¶ 55).

On January 26, 2017, plaintiff's security level was raised from three to four, and he was transferred to MacDougall, a level-four maximum security prison where he currently resides. At MacDougall, plaintiff continues to be "targeted, oppressed, psychologically tortured, [and] retaliated [and] discriminated against." *Ibid.* Plaintiff appealed his placement on high-security status to Deputy Commissioner Rinaldi. Rinaldi received plaintiff's appeal on February 2, 2017. Rinaldi denied the appeal on March 13, but plaintiff did not receive the disposition until March 24, which violated the established timeframe set by DOC. *Id.* at 23–24 (¶ 55).

On February 7, 2017, defendant Santana issued plaintiff a false disciplinary report for attempting to attend gym recreation with other inmates in his unit. Santana prohibited plaintiff from going to gym recreation and charged him with flagrant disobedience. Plaintiff was forced under duress to plead guilty to the offense, which

led to his placement in Q-pod, a punitive segregation housing unit. Plaintiff alleges that this placement was a result of a discriminatory policy created by defendants Chapdelaine, Santana, and Dousis to restrict gym recreation to certain inmates only. Furthermore, he alleges that defendants Santana, Chapdelaine, Roy, and Collins created an "unconstitutionally systematic tactic to punish [plaintiff] [and] unjustly place him in" a restrictive housing unit by forcing him to plead guilty to the disciplinary charge. Plaintiff alleges that Commissioner Semple is aware of this conduct and has done nothing to rectify it. *Id.* at 24–25 (¶ 56).

After plaintiff was placed in Q-pod, he immediately notified correctional staff that there were no medical emergency call boxes in the unit and that, because of his medical conditions and disabilities, he was only supposed to be housed in a unit with a medical emergency call box. As a result, plaintiff was transferred to M-pod, a general population unit with medical emergency call boxes inside the cells. But when defendants Chapdelaine and Hall found out that plaintiff had left Q-pod, they convinced defendant Leightner, the health services administrator, to authorize his removal from M-pod and place him back in Q-pod. *Id.* at 26 (¶ 57).

In late February 2017, plaintiff received another false disciplinary report accusing him of attempting to use the phone without authorization. Defendants Chapdelaine, Gonzalez, Rule, Roy, and Congelos then employed a "systematic tactic" to punish plaintiff by forcing him into a restrictive housing unit for 15 days prior to his hearing on the disciplinary report, intentionally delaying his hearing (and then covering up the fact that it was untimely), finding him guilty of the disciplinary violation, and then sentencing him to 15 days of punitive segregation, 30 days loss of recreation, and 90 days loss of phone. Plaintiff appealed the decision on the report to defendant Quiros, who denied the appeal. While housed in the restrictive Q-pod, plaintiff was denied rights and privileges afforded to other general population inmates, including gym recreation and sufficient time outside of his cell. Plaintiff alleges that Chapdelaine is keeping plaintiff housed in Q-pod as a form of retaliatory punishment, and both Semple and Quiros are aware of Chapdelaine's actions.

*5 Plaintiff claims that defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, and § 504 of the Rehabilitation Act. He seeks monetary relief in the amount of ten million dollars. He has named 33 defendants in total, including the DOC and 32 prison officials in their individual capacities.

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A(a), the Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. The Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless its factual recitations state a claim to relief that is plausible on its face. *See, e.g., Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.,* 770 F.3d 170, 177 (2d Cir. 2014) (same). Nevertheless, it is well-established that "pro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.' " *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater,* 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

*Discrimination under ADA and Rehabilitation Act*

Plaintiff alleges that the DOC and various individual defendants violated Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act by failing to provide him with reasonable accommodations for his hearing disability. To state a *prima facie* claim for discrimination under the ADA or the Rehabilitation Act, a plaintiff must allege: (1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability. *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir. 2009). "A qualified individual can base a discrimination claim on ... failure to make a reasonable accommodation." *Ibid.* (internal quotation marks and citation omitted).

Case 3:17-cv-00107-JBA  Document 52-2  Filed 10/02/17  Page 63 of 80

Plaintiff has sued the individual defendants in their individual capacities, but "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Accordingly, I will dismiss plaintiff's claims under the ADA and the Rehabilitation Act against the individual defendants.

A plaintiff may, however, bring a Title II ADA claim against a state or its agent in its official capacity for monetary damages. *See Garcia*, 280 F.3d at 111. A plaintiff may also bring an official capacity suit against a state or its agent under § 504 of the Rehabilitation Act. *See Super v. J. D'Amelia & Associates, LLC*, 2010 WL 3926887, at *13 (D. Conn. 2010) (explaining that Connecticut's continued acceptance of federal funds constitutes a waiver of its immunity from suit under § 504 of the Rehabilitation Act).

Plaintiff has plausibly alleged a discrimination claim against the DOC under Title II of the ADA and § 504 of the Rehabilitation Act. His "hearing impairment makes him a 'qualified individual' " with a disability. *Valanzuolo v. City of New Haven*, 972 F. Supp. 2d 263, 273 (D. Conn. 2013). He alleges that the DOC failed to place him in a special unit for disabled inmates and failed to afford him additional time to use the telephone. He also alleges that he was kicked out of a disciplinary hearing after he requested a continuance so that he could obtain replacement hearing aids and after he requested a transfer to a quieter room so that he could better hear the proceedings. Plaintiff's discrimination claim under the ADA and the Rehabilitation Act will proceed against the DOC.

*Constitutional claims against DOC*

*6 In addition to his claims under the ADA and Rehabilitation Act, plaintiff brings claims against the DOC under 42 U.S.C. § 1983 for violations of his constitutional rights. The DOC is a state agency and is not considered a person within the meaning of § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Thus, plaintiff's § 1983 claims against DOC are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

*Retaliation*

Plaintiff claims that defendants Semple, Martucci, Maldonado, Wright, Colon, Santiago, Martin, Zegarzewski, Gillette, Richardson, Chapdelaine, Roy, Rule, Gonzalez, Collins, Congelos, Santana, Hall, Vazquez, Leightner, Marga, Griffen, Lizon, and Rinaldi violated his right to free speech under the First Amendment by retaliating against him for submitting complaints and grievances.

In order to state a First Amendment free-speech retaliation claim, a plaintiff must demonstrate that he was engaged in constitutionally protected speech activity, that the defendant took adverse action against him, and that there was a causal connection between the protected activity and the adverse action. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). Filing grievances or lawsuits against correctional staff is protected activity. *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003).

Plaintiff has adequately alleged retaliation claims against defendants Maldonado, Vazquez, Marga, Colon, Griffen, Richardson, Chapdelaine, Hall, and Leightner. Plaintiff contends that each of these defendants took action against him for filing grievances. Maldonado, Vazquez, and Marga transferred him to more restrictive and disciplinary facilities and units in response to his filing of grievances. Colon ordered others to falsify disciplinary reports against him and deny him access to the telephone, posted copies of his private medical records throughout Osborn, and authored false disciplinary reports against him. Griffen took part in placing plaintiff in restrictive housing based on a false disciplinary report. Richardson kicked him out of his disciplinary hearing and disciplined him harshly. Chapdelaine and Hall convinced Leightner to take plaintiff out of M-Pod unit and return him to the Q-pod unit to punish plaintiff for his complaint about the medical emergency call boxes. Because these consequences could plausibly "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," they constitute adverse action. *Davis*, 320 F.3d at 353. *See also Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (prison authorities "may not transfer an inmate in retaliation for the exercise of constitutionally protected rights").

As far as the other defendants are concerned, plaintiff's allegations are either entirely conclusory or fail to explain how the defendants' actions were retaliatory in nature. *See Riddick v. Arnone*, 2012 WL 2716355,

at \*6 (D. Conn. 2012) ("Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient"). Thus, plaintiff's First Amendment retaliation claims will proceed only against Maldonado, Vazquez, Marga, Colon, Griffen, Richardson, Chapdelaine, Hall, and Leightner.

Although plaintiff brings his retaliation claims under the First Amendment, his complaint can be construed to also raise claims of retaliation under the ADA and the Rehabilitation Act. Title V of the ADA "prohibits, *inter alia*, retaliation against any individual who has asserted rights under the ADA." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). The same standards apply to a claim of retaliation under § 504 of the Rehabilitation Act as under the ADA. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). A plaintiff states a retaliation claim under the ADA or the Rehabilitation Act by establishing that "(i) plaintiff was engaged in protected activity; (ii) the alleged retaliatory knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted). Insofar as plaintiff alleges that the DOC retaliated against him for requesting reasonable accommodations for his hearing disability, the Court will consider plaintiff to have stated a retaliation claim against DOC under the ADA and the Rehabilitation Act.

### Denial of access to courts

\*7 To state a claim for denial of access to the courts, a plaintiff must demonstrate that he suffered an actual injury, *see Lewis v. Casey*, 518 U.S. 343, 353 (1996)—that is, he must allege that "defendant's conduct deprived him of an opportunity to press some nonfrivolous, arguable cause of action in court." *Brown v. Choinski*, 2011 WL 1106232, at \*5 (D. Conn. 2011). What this means is that "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation," and "the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Christopher v. Harbury*, 536 U.S. 403, 415, 416 (2002).

A plaintiff must describe "the predicate claim ... well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 416. In this manner, "the complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417–18 (footnote omitted).

Plaintiff alleges that Corrigan, Conger, Santiago, Martin, and Zegarzeski denied him access to legal books from the law library, causing him to lose two of his *pro se* post-judgment motions for release. Plaintiff has not provided a sufficiently detailed description of the underlying cause of action. Because of the complaint's sparse allegations, I am unable to ascertain if the underlying claim was of arguable merit or was frivolous.

Because plaintiff's claim of denial of access to the courts has not been adequately pleaded, I will dismiss this claim without prejudice. If plaintiff believes that he is able to allege specific facts concerning the underlying cause of action that was impeded and to show that this action would not have been frivolous, then plaintiff may file an amended complaint within 30 days to allege a claim for denial of his constitutional right of access to the courts.

### Deliberate indifference to medical needs

It is well established that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A deliberate indifference claim has two component requirements. The first requirement is objective: the alleged deprivation must be serious. The second requirement is subjective: the charged officials must act with a subjectively reckless state of mind in their denial of medical care. *See Spavone v. New York State Dept. of Correctional Servs.*, 719 F.3d 127, 138 (2d Cir. 2013); *Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012).

Plaintiff alleges that defendants Semple, Gallagher, Maurer, Martucci, Maldonado, Wright, Long, Colon, Santiago, Martin, Zegarzewski, Gillette, Conger, Chapdelaine, Roy, Rule, Gonzalez, Hall, Leightner, Marga, Griffen, and Lizon acted with deliberate indifference to his medical needs by denying him

reasonable accommodations for his disability, forcing him into restrictive housing units, denying him access to gym recreation, showers, and personal hygiene products, and subjecting him to conditions that caused him medical problems and pain. Plaintiff also alleges that defendants denied him reasonable accommodations afforded to other hearing-impaired inmates such as additional telephone time, access to a TTY phone, and access to a medical call box in case of an emergency. Plaintiff's hearing impairment may constitute a "serious medical need" and thus, at this stage, satisfies the objective component of the deliberate indifference standard. *See, e.g., Wheeler v. Butler*, 209 Fed.Appx. 14, 16 (2d Cir. 2006) (hearing-impaired plaintiff who was allegedly deprived of hearing aids may state claim for deliberate indifference); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1043 (S.D.N.Y. 1995) (failure to provide interpretive services and assistive devices for deaf and hearing-impaired inmates amounted to deliberate indifference). Furthermore, plaintiff alleges that defendants acted intentionally in an effort to punish him and retaliate against him. The Court will allow plaintiff's deliberate indifference claim to proceed against the above-mentioned defendants at this time.

*Due Process*

\*8 Plaintiff claims that various defendants violated his rights under the Due Process Clause of the Fourteenth Amendment. The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause protects both a right to "substantive" due process and a right to "procedural" due process.

The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam).

In the prison context (involving someone whose liberty interests have already been severely restricted because of his or her confinement in a prison), a prisoner plaintiff must show that he was subject to an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Sandin*, the Supreme Court concluded that a

prisoner who was subject to a disciplinary term of 30 days confinement in restrictive housing did not sustain a deprivation of a liberty interest that was subject to protection under the Due Process Clause. *Id.* at 486. Following *Sandin*, the Second Circuit has explained that courts must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

Plaintiff alleges that he was repeatedly and arbitrarily placed in restrictive housing following inadequate hearings or, in some cases, no hearing at all. He alleges that the conditions he experienced in restrictive housing were particularly oppressive (*e.g.*, poor ventilation and extremely cold temperatures) and that he was denied many rights that were afforded to the other inmates in the same restrictive housing units. These facts are sufficient at this stage to suggest that plaintiff was deprived of a liberty interest.

As to the second step of the analysis, the procedural safeguards to which plaintiff is entitled before being deprived of a constitutionally significant liberty interest are well-established. These requirements include: (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of the defense, subject to the correctional institution's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *See Wolff v. McDonnell*, 418 U.S. 539, 564–69 (1974); *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).

Plaintiff alleges that Semple placed him on high security status without a hearing and also that Semple, together with Chapdelaine, implemented a policy that forced plaintiff to plead guilty to a false disciplinary report (apparently without a hearing). Plaintiff alleges that Santiago and Martin rejected his complaints that he was not receiving adequate notice of his disciplinary charges. Finally, plaintiff alleges that Nemeth, Dousis, Richardson, Conger, Rule, Gonzalez, and Congelos interfered with his ability to present a defense during his disciplinary hearing by denying him the opportunity to call witnesses and present documentary evidence and by placing him in restrictive confinement prior to the hearing. The Court will allow plaintiff's procedural due process

claims to proceed against Semple, Santiago, Martin, Nemeth, Dousis, Richardson, Conger, Chapdelaine, Rule, Gonzalez, and Congelos. All other procedural due process claims are dismissed. [2]

*9 In order to state a substantive due process claim, a plaintiff must allege that government officials have deprived plaintiff of a fundamental constitutional right and that they have done so under circumstances that are no less than "arbitrary" and "outrageous," typically as demonstrated by conduct that "shocks the conscience." *See, e.g., United States v. Mediunjanin,* 752 F.3d 576, 590 (2d Cir. 2014) (substantive due process has generally protected "matters relating to marriage, family, procreation, and the right to bodily integrity"); *Natale v. Town of Ridgefield,* 170 F.3d 258, 262–63 (2d Cir. 1999) (substantive due process standards violated "only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority"); *Velez v. Levy,* 401 F.3d 75, 93–94 (2d Cir. 2005) (describing the "shocks the conscience" standard).

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)). Here, the allegations of the complaint appear to be covered by the First Amendment, Eighth Amendment, and procedural due process, for the reasons explained above. I do not understand the complaint to additionally allege a violation of substantive due process distinct from the foregoing claims. Plaintiff's substantive due process claims are therefore dismissed.

### Equal Protection

Plaintiff brings a Fourteenth Amendment equal protection claim against numerous defendants. Plaintiff contends that he personally was denied various privileges afforded to other disabled inmates or to other inmates in his housing units.

The Supreme Court has recognized that "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)). A plaintiff may state a violation of the Equal Protection Clause under the "class of one" theory. To state a valid class-of-one claim, a plaintiff must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).

I conclude that plaintiff has alleged sufficient facts to support plausible class-of-one equal protection claims against defendants Martucci, Maldonado, Wright, Colon, Santiago, Martin, Zegarzewski, Gillette, and Chapdelaine. He alleges that these defendants denied him privileges afforded to other hearing-impaired inmates, such as additional time to use the telephone and medical call boxes provided to inmates with health issues. He also alleges that they improperly placed him in a restrictive housing unit as opposed to a unit for disabled inmates. Plaintiff has not alleged any facts that support a *prima facie* equal protection claim against the other defendants, however. Thus, his equal protection claims are dismissed as to defendants Semple, Gallagher, Maurer, Long, Conger, Santana, Griffen, and Lizon.

### Supervisory liability

The complaint also alleges that defendants "carelessly and recklessly failed to properly train and supervise [their] employees ... in that they failed to train [their] employees how to do [their] job correctly, [and] failed to give them proper instruction as to [their] deportment, behavior and conduct as representatives of their employer." Doc. #1-1 at 29–30 (¶ 60). The Court construes this allegation as a claim that those defendants who are supervisors violated plaintiff's constitutional rights by failing to properly train and supervise prison officials. A plaintiff can succeed on such a claim if a supervisor is grossly negligent in supervising an officer who commits a constitutional violation or permits a custom that sanctions unconstitutional conduct to continue. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003) (listing five criteria supporting a claim for supervisory liability). But "conclusory, unsupported allegations [of gross negligence or the existence of a policy] are simply insufficient to establish liability of supervisory prison officials under § 1983." *Parris v. New York State Dep't of Correctional Servs.,* 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Because

Fowler v. Department of Correction, Slip Copy (2017)
Case 3:17-cv-00107-JBA Document 52-2 Filed 10/02/17 Page 67 of 80
2017 WL 3401252

plaintiff's supervisory liability claim is not supported by specific facts, I will dismiss the claim.

## CONCLUSION

*10 In accordance with the foregoing analysis, the Court enters the following orders:

(1) Plaintiff's discrimination and retaliation claims under the ADA and § 504 of the Rehabilitation Act will proceed against defendant Connecticut Department of Correction for monetary damages.

(2) Plaintiff's First Amendment retaliation claim will proceed against defendants Maldonado, Colon, Griffen, Richardson, Chapdelaine, Hall, and Leightner in their individual capacities for monetary damages.

(3) Plaintiff's Eighth Amendment deliberate indifference to medical needs claim will proceed against defendants Semple, Gallagher, Maurer, Martucci, Maldonado, Wright, Long, Colon, Santiago, Martin, Zegarzewski, Gillette, Conger, Chapdelaine, Roy, Rule, Gonzalez, Leightner, Marga, Griffen, and Lizon in their individual capacities for monetary damages.

(4) Plaintiff's Fourteenth Amendment procedural due process claim will proceed against defendants Semple, Santiago, Martin, Nemeth, Dousis, Richardson, Conger, Chapdelaine, Rule, Gonzalez, and Congelos in their individual capacities for monetary damages.

(5) Plaintiff's Fourteenth Amendment equal protection claim will proceed against defendants Martucci, Maldonado, Wright, Colon, Santiago, Martin, Zegarzewski, Gillette, and Chapdelaine in their individual capacities for monetary damages.

(6) All other claims not listed above are **DISMISSED**. The Clerk of Court shall dismiss Quiros, Rinaldi, Long, Grimaldi, and Collins as defendants.

(7) **Within twenty-one (21) days of this Order**, the U.S. Marshals Service shall serve the summons, a copy of the complaint and this order on the DOC in its official capacity by delivering the necessary documents in person to the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141.

(8) The Clerk shall verify the current work addresses for defendants Semple, Martucci, Maurer, Gallagher, Marga, Vazquez, Maldonado, Wright, Colon, Lizon, Santiago, Martin, Zegarzewski, Gillette, Conger, Nemeth, Dousis, Richardson, Congelos, Griffen, Chapdelaine, Hall, Roy, Santana, Rule, Gonzalez, and Leightner with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to each defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the **thirty-fifth (35) day after mailing**. If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on him or her, and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(9) Defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them**. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

*11 (10) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed **within seven months (210 days)** from the date of this order. Discovery requests need not be filed with the court.

(11) All motions for summary judgment shall be filed **within eight months (240 days) from the date of this order.**

(12) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(13) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that plaintiff MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address.

2017 WL 3401252

If plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. Plaintiff should also notify defendants or counsel for defendants of his new address.

It is so ordered.

**All Citations**

Slip Copy, 2017 WL 3401252

Footnotes

1    Plaintiff also alleges that he has "another physical disability" in addition to being "hearing impaired/deaf," Doc. #1-1 at 7 (¶ 37), but he does not specify what the other physical disability is.

2    Plaintiff alleges that several defendants issued false disciplinary reports against him. These allegations do not amount a claim for a violation of due process. *See, e.g. Stockwell v. Santiago*, 2016 WL 7197362, at *4 (D. Conn. 2016) (explaining that "inmates 'have no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' ... [and] '[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.' ... An inmate's protection against false accusations lies in the procedural due process requirements to be applied by prison officials who conduct the disciplinary hearing.") (quoting *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986); *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986); *Wolff v. McDonnell*, 418 U.S. 539, 564–66 (1974)).

---

**End of Document**                                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.