**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSSEAN CRISPIN, | ) | CASE NO. 3:21-cv-00475 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEIRI, *et al*., | ) | MAY 5, 2026 |
| *Defendants*. | ) | |

<u>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, ECF No. 150**</u>

Plaintiff Jossean Crispin, ("Crispin" or "Plaintiff") a sentenced inmate in the custody of the Connecticut Department of Correction, commenced this civil rights action *pro se*, alleging various violations of his constitutional rights.  Now before the Court is Defendants' Motion for Summary Judgment and supporting memorandum (together, "Motion").  *See* ECF Nos. 150–150-1.  The Court has reviewed the Motion, the facts contained in Defendants' Local Rule 56(a)1 statement, ECF No. 150-2, Defendants' exhibits, ECF No. 150-3–150-8, 151, Plaintiff's response, ECF No. 154, Defendants' reply, ECF No. 155, Crispin's sur-reply, ECF No. 156, and the record in this matter.  For the reasons that follow, the Motion for Summary Judgment is **GRANTED**.

**Procedural History**

Crispin filed a complaint under 42 U.S.C. § 1983 against twenty prison officials asserting that these officials violated his federally protected rights.  ECF No. 1.  The Court conducted an initial review of Crispin's complaint under 28 U.S.C. § 1915A.  ECF No. 27 at 1.  The Court permitted Crispin's Eighth Amendment claim for denial of mental health treatment to proceed

against Defendants Peiri,[1] Torres,[2] Patel, Jackson 1, Callahan, Barbara K.,[3] Reischerl, APRN or Dr. Doe, and Maiga in their individual capacities. *Id*. at 21. The Court dismissed all other claims and terminated all other defendants. *See id*. at 20–21.

Defendants filed a motion to dismiss because Crispin failed to update his address with the court. ECF No. 42 at 1. Defendants also filed a motion to strike the complaint. ECF No. 45. The Court denied Defendants' motion to dismiss, ECF No. 46, but the Court granted Defendants' motion to strike and required Crispin to file an amended complaint. ECF No. 47. When Crispin failed to file an amended complaint by the Court's deadline, the Court dismissed the case without prejudice. ECF No. 49. Crispin later moved to reopen his case. ECF No. 52. The Court denied that motion without prejudice, permitting Crispin to refile the motion after he filed an amended complaint. ECF No. 58.

Crispin thereafter filed an amended complaint. ECF No. 64. The Court permitted Crispin to reopen the case and conducted an initial review of the amended complaint under 28 U.S.C. § 1915A. *See* ECF No. 65. The Court permitted Crispin's Eighth Amendment deliberate indifference to medical/mental health needs claim to proceed against Defendants Pieri, Torre, Patel, Jackson 1, Callahan, Kuzebski, Reischerl, APRN/Dr. Doe, Maiga, Bentos, Rodriguez, White, Ibsevic, and Bakewell. *Id*. The Court ordered Crispin to provide the complete name and

---

[1] This defendant was later identified as "Pieri." ECF No. 150-5 at 2. The Court will maintain this spelling throughout the remainder of the order.

[2] This defendant was later identified as "Torre." ECF No. 150-6 at 2. The Court will maintain this spelling throughout the remainder of the order.

[3] This defendant was later identified as "Barbara Kuzebski." ECF No. 150-7 at 2. The Court will refer to "Barbara K." as "Kuzebski" throughout the remainder of this order.

current work address for Defendants Jackson 1, Callahan, and APRN/Dr. Doe so they could be served. *Id*. The Court also ordered Crispin to provide service information for Bentos because the Department of Correction ("DOC") could not identify this defendant. ECF No. 67.

Defendants Rodriguez, White, Ibsevic, and Bakewell filed a motion to dismiss because the allegations against these defendants were time-barred. ECF No. 88 at 1. The Court granted the motion in part, ECF No. 97 at 13, dismissed the claims against Defendants White, Ibsevic and Bakewell, but did not dismiss the claim against Rodriguez. *See id*.

After Crispin failed to provide the service information for Defendants Jackson 1, Callahan, APRN/Dr. Doe, and Bentos, the Court *sua sponte* extended the deadline for providing this information. ECF No. 99. The Court warned Crispin that failure to file a notice containing service information for these defendants would result in dismissal of the claims against them. *See id*. Crispin failed to provide the service information for these defendants.

Crispin filed a motion for entry of a default as a discovery sanction in July of 2025. ECF No. 125. The Court denied that motion. ECF No. 126. Crispin filed a notice of interlocutory appeal as to the Court's order denying Crispin's motion for default.[4] ECF No. 127. That appeal remains pending. *See Crispin v. Peiri*, No. 25-1754.

Remaining Defendants Kuzebski, Maiga, Patel, Pieri, Reischerl, Rodriguez, and Torre filed a motion for summary judgment. ECF No. 150. Defendants argue that they are entitled to

---

[4] This is the third interlocutory appeal Crispin has taken in this case. Crispin appealed the Court's order denying Crispin's motion for leave to proceed *in forma pauperis* in May of 2021. ECF No. 14. In August of 2022, the Second Circuit vacated the Court's order denying Crispin's motion for leave to proceed *in forma pauperis* and instructed the court to grant Crispin's motion. *See* ECF No. 24. Crispin filed a second interlocutory appeal in July of 2024. ECF No. 84. The Second Circuit dismissed that interlocutory appeal for lack of jurisdiction in February of 2025. ECF No. 96.

summary judgment because they "did not violate plaintiff's Eighth Amendment rights," *id*. at 1, and are otherwise entitled to qualified immunity.  ECF No. 150-1 at 25.  Rodriguez additionally argued that Crispin "previously released all claims against" him and that Crispin's claims against him are time-barred.  *Id*. at 1.  Crispin has filed a response, ECF No. 154, Defendants have filed a reply, ECF No. 155, and Crispin has filed a sur-reply.  ECF No. 156.

Because the Court agrees that Defendants did not violate Crispin's Eighth Amendment rights and that they would otherwise be entitled to qualified immunity, the Court grants summary judgment on those grounds without considering Rodriguez's additional arguments.  *See*, *e.g.*, *Arroyo v. Hartford Bd. of Educ.*, No. 3:17-cv-2067 (MPS), 2019 WL 6350629, at *15 (D. Conn. Nov. 27, 2019) (declining to address affirmative defenses when claims failed on the merits).

**Facts**

Local Rule 56(a)1 provides that a party moving for summary judgment must file "a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)1.  Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 statement and indicating whether the opposing party admits or denies the facts set forth by the moving party.  D. Conn. L. Civ. R. 56(a)2.  Each denial must include a specific citation to an affidavit or other admissible evidence.  D. Conn. L. Civ. R. 56(a)3.  Defendants informed Crispin of this requirement.  *See* ECF No. 150-9.  Crispin did not submit a submit a Local Rule 56(a)2 statement.[5]

---

[5] When a plaintiff does not submit a Local Rule 56(a)2 statement, a court may nonetheless consider the allegations in a verified complaint when determining whether there is a genuine dispute of material fact. *See Otero v. Purdy*, No. 3:19-cv-01688 (VLB), 2021 WL 4263363, at *1 n.1 (D. Conn. Sept. 20, 2021)

That Crispin "is unrepresented does not excuse him from complying with the Court's procedural and substantive rules." *Rashid v. Kurtulus*, No. 23-cv-722 (VDO), 2024 WL 4111610, at *1 (D. Conn. Sept. 6, 2024). Thus, the facts contained in the defendants' Local Rule 56(a)1 statement, where supported by evidence of record, are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)3. Accordingly, the Court recites below the relevant facts taken from the Defendants' Local Rule 56(a)1 statement.

Crispin entered the DOC in January of 2018. ECF No. 150-2 at ¶ 1. In October of 2018, Warden Nick Rodriguez recommended that Crispin be placed on administrative segregation status after Crispin was involved in a physical altercation with an inmate, after officers located a "shank" on Crispin's person, and after Crispin made threatening statements to officers. *Id.* at ¶¶ 2–5. Maiga approved Crispin's placement on administrative segregation status after an administrative segregation hearing in November of 2018. *Id.* at ¶¶ 7–8.

---

(noting that, in addition to "(1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial[,]" D. Conn. L. Civ. R. 56(a)3, "[t]he Court may also consider the allegations of the verified complaint in reviewing the motion for summary judgment." (citing *Jordan v. LaFrance*, No. 3:18-cv-01541 (MPS), 2019 WL 5064692, at *3 (D. Conn. Oct. 9, 2019) (a "verified complaint . . . may be considered as an affidavit" for summary judgment purposes)). But for a complaint to be considered "verified," such that the Court may treat it as an affidavit, it "must be made under penalty of perjury." *Conquistador v. Hurdle*, No. 20-cv-01658 (KAD), 2022 WL 17821097, at *3 n.4 (D. Conn. Dec. 20, 2022) (citing 28 U.S.C. § 1746). Crispin's initial complaint was "made under penalty of perjury." *Id.*; *see also* ECF No. 1 at 45. But an "amended complaint ordinarily supercedes [sic] the original, and renders it of no legal effect." *Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks and citation omitted). Crispin's amended complaint is not a verified complaint. *See Conquistador*, 2022 WL 17821097, at *3 n.4; *see also* ECF No. 64 at 29. Accordingly, the allegations in the amended complaint are "insufficient to counter Defendants' evidence offered in support of the motion." *Conquistador*, 2022 WL 17821097, at *3 n.4; *see also Van Eck v. Bauer*, No. 3:24-cv-01873 (SFR), 2025 WL 2403001, at *1 n.1 (D. Conn. Aug. 19, 2025) (deeming facts in Defendants' Local Rule 56(a)1 statement admitted because plaintiff's complaint was not verified and he "ha[d] not submitted any affidavits, declarations, or other evidence with his opposition to summary judgment.").

Prison officials transferred Crispin to other facilities after he was placed on administrative segregation status.  *See id*. at ¶ 9.  Crispin returned to Northern Correctional Institution ("Northern") in May of 2019.  *Id*. at ¶ 10.  Medical staff advised Crispin how to seek mental health services upon his intake at Northern.  *Id*. at ¶ 11.  APRN Reischerl saw Crispin shortly after he returned to Northern.  *Id*. at ¶ 12.  At that time, Crispin was on a "polypharmacy medicine regimen and still reporting symptoms."  *Id*. (cleaned up).  After discussing this with Crispin's "treatment team," Reischerl recommended a medical evaluation and psychological testing to "guide in appropriate medication regimen."  *Id*. (internal quotation marks omitted).

Dr. Mueller saw Plaintiff less than three weeks after Crispin saw Reischerl.  *Id*. at ¶ 13. Mueller discussed transferring Crispin to another facility "to get [Crispin's] medications adjusted." *Id*. (internal quotation marks omitted).  Crispin was at first "reluctant" to transfer, but "appeared to understand the need to address his recent concerns about sleeping too much, not eating, not showering or participating in recreation activities."  *Id*. (internal quotation marks omitted).  Prison officials transferred Crispin to Garner Correctional Institution ("Garner") following Crispin's meeting with Mueller.  *Id*. at ¶ 14.  At Garner, prison officials placed Crispin in the inpatient medical unit for observation "during his medication adjustment."  *Id*.

Three days after Crispin arrived at Garner, Crispin refused to meet with Dr. Patel.  *Id*. at ¶ 15.  Patel attempted to meet with Crispin two days later.  *Id*. at ¶ 16.  Crispin initially refused to leave his cell, but he eventually agreed to meet with Patel.  *Id*.  Patel noted that Crispin had been taking his medication but was "not making progress."  *Id*.  Patel reviewed Crispin's medications and made changes to Crispin's medication regimen.  *Id*.  Patel saw Crispin approximately two weeks later, in July of 2019.  *Id*. at ¶ 17.  At that meeting, Patel noted that Crispin "was not

psychotic or at risk for self-harm and demonstrated good behavioral control." *Id*. As a result, Patel lowered Crispin's "mental health score to MH3" and cleared Crispin to return to Northern. *Id*. Plaintiff returned to Northern the same day he met with Patel. *Id*. at ¶ 18.

Crispin met with LPC Matthew Clark the day after Crispin returned to Northern. *Id*. at ¶ 19. Crispin told Clark that "he did not believe he was receiving treatment for his reported Schizophrenia." *Id*. Clark observed, however, that Crispin "presented with full range of affect, responded to questions appropriately and without delay, displayed no evidence of perceptual abnormalities, and denied suicidal ideation." *Id*. Less than thirty minutes after meeting with Crispin, Clark received a referral from prison staff. *Id*. at ¶ 20. Crispin had reported to staff that he was "having an emergency" and needed "immediate intervention" but "did not want to go to the infirmary." *Id*. (internal quotation marks omitted). Clark "provide[d] an intervention" that decreased Crispin's "anxiety/frustration." *Id*. (internal quotation marks omitted). Nevertheless, Clark noted, as before, that Crispin "was not presenting with perceptual abnormalities, and that [Crispin] denied any current suicidal/homicidal ideation or audio/visual hallucinations." *Id*. (internal quotation marks omitted).

On the same day Crispin met with Clark, he later met with Nurse Fryer after Crispin requested assistance. *Id*. at ¶ 21. Crispin made "suicidal statements" to Fryer at this meeting. *Id*. After making these statements, Crispin was placed in the infirmary on suicide watch, and his mental health score was increased to MH5. *Id*. Crispin refused his Haldol, Clonidine, and Zoloft medication. *Id*. While housed in the infirmary, medical staff saw Crispin daily. *Id*. at ¶ 22.

Dr. Mueller met with Crispin two days after Crispin entered the infirmary. *Id*. at ¶ 23. Mueller observed that Crispin expressed an intention to harm himself because Crispin's demands

7

were not being met. *Id*. Mueller noted that Crispin's medications were being adjusted and that Dr. Burns sought to return Crispin to Garner when space was available there. *Id*. Mueller explained to Crispin during a second meeting that same day that mental health staff were working on adjusting Crispin's medication. *Id*. at ¶ 24.

Four days after meeting with Mueller, prison officials transferred Crispin to Garner, where he was admitted to the infirmary. *Id*. at ¶ 25. The purpose of this transfer was "for mental health assessment, mental health observation, and a medication wash." *Id*. at ¶ 26. A "medication wash is done for psychiatric diagnostic purposes, whereby the patient is taken off mental health medication under supervised circumstances." *Id*. at ¶ 27. After a medication wash, "medications can be slowly reintroduced." *Id*.

While at Garner, Dr. Pieri, a supervising psychologist within DOC, met with Crispin twelve times. *Id*. at ¶¶ 28–29. The purpose of these meetings was to "check[] in" with Crispin and to "evaluate[] [Crispin's] mental health" and "the effectiveness of [Crispin's] treatment plan." *Id*. at ¶ 30. Crispin also "had an opportunity to discuss his concerns with his mental health providers" during these meetings. *Id*. While at Garner, APRN Sara Torre also met with Crispin thirteen times. *Id*. at ¶ 33.

During Crispin's first meeting with Pieri, in mid-July of 2019, Pieri "confirmed that Plaintiff had been transferred to Garner for medication adjustment and psychological testing." *Id*. at ¶ 31. The following day, during Crispin's first meeting with Torre, she "discussed a plan, along with Dr. Burns, to decrease [Crispin's] medications and evaluate his diagnosis in an in-patient setting for his safety." *Id*. at ¶ 34. Crispin agreed to this plan. *Id*.

8

Crispin met with Pieri two days after meeting with Torre. *Id*. at ¶ 35. At that meeting, Crispin "demanded to leave the infirmary and for the 'med wash' to occur while housed on a block." *Id*. Pieri told Crispin that he "was not being kept in the infirmary as punishment, but rather to closely monitor him in case his symptoms worsened." *Id*. Pieri met with Crispin four days later. *Id*. at ¶ 36. Pieri explained to Crispin the purpose of the "med wash." *Id*. Crispin "continued to perseverate on needing meds and threats to increase maladaptive behavior." *Id*. (cleaned up).

Six days after Crispin's meeting with Pieri, in late July of 2019, Crispin met with both Pieri and Torre. *Id*. at ¶ 37. Crispin "expressed his disagreement with his treatment plan and became 'irate' when it was suggested that what he perceived as paranoia could also have been explained as simply 'argumentative and misinterpretation.'" *Id*. Four days later, Pieri, Torre, and Reischerl met with Crispin "for collaboration of care." *Id*. at ¶ 38. Crispin "continued to perseverate on wanting to be out of the mental health unit and out of [administrative segregation]." *Id*. Crispin "did not display any overt paranoia," but Crispin "frequently used the word paranoia when referring to his interactions with others." *Id*. (internal quotation marks omitted).

Six days after Pieri, Torre, and Reischerl met with Crispin, Pieri began conducting psychological testing with Crispin. *Id*. ¶ 39. During testing, Crispin indicated that he did "not hav[e] enough opportunity to speak with people," but Pieri "referenced 'documentation to the contrary.'" *Id*. at ¶ 40. Approximately one month later, Pieri met with Crispin and "noted that she spent a considerable amount of time talking to [Crispin,] and despite that, [Crispin] continued to perceive being ignored by Mental Health staff." *Id*. at ¶ 41 (cleaned up). Two days after Crispin met with Pieri, Torre concluded that Crispin "was stabilized and lowered [Crispin's] status to

9

MH3." *Id.* at ¶ 42. Prison officials then transferred Crispin out of the inpatient unit to the restrictive housing unit because Crispin was still on administrative segregation status. *Id.* Once in the restrictive housing unit, Crispin "had a multidisciplinary treatment plan, received medication and talk therapy, and was offered private out of cell sessions with a mental health care team member at least once a month." *Id.* at ¶ 43.

Kuzebski, a clinical social worker, met with Crispin twelve times after Crispin was released from the infirmary. *Id.* at ¶¶ 44, 47–48. In September of 2019, Kuzebski resumed Crispin's Zoloft prescription after noticing Crispin "struggling with the increased noise in his unit." *Id.* at ¶ 48. Crispin later came to the medical department in early November of 2019 "with what appeared to be 'superficial abrasions' on his left arm." *Id.* at ¶ 49 (cleaned up). Crispin "denied pain, denied suicidal/homicidal ideation, and denied audio/visual hallucinations." *Id.* Crispin indicated being "stressed" in the restrictive housing unit, and medical staff made a referral to the mental health department. *Id.* (internal quotation marks omitted).

Kuzebski met with Crispin the day after the medical department made the referral. *Id.* at ¶ 50. Kuzebski "did not observe [Crispin] to be in acute mental distress and noted that [Crispin] denied any immediate need for mental health services or support." *Id.* Crispin requested to see mental health staff later that day. *Id.* at ¶ 51. Crispin met with LPC Parker. *Id.* Crispin "again denied being in immediate crisis." *Id.* Two weeks after Crispin's meetings with Kuzebski and Parker, he met with Torre. *Id.* at ¶ 52. Crispin "reported that his Zoloft prescription was beneficial for his complaints of anxiety and denied any side effects at that time." *Id.* Approximately one month after this meeting with Torre, Crispin met again with Torre. *Id.* at ¶ 53. At this meeting, Torre "did not observe any signs or symptoms of psychosis[.]" *Id.* Torre also noted that Crispin

"again reported benefit with Zoloft." *Id.* However, Crispin expressed his "frustrat[ion] with [Torre for] not putting him on antipsychotic medications for his reports of 'schizophrenia.'" *Id.* at ¶ 53. Crispin twice met with Kuzebski the day after meeting with Torre. *Id.* at ¶ 54. Kuzebski did not observe Crispin "to be in a state of decompensation," and Crispin did not report any "ideations, intent, or plan to self-harm during either of those meetings." *Id.*

Crispin was removed from administrative segregation status in March of 2020. *Id.* at ¶ 64. Prison officials transferred Crispin to Cheshire Correctional Institution the following month. *Id.* at ¶ 65. While Pieri was treating Crispin from July of 2019 to April of 2020, Pieri did not observe Crispin "displaying any symptoms of psychosis." *Id.* at ¶ 55. During the same timeframe, Crispin "perseverated in his desire for Loxapine," but Torre "did not believe it was clinically indicated." *Id.* at ¶ 57. While Kuzebski saw Crispin from September of 2019 to January of 2020, Kuzebski "did not observe [Crispin] to present any symptoms of psychosis." *Id.* at ¶ 61.

**Discussion**

Preliminarily, the Court observes that Crispin's opposition and reply briefs are largely unresponsive to Defendants' Motion. *See generally* ECF Nos. 154, 156. Crispin's briefs mostly reassert grievances against defense counsel, the magistrate judge, and the court reporter. *See ibid.* These complaints stem from previously raised discovery disputes. *See ibid.* However, as this Court noted in its March 30, 2026, order, Crispin "ha[d] been given every opportunity to raise his claims that the Defendants failed to provide discovery" but he "failed to comply with the court's orders or otherwise participate appropriately in the efforts to adjudicate his claims." ECF No. 161. As such, "discovery closed," and the Court advised Crispin that "he is precluded from seeking

11

Court intervention with respect to any outstanding discovery in this case." *Id*. (cleaned up). Accordingly, the Court does not further address Crispin's complaints about discovery in this case.

The Court, however, will briefly address two non-merits based issues that Crispin raises that bear on the disposition of this motion: (1) whether the Court has subject matter jurisdiction to rule on the Motion in light of Crispin's pending interlocutory appeal, *see* ECF No. 154 at 20 (response to Motion indicating that Crispin was "lead to believe that the District Court no longer has jurisdiction over this case['s] proceedings" in light of pending interlocutory appeal), and (2) whether the claims against Defendants Jackson 1, Callahan, APRN/Dr. Doe, and Bentos should be dismissed for Crispin's failure to serve them, *see id*. at 1 (maintaining that defense counsel "committed fraud upon the court" by alleging that these defendants were never identified or served). The Court discusses each issue in turn before turning to the merits of the instant motion.

### *Subject Matter Jurisdiction*

A court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citation omitted). "The filing of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (citation omitted). "The divestiture of jurisdiction rule is, however, not a per se rule. It is a judicially crafted rule rooted in the interest of judicial economy, designed 'to avoid confusion or waste of time resulting from having the same issues before two courts at the same time.'" *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) (quoting *United States v. Salerno*, 868 F.2d 524, 540 (2d Cir. 1989)).

As relevant here, "where the notice of appeal is filed as to an order which is not yet subject to appeal, that notice does not divest the district court of jurisdiction." *S.E.C. v. Ahmed*, No. 3:15-cv-675 (JBA), 2018 WL 11294435, at *1 (D. Conn. Nov. 5, 2018) (citing *Griggs*, 459 U.S. at 58 (holding that where the notice of appeal was untimely, it "was a nullity" which "shall have no effect" and, "in short, it is as if no notice of appeal were filed at all" and the Court of Appeals therefore did not acquire jurisdiction)). Crispin filed a notice of appeal as to the Court's order denying his motion for entry of a default as a discovery sanction. ECF No. 127. But the Second Circuit "lack[s] jurisdiction to consider an interlocutory appeal from the denial of a motion for default judgment." *Weaver v. Schiavo*, 750 F. App'x 59, 60 (2d Cir. 2019) (summary order) (citing *In re Wills Lines, Inc.*, 227 F.2d 509, 511 (2d Cir. 1955)); *see also Perez v. Arnone*, 600 F. App'x 20, 21 (2d Cir. 2015) (summary order) (concluding same and dismissing appeal "insofar as [appellant] appeals from the denial of his motions for default judgment[.]")). Thus, Crispin's interlocutory appeal of the Court's order denying his motion for default does not divest the Court of jurisdiction over Defendants' Motion for Summary Judgment. *See Ahmed*, 2018 WL 11294435, at *1; *see also Perez v. Quiros*, No. 24-cv-651 (VDO), 2025 WL 1692416, at *1 (D. Conn. June 17, 2025) (concluding that plaintiff's interlocutory appeals of "order on motion for hearing[,] order on motion for miscellaneous relief[,] [and] order on motion for order" did not divest district court of jurisdiction to hear defendants' motion to dismiss because the Second Circuit "lacks jurisdiction to consider appeals from these non-final orders[.]").

Second, even if the Second Circuit had jurisdiction to consider Crispin's interlocutory appeal, "the filing of a notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal." *N.Y. State Nat'l Org. for Women v.*

13

*Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989).  Because the "questions raised and decided in the order that is on appeal," *id.*, concern whether Crispin is entitled to a default as a discovery sanction — not whether Defendants are entitled to summary judgment against Crispin — his notice of interlocutory appeal does not divest the Court of jurisdiction.  *See Rosa v. Cook*, No. 3:22-cv-703 (JAM), 2024 WL 1050516, at *2 (D. Conn. Mar. 11, 2024) (concluding that because Defendants' motions to dismiss "d[id] not raise questions decided in the orders that [plaintiff] has appealed, the Court retains jurisdiction to rule on these motions.").  Accordingly, the Court has jurisdiction to consider Defendants' motion for summary judgment notwithstanding Crispin's pending interlocutory appeal.

### *Dismissal of Claims Against Unserved Defendants*

On February 24, 2025, the Court ordered Crispin to provide service information for Defendants Jackson 1, Callahan, APRN/Dr. Doe, and Bentos by March 31, 2025.  ECF No. 99. The Court cautioned Crispin that failure to timely provide this information would result in the dismissal of his claims against these defendants.  *See id.*  Crispin never provided this information to the court.  Accordingly, these defendants were never served with the complaint and did not appear to defend themselves against Crispin's allegations.  Thus, any claims against Defendants Jackson 1, Callahan, APRN/Dr. Doe, and Bentos must be dismissed.  *See Marchand v. William W. Backus Hosp.*, 561 F. Supp. 2d 258, 260 (D. Conn. 2008) (granting summary judgment in favor of defendants who had been served and dismissing claims against defendants who had not been served).

The Court next turns to the merits of the Defendants Motion for Summary Judgment.

**Standard of Review**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Whether a fact is material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense[.]" *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010) (citation omitted).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party cannot "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted). To defeat a motion for summary judgment, "a nonmoving party must offer some hard evidence" on which "the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted; emphasis in original).

15

The Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012). But "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

**Discussion**

Defendants assert that there is no genuine issue of material fact and that they were not deliberately indifferent to Crispin's serious mental health needs. Alternatively, they assert that they are entitled to qualified immunity. *See* ECF No. 150-1 at 23.

### *Deliberate Indifference to Serious Mental Health Needs*

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to serious medical needs, the prisoner must allege facts satisfying two components, one objective and one subjective. *See id*.

The objective component requires the prisoner to demonstrate that the alleged deprivation of medical care was "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). This objective showing, in turn, requires a court to undertake two inquiries. First, the Court must determine whether the inmate was "actually deprived of adequate medical care" by an official's failure "to take reasonable measures in response to a medical condition." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006) (cleaned up), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023); *see also Davila v. UConn Med. Ctr.*, 353 F. App'x 490, 492 (2d Cir. 2009)

16

(summary order) ("At the most basic level, to establish a claim under the Eighth Amendment for deliberate indifference, the plaintiff must first demonstrate that he was 'actually deprived of adequate medical care.'" (quoting *Salahuddin*, 467 F.3d at 279)).

Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious," requiring an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280 (citation omitted). This examination differs based on whether the issue is failure to provide *any* medical treatment, inadequate treatment, or delayed treatment. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). This inquiry is necessarily contextual and fact-specific. *Id*. at 185.

However, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

As to the subjective component, "[a]n official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety,'" which is "a state of mind 'equivalent to the familiar standard of recklessness' as used in criminal law." *Smith*, 316 F.3d at 184 (quoting *Chance*, 143 F.3d at 702); *see also Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002). Conduct may rise to the level of deliberate indifference when the prison official's act or failure to act "evinces 'a conscious disregard of a substantial risk of serious harm.'" *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Farmer*, 511 U.S. at 839).

"A plaintiff cannot establish a claim of deliberate indifference on a theory that the defendant failed to take some available alternative or additional diagnostic techniques or forms of

17

treatment when the defendant's decision is based on sound medical judgment." *Clark v. Quiros*, 693 F. Supp. 3d 254, 286 (D. Conn. 2023) (noting that "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice[.]" *Id*. (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976))).  Allegations constituting negligence or medical malpractice are insufficient to support an Eighth Amendment deliberate indifference claim.  *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020) (summary order) (citing *Hathaway*, 99 F.3d at 553).

### *Rodriguez and Maiga*

Preliminarily, the Court addresses whether there is sufficient evidence as to Defendants Rodriguez and Maiga's personal involvement in the claimed constitutional deprivation.  A Plaintiff seeking damages on an Eighth Amendment claim, as Crispin does here, must show the defendant's "personal involvement" in the constitutional violation.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotation and citation omitted).  "Personal involvement," the Second Circuit has said, means either direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts."  *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).  In the present context, personal involvement may be shown by evidence suggesting that Defendants "treated [Crispin] or were otherwise aware of his concerns."  *Shand v. Conn. Dep't of Corr.*, No. 3:21-cv-523 (SVN), 2022 WL 503952, at *11 (D. Conn. Feb. 18, 2022).

Rodriguez and Maiga argue that they "had no personal involvement with [Crispin's] mental health care." ECF No. 150-1 at 14–15. The Court agrees. The undisputed facts show that Rodriguez's involvement was limited to recommending in October of 2018 that Crispin be placed on administrative segregation status for misconduct. *See* ECF No. 150-2 at ¶¶ 2–5. Maiga's involvement was limited to approving Rodriguez's recommendation in November of 2018. *Id*. at ¶ 8. Notably, Rodriguez and Maiga's actions occurred well before any medical or mental health staff defendants began treating Crispin's mental health issues. *See id*. at ¶ 12 (describing Reischerl meeting with the "treatment team" in June of 2019 to "recommend a med eval and possible psych testing for diagnostic clarification to guide in appropriate medication regimen." (internal quotation marks omitted)).

Because no admissible record evidence suggests that Rodriguez and Maiga even knew of Crispin's mental health issues, let alone were involved in Crispin's mental health treatment, summary judgment must enter in favor of Rodriguez and Maiga. *See also Adeyemi v. Lightner*, No. 3:12-cv-1525 (JBA), 2014 WL 580226, at *6 (D. Conn. Feb. 12, 2014) (granting summary judgment in favor of defendant because there was no evidence that defendant "participated in the denial of treatment or even knew that Plaintiff had requested treatment and no treatment was provided."); *Raynor v. Erfe*, No. 3:20-cv-1102 (VLB), 2022 WL 972441, at *7 (D. Conn. Mar. 31, 2022) (granting summary judgment in favor of defendants who were "not personally involved in the treatment of [plaintiff] following [his] fall.").

### Reischerl, Patel, Pieri, Torre, and Kuzebski

The Court next considers whether the remaining Defendants — Reischerl, Patel, Pieri, Torre, and Kuzebski — were deliberately indifferent to Crispin's mental health needs. These

19

defendants argue that summary judgment should enter in their favor because there is no genuine dispute of material fact as to either component of such a claim. *See* ECF No. 150-1 at 15–23. The Court agrees.

The first inquiry of the objective component may be satisfied if a defendant "fail[s] to take reasonable measures in response to a medical condition," or here, a mental health condition. *Salahuddin*, 467 F.3d at 280 (cleaned up). Reischerl was the first defendant to see Crispin for his mental health concerns, in June of 2019. ECF No. 150-2 at ¶ 12. Reischerl noted that Crispin was on a "polypharmacy medicine regimen and still reporting symptoms," *id*. (cleaned up), making clear that Reischerl recognized Crispin's need for psychiatric care. Reischerl addressed that need by discussing Crispin's mental health conditions with the treatment team and recommending that Crispin undergo a medical evaluation and psychological testing so that Crispin could be placed on an "appropriate medication regimen." *Id*. (internal quotation marks omitted). Reischerl later joined Pieri and Torre "for collaboration of care" in August of 2019. *Id*. at ¶ 38.

Patel was the second defendant to see Crispin for his mental health concerns, also in June of 2019. *Id*. at ¶ 16. Patel noted that Crispin was "not making progress," *id*., so Patel too recognized Crispin's need for psychiatric care. Patel addressed that need by making changes to Crispin's medication regimen. *Id*. After Crispin positively responded to the change in medication, Patel lowered Crispin's mental health score and cleared Crispin to return to Northern. *Id*. at ¶ 17.

Pieri was the third defendant to see Crispin for his mental health concerns, in July of 2019. *Id*. at ¶ 29. At Pieri's first meeting with Crispin, Pieri noted that Crispin had been "transferred to Garner for medication adjustment and psychological testing," *id*. at ¶ 31. Pieri also was aware of Crispin's need for psychiatric care. Pieri addressed that need by meeting with Crispin twelve times

from July 16, 2019, to September 19, 2019. *Id*. at ¶ 29. Pieri used these meetings to "check[] in" with Crispin and to "evaluate[] [Crispin's] mental health" and "the effectiveness of [Crispin's] treatment plan." *Id*. at ¶ 30. These meetings also gave Crispin the "opportunity to discuss his concerns with his mental health providers." *Id*. Pieri "spent a considerable amount of time talking to [Crispin]" at these meetings. *Id*. at ¶ 41 (cleaned up). During one such meeting, Pieri explained to Crispin the purpose of the "med wash," *id*. at ¶ 36, which was designed to reset Crispin's medication regimen. *See id*. at ¶ 27. Pieri also collaborated with Crispin's other treatment providers, like Torre and Reischerl. *Id*. at ¶ 38. After meeting with Torre and Reischerl, Pieri began psychological testing with Crispin. *Id*. at ¶ 39.

Torre was the fourth defendant to see Crispin for his mental health concerns, also in July of 2019. *Id*. at ¶ 33. At Torre's first meeting with Crispin, Torre discussed a plan to decrease Crispin's medication and "evaluate his diagnosis in an in-patient setting for his safety," *id*. at ¶ 34, so Torre also recognized Crispin's need for psychiatric care. Torre addressed that need by meeting with Crispin thirteen times from July 17, 2019, to March 5, 2020. *Id*. at ¶ 34. Torre also collaborated with Reischerl and Pieri to provide care to Crispin. *Id*. at ¶ 38. Torre lowered Crispin's mental health status to MH3 after concluding that the treatment regimen had stabilized Crispin. *Id*. at ¶ 42.

Kuzebski was the final defendant to see Crispin regarding his mental health concerns, in September of 2019. *Id*. at ¶ 47. At one of Kuzebski's first meetings with Crispin, Kuzebski observed that Crispin was "struggling with the increased noise in his unit," *id*. at ¶ 48. Kuzebski thus recognized Crispin's need for psychiatric care. Kuzebski addressed that need by prescribing

21

Zoloft to Crispin.  *Id*.  Kuzebski also met with Crispin eleven times from September 13, 2019, to December 18, 2019.  *Id*. at ¶ 47.

The uncontested evidence shows that each of these five defendants met with Crispin, recognized his need for psychiatric care, and then responded to that need by providing psychiatric treatment to Crispin, often in coordination.  Accordingly, the Court cannot conclude that there is a genuine dispute of material fact as to whether any of these defendants "fail[ed] to take reasonable measures in response to a medical condition[.]"  *Salahuddin*, 467 F.3d at 280 (internal quotation marks and citation omitted); *see also Dichiara v. Pataki*, No. 1:06-cv-6123-ENV-LB, 2007 WL 749742, at *3 (E.D.N.Y. Mar. 7, 2007) (noting that "a prisoner is not entitled to the best healthcare possible or even to a choice among available treatment modalities; instead, the Constitution entitles a prisoner only to reasonable measures to meet a substantial risk of serious harm.").  Thus, the Court cannot conclude, under the first inquiry of the objective component, that these defendants "actually deprived [Crispin] of adequate medical care."  *Salahuddin*, 467 F.3d at 279; *see also Thomas*, 832 F. App'x at 92 (concluding that plaintiff failed to satisfy objective component because doctor's "decision to prescribe ibuprofen and muscle relaxants" for plaintiff's back pain did not "actually deprive[] [plaintiff] of adequate care.").

Though Crispin may have, at times, disagreed with Defendants' mental health treatment by refusing medication, ECF No. 150-2 at ¶ 21; demanding that the "med wash" occur while Crispin was in the housing unit, *id*. at ¶ 35; "express[ing] his disagreement with his treatment plan," *id*. at ¶ 37; and requesting antipsychotic medications, *id*. at ¶¶ 53, 57, his disagreement with treatment does not render the treatment Crispin received inadequate.  *See Chance*, 143 F.3d at 703 (noting that "mere disagreement over the proper treatment does not create a constitutional claim.");

*Veloz v. New York*, 178 F. App'x 39, 41 (2d Cir. 2006) (summary order) (concluding that plaintiff's "disagreement with his medical providers' decisions concerning his treatment plan did not 'create a constitutional claim,' and neither did his bare allegations of negligence[.]" (quoting *Chance*, 143 F.3d at 703)); *Jones v. Tompkins*, 715 F. App'x 101, 103 (2d Cir. 2018) (summary order) (relying on *Chance* to conclude that plaintiff's "stated preference for a prescription narcotic is not evidence of [defendant-nurse's] deliberate indifference to [plaintiff's] condition.").

Because the treatment Defendants provided Crispin was adequate, the second inquiry of the objective component — "whether the inadequacy in medical care is sufficiently serious" — need not, indeed cannot, be undertaken. *Salahuddin*, 467 F.3d at 280; *see also Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (declining to consider second inquiry of objective component because "plaintiff's claim fail[ed] on the first subpart of the objective prong[.]"). Accordingly, no "jury could *reasonably* find for the plaintiff" on the objective component of Crispin's deliberate indifference claim. *Jeffreys*, 426 F.3d at 554 (internal quotation marks and citation omitted) (emphasis in original).

The same is true of the subjective, *mens rea*, component. The inquiry is whether Defendants "kn[e]w[] of and disregard[ed] an excessive risk to inmate health or safety[.]" *Smith*, 316 F.3d at 184 (internal quotation marks and citation omitted). As detailed above, each defendant acknowledged the risk that Crispin's mental health conditions posed to his health or safety and each recognized his need for psychiatric care. But there is no genuine issue of material fact insofar as *none* of these defendants "disregard[ed]" that risk. *Id*.

Indeed, to the contrary, these defendants collaborated with each other and Crispin, ECF No. 150-2 at ¶ 38, conducted evaluations and tests, *id*. at ¶¶ 12, 39, reformulated Crispin's

medication regimen as needed, *id*. at ¶¶ 16, 26–27, 48, and met with Crispin numerous times over several months to monitor his progress. *Id*. at ¶¶ 29–30, 33, 47. That Crispin may have preferred different medications, *id*. at ¶¶ 53, 57, does not demonstrate that any of these Defendants acted with deliberate indifference to Crispin's needs. It is undisputed that the treatment provided was "based on [defendants'] sound medical judgment." *Clark*, 693 F. Supp. 3d at 286; *see also Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *12 (D. Conn. Mar. 2, 2007) (concluding that plaintiff failed to satisfy subjective component because medical staff "utilized sound medical judgment" in deciding not to treat prisoner's Hepatitis C condition).

Because there is no genuine dispute of material fact to exist as to either component of Crispin's deliberate indifference claim, summary judgment must enter in favor of Defendants Reischerl, Patel, Pieri, Torre, and Kuzebski on the merits.[6]

**Conclusion**

For the foregoing reasons, the claims against Jackson 1, Callahan, APRN/Dr. Doe and Bentos are DISMISSED. The Motion for Summary Judgment by Defendants Rodriguez, Maiga, Reischerl, Torre, Patel, Kuzebski and Pieri is GRANTED. The Clerk is directed to enter judgment and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 5th day of May 2026.

        */s/ Kari A. Dooley*
        KARI A. DOOLEY
        UNITED STATES DISTRICT JUDGE

---

[6] Because the Court has determined that there is no genuine issue of material fact as to whether a constitutional violation occurred — none did — it need not address Defendants' alternative argument that they are entitled to qualified immunity. *Duamutef v. Hollins*, 297 F.3d 108, 113 n.1 (2d Cir. 2002) (Once a court "decide[s] that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity").